ADRIANO L. MARTINEZ (State Bar No. 237152)
YASMINE L. AGELIDIS (State Bar No. 321967)
CANDICE L. YOUNGBLOOD (State Bar No. 328843)
amartinez@earthjustice.org
yagelidis@earthjustice.org
cyoungblood@earthjustice.org
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
T: (415) 217-2000 / F: (415) 217-2040

*Attorneys for Plaintiffs CleanAirNow and Sierra Club*

MAYA D. GOLDEN-KRASNER (State Bar No. 217557)
SCOTT B. HOCHBERG (State Bar No. 305567)
mgoldenkrasner@biologicaldiversity.org
shochberg@biologicaldiversity.org
Climate Law Institute
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
T: (510) 844-7119 / F: (510) 844-7150

*Attorneys for Plaintiff Center for Biological Diversity*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CLEANAIRNOW; CENTER FOR BIOLOGICAL DIVERSITY; and SIERRA CLUB, | ) ) ) ) |
| Plaintiffs, | ) **COMPLAINT FOR DECLARATORY** ) **AND INJUNCTIVE RELIEF** |
| v. | ) ) |
| LOUIS DEJOY, in his official capacity as U.S. Postmaster General; and U.S. POSTAL SERVICE, | ) ) ) ) |
| Defendants. | ) ) |

1

## INTRODUCTION

2  1.  Plaintiffs challenge the United States Postal Service's ("Postal Service" or "USPS")

3 unlawful decision to replace up to 165,000 postal delivery vehicles—a significant majority of the

4 agency's active vehicle fleet—without first performing a lawful environmental review as required

5 under the National Environmental Policy Act ("NEPA"). The crux of this case is that the Postal

6 Service performed its NEPA analysis too late, and the analysis it did finally prepare was incomplete,

7 misleading, and biased against cleaner vehicles. The Postal Service finalized its Next Generation

8 Delivery Vehicles ("NGDV") plan to purchase approximately 90% internal combustion engine

9 ("ICE" or "gas") and 10% electric ("EV") postal delivery vehicles before properly analyzing the

10 environmental effects of its decision. Astoundingly, the Postal Service signed a contract *and* agreed

11 to pay millions of dollars for these vehicles first, *before* beginning its environmental analysis to

12 justify its action, in blatant violation of NEPA. As the largest government fleet in the nation, the

13 Postal Service's improper action will not only needlessly pollute every American community for

14 decades to come, but it will also cost millions more in taxpayer funds and leave the agency

15 vulnerable to fluctuating fuel prices.

16  2.  When the Environmental Protection Agency ("EPA") and the President's Council on

17 Environmental Quality ("CEQ") pointed out the flawed calculations and reasoning in the Postal

18 Service's environmental review, the Postal Service ignored its sister agencies' concerns. The Postal

19 Service proceeded to finalize its NEPA review and move forward with its plan anyway.

20  3.  Specifically, in January 2015, the Postal Service issued a request for information for

21 various postal delivery vehicle prototypes. Shortly thereafter, the agency selected and ordered

22 prototypes for ICE vehicles, EVs, and hybrid options. On February 23, 2021, the Postal Service

23 formalized a contract with Oshkosh Defense ("Oshkosh") to produce up to 165,000 vehicles. The

24 terms of the contract noted the initial order would be fulfilled in 2023. At the same time, the Postal

25 Service issued the first payment for this order, totaling $482 million. Only *after* its lengthy call for

26 prototypes, evaluation and research of different vendors, finalization of the contract, and issuance of

27 its first payment—a process that took over 6 years—did the Postal Service begin its environmental

28 review as required by NEPA. It issued a Draft Environmental Impact Statement ("EIS") for the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NGDV Acquisition on August 26, 2021, and a Final EIS on January 7, 2022. *See* Notice of Availability of Draft Environmental Impact Statement for Purchase of Next Generation Delivery Vehicle, 86 Fed. Reg. 47,662 (Aug. 26, 2021) ("Draft EIS"); Notice of Availability of Final Environmental Impact Statement for Purchase of Next Generation Delivery Vehicles, 87 Fed. Reg. 994 (Jan. 7, 2022) ("Final EIS").

4.      Despite the Postal Service's glaring failure to perform a timely NEPA review, there is no question that the agency was well-aware of its obligations under NEPA. Indeed, almost 25 years ago, the Postal Service formalized the current iteration of its NEPA regulations and issued internal documents proclaiming the importance of NEPA review. 39 C.F.R. pt. 775; *see, e.g.*, U.S. Postal Serv., Facilities Environmental Guide, Handbook RE-6 (Dec. 1997).

5.      Criticism of the Draft EIS was swift and overwhelming. The agency received over 35,000 comments from federal and state agencies, scientists, labor organizations, environmentalists, and members of the public, among many others. Commenters raised several concerns, including the untimeliness of the Postal Service's environmental review process, and that the Draft EIS rested on faulty assumptions. Specifically, the Center for Biological Diversity (the "Center") and Sierra Club highlighted that the Postal Service's review relied on flawed estimates to justify purchasing almost entirely ICE vehicles. Some concerns raised included that the Postal Service's estimates for battery costs were unrealistically high, while its evaluations of gas prices were unreasonably low. Commenters also noted that the Draft EIS dramatically underestimated the mileage range for EVs, ignoring the fact that EVs on the market today already surpass the figure the Postal Service relied on. Further, commenters explained that the Draft EIS underestimated the benefits of EVs in reducing greenhouse gas ("GHG") emissions, especially as the power sector increasingly relies on renewable energy. Commenters also raised that the Postal Service's award of the purchase contract to Oshkosh before performing the environmental review process violated NEPA.

6.      Several governmental agencies also criticized the environmental review. EPA called the EIS "seriously deficient" and "inconsistent with the requirements of NEPA." CEQ noted that the Postal Service "committed to walk down a path before looking to see where that path was leading," an approach that conflicts with NEPA's requirements. The Bay Area Air Quality Management

District ("BAAQMD") explained that the proposed action would delay the transition to clean technologies and hinder the California Bay Area's progress toward improving local air quality and reducing GHG emissions, particularly in communities with environmental justice concerns. Despite these agencies' requests that the Postal Service take time to reexamine its work, the Postal Service pressed on and issued a Record of Decision ("ROD") on February 23, 2022. Next Generation Delivery Vehicles Acquisitions, 87 Fed. Reg. 14,588, 14,589 (Mar. 15, 2022).

7.      The NGDV Acquisition comes at a pivotal moment in the federal government's efforts to slow the effects of climate change. President Biden has committed to channeling the "whole of government" to combat climate change, and he has specifically pledged to electrify all federal fleets, including USPS vehicles. *See* Executive Order 14008: Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7,619, 7,624 (Jan. 27, 2021).

8.      There are good reasons for this. Electrifying the Postal Service fleet would reduce smog and particulate matter pollution in nearly every neighborhood in America. Postal delivery routes are stop-and-go by nature, which means that gas-powered delivery vehicles idle just outside people's homes for much of the day. This daily pollution impacts nearly every single resident in the country, but the harmful effects of this pollution are felt most significantly by low-income communities of color, which are often forced to breathe compounding sources of pollution. Indeed, highways, ports, railyards, and oil refineries are often located in or near low-income communities of color, exacerbating the daily, negative health impacts these communities experience. Transitioning the postal fleet to zero-emissions would remove many otherwise polluting vehicles from this harmful equation.

9.      In addition, transitioning one of the world's largest civilian fleets to zero-emissions would have a meaningful impact on reducing GHG emissions, which are the primary driver of climate change. Indeed, the Final EIS estimates that the NGDV Acquisition would emit 309,270 metric tons of carbon dioxide per year. EPA estimates the Acquisition will result in more than three times that amount, at 975,534 tons per year. Either figure makes clear that the GHG emissions from the Postal Service's NGDV Acquisition are significant.

10.     On top of this, the Postal Service itself would benefit from electrifying its fleet. In fact, the Final EIS estimates that the current ICE fleet burns 135 million gallons of fuel per year, and that in 2020, the fleet burned an astounding 180 million gallons of gasoline. Final EIS at G-2, 4-6. Electrifying the postal fleet would dramatically reduce, or even eliminate, Postal Service gasoline costs in the coming decades—a surely welcome cost saving given the significant and often unpredictable nature of fuel price fluctuations. But instead, the Postal Service doubled down on its reliance on fossil fuels for the foreseeable future, a decision that could cost the agency—and ultimately taxpayers—hundreds of millions of dollars.

11.     For these reasons, Plaintiffs CleanAirNow, Center for Biological Diversity, and Sierra Club (collectively, "Plaintiffs") challenge the Postal Service's Final Environmental Impact Statement on Next Generation Delivery Vehicle Acquisitions and its Record of Decision related to the vehicle acquisition. *See* 87 Fed. Reg. 994; 87 Fed. Reg. 14,588. Plaintiffs seek a declaration that the Postal Service's EIS violated NEPA, as well as vacatur of the EIS and the ROD until the Postal Service complies with applicable law. Plaintiffs also ask the Court to enjoin the Postal Service from taking any action under the NGDV Acquisition until Defendants demonstrate lawful compliance with NEPA.

## JURISDICTION AND VENUE

12.     This case arises under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*; the Council on Environmental Quality's NEPA regulations, 40 C.F.R. pts. 1500–1508; and the Postal Service's NEPA regulations, 39 C.F.R. pt. 775.

13.     As a federal agency, the Postal Service is subject to the requirements of NEPA. 42 U.S.C. § 4332; 40 C.F.R. § 1500.3(a); *see also Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140 (9th Cir. 2000); *Chelsea Neighborhood Ass'ns v. U.S. Postal Serv.*, 516 F.2d 378 (2d Cir. 1975).

14.     Plaintiffs have a cause of action to enforce the Postal Service's violations of NEPA, the CEQ's NEPA regulations, and the Postal Service's NEPA regulations as arbitrary and capricious, a violation of the requirement for reasoned decision-making, and in exceedance of the Postal Service's statutory authority.

15.    The challenged agency action is final.

16.    The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States) and 39 U.S.C. §§ 401(1), 409 (suits against the Postal Service). This Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and its equitable powers.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because this complaint seeks relief against an agency of the United States, and defendant Louis DeJoy is an officer or employee of the United States acting in his official capacity; plaintiff Sierra Club is headquartered in this District; plaintiff Center for Biological Diversity is incorporated and has an office in this District; and no real property is involved in the action.

18.    Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of this action to any particular location or division of this Court.

**PARTIES**

19.    Plaintiff CleanAirNow is a leading non-profit environmental justice organization in the Midwest that is dedicated to improving air quality and addressing environmental injustice in the counties that compose the Kansas City metro area, with a particular focus on overburdened communities impacted by environmental health hazards associated with cumulative pollution exposure. CleanAirNow is especially committed to preventing and mitigating disease caused by air pollution in the communities that are forced to suffer the greatest health burdens from these injustices. Specifically, CleanAirNow works extensively on cleaning up transportation pollution, including pollution from medium- and heavy-duty trucks. CleanAirNow also works to clean up industrial sources of pollution and is very concerned about the impacts of oil and gas transport and dispensing in the region where it works. CleanAirNow is a member of the Moving Forward Network, which is a nationwide coalition of grassroots organizations committed to addressing the pollution burdens from the freight and logistics industry.

20.    CleanAirNow is a membership organization that holds regular meetings to strategize how best to address air pollution and environmental injustice in the Kansas City metro area. CleanAirNow's members are impacted by transportation pollution every day. CleanAirNow's

members have an interest in reducing the air quality and noise pollution in and around their homes, neighborhoods, places of work, schools, and parks. CleanAirNow's members also have an interest in minimizing and eliminating additional harms to their members' health from the Postal Service's decision to procure such a high percentage of ICE vehicles.

21.     Among CleanAirNow's impacted members is Atenas Mena, who lives in Kansas City, Missouri. Ms. Mena grew up in an area greatly impacted by industrial pollution, and she remains concerned about industrial and transportation pollution impacts on her health. She must remain constantly vigilant about the cumulative impacts of pollution from postal delivery vehicles that drive through her neighborhood every day to deliver mail. Another CleanAirNow member, Beto Lugo Martinez, who lives in Kansas City, Missouri, has deep concerns about the continued investments in gas-powered postal trucks. Mr. Martinez works on cleaning up transportation pollution, and he is familiar with zero-emission options for medium-duty trucks. Postal vehicles deliver mail in his neighborhood, and he is concerned about the pollution impacts on his and his partner's health.

22.     Plaintiff Center for Biological Diversity is a national nonprofit membership organization incorporated and with a major office in the Northern District of California, and with its headquarters in Tucson, Arizona. The Center has over 89,000 members and more than 1.7 million supporters throughout the United States dedicated to the protection of endangered species and the environment. Combining conservation biology with litigation, policy advocacy, creative communications and strategic vision, the Center is working to protect the lands, water, air, and climate that all living species need to survive.

23.     The Center's Climate Law Institute, in particular, works to curb greenhouse gas and other air pollution, in order to limit the damaging effects of climate change and air pollution on endangered species, their habitats, and human health. For instance, the Center was a Plaintiff in *Massachusetts vs. EPA*, which resulted in the landmark Supreme Court decision finding that greenhouse gases are pollutants under the Clean Air Act. *Massachusetts v. EPA*, 549 U.S. 497 (2007). The Center has submitted comments on and litigated many successive vehicle rules under the Energy Policy Conservation Act, the Clean Air Act, and NEPA. For example, when the National

Highway Traffic Safety Administration issued a rule preempting state greenhouse gas emissions standards and zero-emission mandates and EPA withdrew California's Clean Air Act waiver allowing it to set those standards (84 Fed. Reg. 51,310 (Sept. 27, 2019)), the Center challenged the preemption rule and waiver withdrawal. *Union of Concerned Scientists v. Nat'l Highway Traffic Safety Admin.*, No. 19-1230 (D.C. Cir. filed Nov. 25, 2019).

24.     Air pollution and greenhouse gas emissions from Postal Service vehicles harm the health, welfare, economic, recreational, and aesthetic interests of the Center's members. Climate change is already driving many animals and plants to extinction; increasing temperatures, causing droughts, flooding and sea level rise; and affecting the livelihoods and property of Center members. Center members are increasingly less able to, and sometimes altogether prevented from, viewing, photographing, and enjoying wildlife threatened by climate change and from recreating in wilderness areas undergoing rapid climate change. They are deprived of the aesthetic and recreational enjoyment that stems from such activities, and experience worry, upset, and other significant emotional injury because of it. Some of the Center's members suffer from pulmonary diseases such as asthma from the smog-forming co-pollutants emitted by vehicles and from refineries used to process fuels. Those co-pollutants include volatile organic compounds, sulfur dioxide, nitrogen oxides, and fine particulate matter.

25.     Among the Center's affected members is Jennifer Molidor in Cloverdale, California. Ms. Molidor spends a part of almost every day gardening outside with her son and taking long walks along the Russian River near her house. Postal trucks drive by her home and through her neighborhood several times a day, and she lives near a busy intersection that draws pollution from other postal trucks completing their routes. Ms. Molidor has asthma, which is exacerbated when the air quality is worse. Another Center member, Mary K. Reinhart, lives in Scottsdale, Arizona. She goes running in her neighborhood six days a week, and sometimes she is caught behind a gas-burning postal truck as it completes its route. She also hikes and walks her dog in local parks. Ms. Reinhart lives near a busy six-lane roadway, which adds constant noise and vehicle exhaust to her community. Gas-burning postal trucks exacerbate this pollution and endanger her ability to exercise outside and enjoy her neighborhood.

26.     Plaintiff Sierra Club is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. The Sierra Club has over one million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out those objectives. The Sierra Club has chapters and members in every state.

27.     The Sierra Club actively works toward the widespread shift to electric vehicles as a way to reduce emissions. This work includes advocacy for policies at all levels of government to make EVs more affordable; pushing for investments in EVs from the utility sector; outreach on the benefits of EVs; and campaigning for public transportation and school adoption of electric buses. In 2016, the Sierra Club published Rev Up Electric Vehicles, the first multi-state study of the EV shopping experience. The Sierra Club is a co-presenter of the annual National Drive Electric Week and a member of the EV Charging Initiative.

28.     Among Sierra Club's members impacted are Hadrien Dykiel. Mr. Dykiel lives in Evergreen, Colorado, which is located in an area that is in nonattainment of the Clean Air Act's National Ambient Air Quality Standards for ozone. Mr. Dykiel has an infant son who is particularly susceptible to the impacts of air pollution. The Dykiel family enjoys outdoor activities, including walking and running, but they alter their activities based on air pollution levels. Mr. Dykiel sees several postal vehicles travel in his neighborhood daily. He is very concerned that continued reliance on gas postal vehicles will impact air quality in his neighborhood. He is also concerned about the large number of postal vehicles in the Denver region contributing to poor air quality where he lives and works. Another Sierra Club member, Alexa Cameron, lives in Denver, Colorado, close to a large USPS distribution facility and in a nonattainment area for ozone. Ms. Cameron can clearly see the USPS facility and postal delivery vehicles when she is driving to and from her home. Ms. Cameron is an avid runner who used to run semi-competitively; she currently trains 3 to 4 days per week on a trail that she believes is impacted by postal vehicle pollution from a large USPS distribution facility. Ms. Cameron monitors the daily air quality and alters her training schedule on days with poor air quality. Ms. Cameron is highly concerned that the continued use of gas vehicles at the USPS facility

near her home will worsen the local air quality and continue to impact her ability to recreate outdoors.

29.     Defendant Louis DeJoy is sued in his official capacity as Postmaster General. The Postmaster General is the chief executive officer of the Postal Service. *Id.* § 203.

30.     Defendant Postal Service is "an independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 201. The Postal Service may be sued in its official name. *Id.* § 401.

## LEGAL BACKGROUND

### I.     National Environmental Policy Act

31.     NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (1978). At its core, NEPA is guided by the principle that "[s]imply by focusing the agency's attention on the environmental consequences of a proposed project, . . . important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

32.     The statute has twin aims: (1) it "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" from the action; and (2) it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.*

33.     To fulfill these goals, the statute imposes procedural requirements "designed to force agencies to take a 'hard look' at environmental consequences." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) (citation omitted). Agencies must prepare an environmental impact statement for federal actions that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 868 (9th Cir. 2020). The EIS "shall be prepared early enough so that it can serve as an important practical contribution to the decision-making process and will not be used to rationalize or justify decisions already made." 40 C.F.R. § 1502.5.

1

**II.     The Postal Service, the Postal Reorganization Act, and NEPA**

2

34.     The Postal Service, as a federal agency, is subject to NEPA's requirements, including

3

the duty to prepare a thorough, detailed EIS. 42 U.S.C. § 4332; 40 C.F.R. § 1500.3(a); *Akiak Native*

4

*Cmty.*, 213 F.3d at 1144; *Chelsea Neighborhood Ass'ns*, 516 F.2d at 386.

5

35.     Congress adopted the Postal Reorganization Act ("PRA"), *see* Pub. L. No. 91-375, 84

6

Stat. 719 (1970), to "eliminate outmoded 'legislative, budgetary, financial, and personnel files' so

7

that the Postal Service could employ 'modern management and business practices' to provide the

8

American public with 'efficient and economical postal service.'" *Carlson v. U.S. Postal Serv.*, No.

9

13-cv-06017-JSC, 2015 WL 9258072, at *3 (N.D. Cal. Dec. 18, 2015) (quoting H.R. Rep. No. 91-

10

1104, 91st Cong., 2d Sess., at 2 (1970), *reprinted in* 1970 U.S.C.C.A.N. 3649, 3650).

11

36.     The PRA directs the Postal Service to operate in a more "businesslike way," but with

12

"appropriate safeguards against abuse" of its responsibility for managing the postal system and

13

"appropriate assurances of continued congressional surveillance." H.R. Rep. No. 91-1104 at 5,

14

*reprinted in* 1970 U.S.C.C.A.N. at 3653.

15

37.     The PRA exempts the Postal Service from some federal laws, unless "such laws

16

remain in force as rules or regulations of the Postal Service." 39 U.S.C. § 410(a). The PRA does not

17

exempt the Postal Service from NEPA. *Chelsea Neighborhood Ass'ns*, 516 F.2d at 386.

18

38.     The Postal Service has promulgated its own agency-specific NEPA procedures. 39

19

C.F.R. pt. 775; *see also Akiak Native Cmty.*, 213 F.3d at 1144 ("There is no longer any dispute that

20

the Postal Service has adopted the relevant provisions of . . . NEPA.").

21

39.     In its regulations, the Postal Service states that it is the agency's policy to "[i]nterpret

22

and administer applicable policies, regulations, and public laws of the United States in accordance

23

with the policies set forth in the National Environmental Policy Act, as amended, and the NEPA

24

Regulations." 39 C.F.R. § 775.2(a).

25

40.     It is also the Postal Service's policy to "[m]ake the NEPA process useful to Postal

26

Service decision makers and the public," *id.* § 775.2(b), and to "[u]se the NEPA process to identify

27

and assess reasonable alternatives to proposed actions in order to avoid or minimize adverse effects

28

on the environment," *id.* § 775.2(e).

41.     The Postal Service has also acknowledged that NEPA applies to its proposed NGDV Acquisition. The agency noted that it developed this EIS "[p]ursuant to the requirements of the National Environmental Policy Act of 1969 . . . , its implementing procedures at 39 CFR 775, and the Council on Environmental Quality Regulations (40 CFR parts 1500–1508)." 87 Fed. Reg. 994, 994. The Postal Service also provided, in its Notice of Intent to Prepare an EIS for the proposed NGDV Acquisition, that it is the "intent of the U.S. Postal Service, pursuant to the requirements of" NEPA and its implementing regulations "to prepare an EIS to evaluate the environmental impacts of the proposed action" and alternatives. 86 Fed. Reg. 12,715, 12,715.

42.     A reviewing court should set aside the Postal Service's EIS if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Akiak Native Cmty.*, 213 F.3d at 1144 (quoting 5 U.S.C. § 706(2)(A)).

43.     An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

44.     Moreover, the agency's factual determinations "must be supported by substantial evidence." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759 (9th Cir. 2014).

45.     In order to establish that the action is neither arbitrary nor capricious, the Postal Service "must articulate a rational connection between the facts found and the conclusions made." *Env't. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 858 n.36 (9th Cir. 2003).

**III.     NEPA Requirements for an Environmental Impact Statement**

46.     Under the Postal Service's NEPA regulations, the agency must prepare an "analytic" EIS that contains "discussions of impacts," including all direct, indirect, and cumulative impacts, "in proportion to their significance." 39 C.F.R. § 775.11(b)(2).

47.     Courts employ a "rule of reason" analysis to determine the adequacy of an EIS under NEPA, which involves evaluating "whether the agency took a sufficiently 'hard look' at probable consequences." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020) (citation omitted). Put another way, the "rule of reason" standard demands "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted).

48.     Agencies only satisfy this "hard look" standard if they prepare an EIS "before any irreversible and irretrievable commitment of resources is made." *California v. Norton*, 311 F.3d 1162, 1168 (9th Cir. 2002) (citation omitted). It is critical that the EIS not be used "to justify decisions already made," but instead "[s]erve to assess the environmental impact of proposed actions." 39 C.F.R. § 775.11(b)(2).

49.     In pursuit of this principle, "NEPA emphasizes the early presentation of relevant information to facilitate reaching fully informed decisions." *Ctr. for Biological Diversity*, 982 F.3d at 735 (citation omitted).

50.     Preparing an EIS "necessarily involves some degree of forecasting," and the agency "must use its best efforts to find out all that it reasonably can" when assessing the environmental impacts of the proposed action. *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975).

51.     The alternatives and mitigation portion of the EIS is one of the most "vitally important" sections of the environmental review process. 39 C.F.R. § 775.11(c)(5). Under the Postal Service's regulations, the agency is required to "[s]tudy, develop, describe, and evaluate at all decision points, reasonable alternatives to recommended actions which may have a significant effect on the environment," including the "no action" alternative. *Id.* §§ 775.8(a)(4), 775.11(c)(5); *see also Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985) ("The existence of a viable but unexamined alternative renders an environmental impact statement inadequate.").

52.     It is critical that the agency "[d]evote substantial treatment" to its evaluation of each alternative and consider each "in detail" so that reviewers "may evaluate their comparative merits." 39 C.F.R. § 775.11(c)(5). The analysis should also "discuss the reasons for eliminating any alternatives." *Id.*

53.     Moreover, the Postal Service's evaluation of "each reasonable alternative" must describe "each affected element of the environment . . . , followed immediately by an analysis of the impacts." *Id.* § 775.11(c)(6). Among other things, this analysis should include "[a]ny adverse environmental effects which cannot be avoided should the action be implemented," and "[a]ny irreversible or irretrievable commitments of resources" if the action is implemented. *Id.*

54.     Likewise, NEPA requires agencies to disclose the underlying data on which the environmental analysis is based, including the methods used, the "scientific and other sources relied on for conclusions," a summary of "existing credible scientific evidence relevant to evaluation of the impacts," and "an evaluation of such impacts on the basis of theoretical approaches or generally accepted research methods." *Id.* §§ 775.11(b)(6), 775.11(b)(8). Agencies fail to meet the "hard look" standard if they rely on incorrect assumptions or data. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005) (citation omitted).

55.     The Postal Service is also required to hold public hearings on the EIS whenever a "request for a hearing [is made] by an agency with jurisdiction over or special expertise concerning the proposed action," if there is a "[s]ubstantial environmental controversy concerning a proposed action and [there is] a request for a hearing by any responsible individual or organization," or if there is a "reasonable expectation that a hearing will produce significant information not likely to be obtained without a hearing." 39 C.F.R. § 775.14(a)(1)–(3).

## IV.     The EIS's Environmental Justice Analysis and Review

56.     Executive Order 12,898 requires all federal agencies to "make achieving environmental justice part of [their] mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of [their] programs, policies, and activities on minority populations and low-income populations" to the "greatest extent practicable and permitted by law." Executive Order 12,898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations, § 1-101, 59 Fed. Reg. 7,629 (Feb. 16, 1994) ("Environmental Justice Order").

57.     The Environmental Justice Order requires that federal agencies conduct "environmental justice" analyses by "collect[ing], maintain[ing], and analyz[ing] information on the

race, national origin, income level, and other readily accessible and appropriate information for areas

surrounding facilities or sites expected to have a substantial environmental, human health, or

economic effect on the surrounding populations." *Id.* § 3-302(b).

58.     While the Environmental Justice Order does not create a private right to judicial

review, once an agency has "exercised its discretion to include the environmental justice analysis in

its NEPA evaluation, . . . that analysis therefore is properly subject to 'arbitrary and capricious'

review under the APA." *Cmties. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C.

Cir. 2004); *see also Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321,

1330 (D.C. Cir. 2021) ("[A] petitioner may challenge an agency's environmental justice analysis as

arbitrary and capricious under NEPA and the APA.").

# FACTUAL AND PROCEDURAL BACKGROUND

## I.     Postal Delivery in the United States

59.     The United States Postal Service is required to "provide prompt, reliable, and

efficient services to patrons in all areas and shall render postal services to all communities." 39

U.S.C. § 101(a). It must "maintain an efficient system of collection, sorting, and delivery of the mail

nationwide," and "establish and maintain postal facilities of such character and in such locations,

that postal patrons throughout the Nation will, consistent with reasonable economies of postal

operations, have ready access to essential postal services." *Id.* § 403(b)(1), (3).

60.     The Postal Service has "specific powers" to meet these requirements, including "to

provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of

mail" and "to determine the need for post offices, postal and training facilities and equipment, and to

provide such offices, facilities, and equipment as it determines are needed." *Id.* § 404(a)(1), (3). The

Postal Service also has "general powers," including "to adopt, amend, and repeal such rules and

regulations . . . as may be necessary in the execution of . . . such other functions as may be assigned

to the Postal Service under any provisions of law" and "to have all other powers incidental,

necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." *Id.*

§ 401(2), (10).

61.     The Postal Service's fleet consists of roughly 212,000 delivery vehicles. Final EIS, at 1-1. It is one of the largest civilian fleets in the world and the largest government fleet in the country.

62.     An important vehicle type that the Postal Service owns and operates are purpose-built, right-hand drive light delivery vehicles. These vehicles have been labeled "Long-Life Vehicles" ("LLVs"). Of the approximately 212,000 delivery vehicles in the fleet, more than 141,000 of these vehicles are LLVs. *See* Final EIS at 1-1, G-2.

63.     There is no dispute that these vehicles have been in operation for decades, long past their intended lifespan. LLVs lack basic features such as airbags and anti-lock brakes. *Id.* at 2-2. They also each average over $5,000 in annual maintenance costs, and the total average annual maintenance costs exceeds $700 million for these vehicles. *See id.* at C-2.

64.     Current LLVs have an average fuel efficiency of 8.2 miles per gallon ("mpg"). Final EIS at G-2. The Postal Service estimates the total gasoline usage for these vehicles is over 97 million gallons per year. *Id.*

65.     The Final EIS states that the 165,000 vehicles poised for replacement burned 180 million gallons of gasoline in 2020. Final EIS at 4-6. Yet, at the same time, the Final EIS's analysis assumes the fleet burns 135 million gallons of gasoline per year. Final EIS at 4-6. The Final EIS does not explain this discrepancy.

**II.     The Role of Electric Vehicles in Addressing the Climate Crisis and Air Pollution**

66.     Emissions of greenhouse gases from the transportation sector pose mortal dangers to public health and the environment, as they accelerate climate change. The U.S. is battered by a never-ending stream of disastrous weather events, from unrelenting heat waves and droughts to raging wildfires and extreme rainfall and flooding. Many of these events are clearly attributable to the deteriorating climate and are already costing the U.S. economy billions of dollars in damages, with economic losses worsening with each additional ton of carbon pollution.

67.     According to the Intergovernmental Panel on Climate Change's 2022 Sixth

Assessment Report ("IPCC Report"),[1] we have a narrow and rapidly closing window in which we

can act to limit warming to close to 1.5 degrees Celsius, the international goal set to avoid the worst

catastrophic damages to the U.S. and the rest of the world. To stay close to or below 1.5 degrees, the

IPCC Report states that the world must slash fossil fuel production and stop building new fossil fuel

infrastructure—including gas-powered vehicles—that will lock in future carbon emissions. Instead,

governments must redirect investment to electrification and renewable energy. Combustion vehicles

sold over the next 10 years could be on the road for 20 or more years, meaning that the consequences

of USPS's NGDV Acquisition plan will be felt decades into the future.

68.     According to the American Lung Association,[2] more than 4 in 10 Americans live in

communities with unhealthy levels of air pollution. Air pollution, including particulate matter and

smog, causes or exacerbates health harms, including shortness of breath, asthma attacks, worsening

Chronic Obstructive Pulmonary Disease, lung cancer, increased infant mortality, increased hospital

admissions for cardiovascular disease, and premature death. These health effects are even more

acute in communities that live near highways, busy roads, and depots, including Postal Service

depots, many of which are in low-income communities and communities of color.

69.     Transitioning to EVs will help ameliorate these climate and health impacts. The IPCC

Report notes that transitioning to EVs powered by low-emissions electricity is essential for

decarbonizing transportation and meeting the 1.5-degree warming goal. EVs do not require gasoline

and do not emit tailpipe pollution or greenhouse gas emissions. EV battery prices are falling rapidly,

along with the overall cost of EVs. At the same time, EV sales are skyrocketing. Some automakers

---

[1] *See* Intergovernmental Panel on Climate Change, Sixth Assessment Report, Climate Change 2022: Impacts, Adaptation and Vulnerability (Working Group II) (Feb. 2022), https://www.ipcc.ch/report/ar6/wg2/downloads/report/IPCC_AR6_WGII_FinalDraft_FullReport.pdf; Climate Change 2022: Mitigation of Climate Change (Working Group III) (April 2022), https://report.ipcc.ch/ar6wg3/pdf/IPCC_AR6_WGIII_FinalDraft_FullReport.pdf.

[2] American Lung Association, Zeroing in on Healthy Air: A National Assessment of Health and Climate Benefits of Zero-Emission Transportation and Electricity, at 4 (2022), https://www.lung.org/getmedia/13248145-06f0-4e35-b79b-6dfacfd29a71/zeroing-in-on-healthy-air-report-2022.pdf.

have announced plans to fully electrify their models by 2035, and almost all have announced new

electric models they will debut in the coming years.

70.     In line with these findings, the federal government is committed to transitioning to

EVs for federal fleets. The government wants both the direct climate change benefits and overall

cost savings that come with EVs. It also wants to lead by example, so that other vehicle fleets will

follow in purchasing EVs. President Biden has issued an executive order for the development of a

clean vehicle procurement strategy, which specifically directed government agencies to only acquire

zero-emission light-duty vehicles by 2027. Executive Order 14057: Catalyzing Clean Energy

Industries and Jobs Through Federal Sustainability, 86 Fed. Reg. 70,935 (Dec. 13, 2021). This goal

will be impossible to meet if the Postal Service acquires thousands of ICE vehicles over the next 10

years.

**III.     NEPA Process**

71.     In 2015, the Postal Service issued a request for information related to replacing a

portion of its delivery fleet. Final EIS at 1-2. The Postal Service ordered prototypes based on bids for

a variety of types of vehicles. *Id.*

*72.*     On February 23, 2021, the Postal Service announced that it had selected Oshkosh

Defense for a 10-year contract to produce up to 165,000 new vehicles, beginning in 2023. *See* Postal

Service, Press Release, U.S. Postal Service Awards Contract to Launch Multi-Billion-Dollar

Modernization of Postal Delivery Vehicle Fleet (Feb. 23, 2021).

73.     The Postal Service did not begin its NEPA process until after it selected Oshkosh for

the 10-year contract.

74.     In 2020, Oshkosh stated in a securities filing that it lacked the "expertise or

resources" to produce EVs on a "cost-effective basis or at all." Oshkosh Corporation, Fiscal 2020

Annual Report on Form 10-K, at 22 (Nov. 18, 2020).[3]

---

[3] This filing is publicly available through the Securities and Exchange Commission. *See*
https://www.sec.gov/Archives/edgar/data/0000775158/000156459020054491/osk-
10k_20200930.htm.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

75. The Postal Service's contract with Oshkosh for the production of vehicles includes a "special provision" on NEPA, which states that the "Postal Service is required to comply with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.*"

76. In February 2021, the Postal Service made an initial task-order of $482 million. It had not completed its NEPA review prior to issuing this initial task order.

77. On March 4, 2021, the Postal Service published a Notice of Intent to prepare an EIS in the *Federal Register.*

78. On August 26, 2021, the Postal Service released a Draft EIS analyzing potential delivery vehicle replacements for public review and comment. 86 Fed. Reg. 47,662.

79. The Draft EIS's preferred alternative was to purchase up to 90% of the 165,000 vehicles as ICE vehicles. The Postal Service assumed an EV would have a range of 70 miles on a single charge, and the EIS projected that 12,500 routes, or about 5% of total routes, could not be served by EVs. Draft EIS at 3-2. For commercially available EVs, the draft considered only left-hand-drive vehicles, which were rejected because they could not support curb-side delivery. *See id.* at 4-12, 4-37.

80. The Sierra Club and the Center for Biological Diversity submitted comments in October 2021, explaining that the Draft EIS violated NEPA by failing to include reasonable alternatives in its analysis, using incorrect cost information, failing to take a hard look at air quality or socioeconomic impacts, lacking a proper analysis of cumulative effects, failing to consider environmental justice, and lacking any mitigation. These organizations also appended a technical report prepared by a mechanical engineer.

81. EPA also submitted comments on the Draft EIS. EPA determined the document was "inadequate and precludes meaningful consideration of the proposed action and alternatives." EPA further elaborated that it "did not believe a proper analysis was conducted" and explained "there was never an evidence-based careful consideration of the merits of each alternative." EPA recommended that the Postal Service revise the Draft EIS in a supplemental draft EIS.

82. BAAQMD also submitted comments on the Draft EIS, critiquing the reasoning behind the preferred alternative of 90% ICE vehicles. BAAQMD explained that the proposed action

1  would delay the transition to clean technologies and hinder the California Bay Area's progress

2  toward improved local air quality and reducing GHG emissions, particularly in communities with

3  environmental justice concerns. BAAQMD also noted that assumptions in the Draft EIS were based

4  on outdated EV technology and that the proposed action would likely cost the Postal Service and

5  taxpayers more in the long term due to ICE vehicles having higher operation and maintenance costs.

6  **IV.    Final EIS**

7      83.    The Postal Service published a notice of its Final EIS on January 7, 2022 in the

8  *Federal Register*. *See* 87 Fed. Reg. 994.

9      84.    The Final EIS included consideration of four alternatives in addition to the no-action

10  alternative: (1) purpose-built vehicles consisting of at least 10% EV and up to 90% combustion

11  engines; (2) purpose-built vehicles consisting of 100% EVs; (3) 100% commercially available right-

12  hand-drive combustion engine vehicles; and (4) 100% commercially available left-hand-drive EVs.

13  Final EIS at 3-4 to 3-7.

14      85.    The Postal Service failed to provide a reason for evaluating a 90% ICE and 10% EV

15  mix for the fleet as opposed to any other combination of powertrains.

16      86.    The Final EIS used an unsupported assumption that the batteries in electric delivery

17  vehicles would solely provide a 70-mile range per charge. This assumption does not account for

18  expected advancements in battery technology over the next decade. Moreover, battery technology at

19  the time of the Final EIS far exceeded this assumption.

20      87.    In the Final EIS, the Postal Service claimed that "approximately 12,500 delivery

21  routes" were too lengthy for EVs with the assumed 70-miles of total range. Final EIS at 3-2. This

22  represents approximately 5% of current routes. The average postal delivery route is 21.05 miles.

23      88.    The Final EIS acknowledged that "battery technology will improve in the future and

24  these routes may become suitable for a BEV [battery electric vehicle] in future years." *Id.* Despite

25  this acknowledgment, the Postal Service retained its limited alternatives analysis. Because of the

26  supposed operational constraints on roughly 5% of routes, neither 100% EV alternative could meet

27  the stated purpose and need of the EIS.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

89.     The Final EIS conceded that the Postal Service was not planning to retrofit any internal combustion engines with EV powertrains in the future.

90.     The Postal Service's analysis concluded that the 100% EV alternative would cost significantly more than its preferred alternative. The price of EVs is heavily influenced by battery costs because the most expensive component for an EV is its battery. But the Postal Service failed to use reasonable assumptions about battery costs in its analysis, instead using unrealistically high costs.

91.     The Final EIS included similarly unreasonably low assumptions of gasoline prices. The Draft EIS did not disclose the gas prices assumed for modeling. The Final EIS explained that it used a baseline national average of prices from October 2020 of $2.19 per gallon and the reference case from the Energy Information Administration ("EIA") to project increases up to $2.55 per gallon by 2040. By the time of the notice of intent to prepare an EIS, gasoline prices had already risen to $2.80 per gallon according to the EIA. Gas prices as of the time of this complaint are much higher than the assumptions used in the Postal Service's models.

92.     The Final EIS indicated the Postal Service would prioritize EVs for longer routes in order to maximize fuel and maintenance savings. The Final EIS failed to explain why it solely considered fuel and maintenance savings to determine which routes EVs should travel, as opposed to other factors like local air quality, environmental justice considerations, traffic congestion, distribution of EV charging infrastructure, programs by utilities to cover charging expenses, availability of state-level EV incentives, or noise. The analysis also provided no list of where those routes are located.

93.     The Postal Service erred in its emissions analyses for both internal combustion engines and EVs. According to EPA's analysis, the ICE delivery vehicles in the preferred alternative would emit 975,534 metric tons of carbon dioxide per year. The Draft and Final EIS assumed that the vehicles would emit an estimated 311,739 metric tons. This is more than a rounding error; it undercounts greenhouse gas emissions threefold. Despite EPA identifying this significant error in the Draft EIS, the Postal Service failed to correct it in the Final EIS. The Postal Service also failed to

consider future decreases of carbon intensity in the electric grid—thereby underestimating climate benefits of EVs.

94.     The Final EIS also did not analyze nitrogen oxides, volatile organic compounds, and particulate matter emissions. Although internal combustion engines emit significant amounts of these pollutants, the Postal Service failed to include an analysis that allowed it and the public to understand the benefits of EVs to reduce criteria pollutants compared to ICE vehicles.

95.     The Final EIS used Westchester County, New York, as a representative location for its emissions modeling analysis. The Postal Service selected this county because it has the most high-maintenance delivery vehicles in need of replacement. Westchester County has a high level of zero-carbon electricity, but the Postal Service did not account for this in its modeling of greenhouse gas emissions in the Final EIS. Instead, the Final EIS used a higher, national average in modeling the carbon intensity of the grid for the EV options. The resulting calculation therefore made the carbon emissions for EVs appear higher than they actually are.

96.     The Final EIS included no reasoned environmental justice analysis, even though the Postal Service explicitly stated in the Draft EIS that it intended to "consider the impacts of its actions on EJ communities of concern." Draft EIS at 4-5; *see also id.* ("[T]he Postal Service endeavors to fulfill the spirit of those non-mandatory requirements [of Executive Order 12,898] and consider the impacts of its actions on EJ communities of concern. This includes locations with high concentrations of minority and low-income populations.").

97.     Despite the numerous flaws in the Draft EIS, the Final EIS only minimally revised the draft. The Postal Service also failed to meaningfully respond to many of the comments submitted on the Draft EIS.

**V.     Criticism of Final EIS**

98.     After the Postal Service released the Final EIS, EPA issued a letter noting that its "review has determined that EPA's concerns with the Draft EIS were not adequately addressed and that the Final EIS remains seriously deficient." EPA Final EIS letter at 1.[4] EPA further noted that the

---

[4] A copy of this letter is provided in Appendix C of the ROD.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Final EIS's "deficiencies render the Final EIS inconsistent with the requirements of NEPA and its implementing regulations." *Id.*

99.     EPA noted the following deficiencies in the Final EIS:

Key deficiencies include the fact that contrary to NEPA's requirements, a contract for this proposal was awarded prior to the NEPA process, critical features of the contract are not disclosed in the EIS, important data and economic assumptions are missing in the EIS, and the EIS failed to consider a single feasible alternative to the proposed action. Specifically, the final EIS does not disclose essential information underlying the key analysis of Total Cost of Ownership (TCO), underestimates greenhouse gas (GHG) emissions, fails to consider more environmentally protective feasible alternatives, and inadequately considers impacts on communities with environmental justice concerns.

*Id.* EPA requested a supplemental EIS given the major flaws.

100.     EPA explained that the award of a contract for the delivery vehicles in advance of starting the environmental analysis violated NEPA regulations. It also described the Postal Service's total cost of ownership analysis as "flawed and out of date," explained that the Postal Service violated requirements to identify methodologies and make explicit reference to sources, and noted that the Postal Service inappropriately limited its choice of alternatives because of the advanced award of a contract.

101.     EPA concluded "the Postal Service must supplement its Final EIS to cure its infirmities and ensure it meets the basic requirements of NEPA." *Id.* at 2. EPA also requested a public hearing under the Postal Service's NEPA regulations based on its "serious concerns and jurisdiction over, and special expertise concerning, the proposed action related to motor vehicles and emissions." *Id.* at 3 (citing 39 C.F.R. § 775.14).

102.     EPA provided detailed explanations of the flaws in the Postal Service's (1) assessment of total cost of ownership; (2) analysis of greenhouse gas emissions, including underestimating ICE emissions and overestimating EV emissions; (3) analysis of mitigation and alternatives; and (4) consideration of environmental justice impacts.

1      103.    CEQ also issued a letter on the Final EIS. The letter urged the Postal Service to

2  comply with NEPA. CEQ reiterated EPA's "grave concerns with the adequacy of the environmental

3  review" that "warrant further examination" through a supplemental EIS. CEQ letter at 1.[5]

4      104.    CEQ explained that the Postal Service "committed to walk down a path before

5  looking to see where that path was leading" by awarding a contract for the delivery vehicles before

6  beginning NEPA review. *Id.* That "approach conflicts with longstanding NEPA practice and law."

7  *Id.*

8      105.    If the Postal Service failed to address its deficiencies under NEPA, CEQ explained

9  that "the Federal courts may compel [the Postal Service] to alter course." *Id.*

10      106.    The California Air Resources Board ("CARB") also issued a letter requesting a public

11  hearing under the Postal Service's NEPA regulations, a request for which the EPA stated its support

12  in its own letter on the Final EIS. EPA Final EIS letter at 3. "[A]n expert agency on vehicle

13  emissions and electrification," CARB requested a public hearing based on its "deep concerns about

14  the EIS's proposed decision to focus procurement on internal combustion vehicles rather than zero

15  emission." *Id.*

16      107.    Plaintiffs and several other organizations filed a letter on the Final EIS raising

17  concerns about the environmental review on February 4, 2022.

18      108.    Sixteen United States Senators and three Representatives submitted a letter to the

19  Postal Service on February 4, 2022 expressing concerns over the Final EIS and requesting a public

20  hearing.[6]

21  **VI.    Record of Decision**

22      109.    The Postal Service issued the Record of Decision on February 23, 2022. 87 Fed. Reg.

23  at 14,589.

---

[5] *Available at* https://www.whitehouse.gov/wp-content/uploads/2022/02/USPS_letter_02022022.pdf.
[6] *Available at*
https://climatecrisis.house.gov/sites/climatecrisis.house.gov/files/202202.04uspselectrificationletterfinal.pdf.

110.     The ROD states it was "prepared in accordance with the requirements of the National Environmental Policy Act, the Postal Service's implementing procedures at 39 CFR part 775, and the President's Council on Environmental Quality Regulations (40 CFR parts 1500–1508)." *Id.*

111.     The ROD indicates the Postal Service will purchase up to 148,500 ICE vehicles over the next 10 years.

112.     The ROD altered its description of alternatives by combining the 90% ICE alternative and the 100% EV alternative into one alternative described as the "proposed action." The EIS analysis did not change as a result of this change in the ROD.

113.     The Postal Service's response in the ROD also included new arguments purporting to support its EIS. For example, on the miles per gallon comparison between the current vehicles and proposed new ones, the Postal Service objected that EPA compared the proposed combustion engine mpg rating with the use of air conditioning to the existing vehicle's mpg rating without the use of air conditioning. *See id.* at 4. The Postal Service provided no evidence that letter carriers would not use air conditioning.

114.     The Postal Service stated in the ROD that it would not issue a supplemental EIS under 40 C.F.R. section 1502.9(d)(1) to address EPA's concerns. ROD at 2, 11. In its response to the EPA's comment that the environmental review included only a limited selection of alternatives, the Postal Service ignored alternatives suggested by EPA. *See id.* at 2-3 (discussing only the scoping phase and failing to mention the Draft EIS phase). The Postal Service claimed EPA "mischaracterize[d] the analysis of alternatives," *id.* at 3, but it failed to explain how EPA mischaracterized the analysis.

115.     The Postal Service conceded that the analysis used the price of gasoline from October 2020, prior to the scoping phase and subsequent NEPA documents. The Postal Service admitted these calculations were "used by Postal Service management at the time it determined which supplier" to use for acquiring new vehicles. *Id.* at 5.

116.     The Postal Service asserted that any differences in gasoline prices or electricity would not have "change[d] the fundamental comparisons of alternatives" in the EIS because the difference would be less than the $2.3 billion net differential between a 90% internal combustion fleet and a

100% EV fleet. *Id.* But that comparison was based on a long list of unsupported and incoherent assumptions that were critiqued by many commenters, including EPA, environmental groups, and local agencies like the BAAQMD.

117.    The Postal Service dismissed EPA and others' concern that it underestimated greenhouse gas emissions based on improper modeling entries, implying it was not relevant to its decision. *Id.* at 5-7.

118.    In response to EPA's critique that the Postal Service failed to consider deploying EVs in places with cleaner grids and therefore greater potential for emission reductions, the Postal Service asserted that its statutory mission does not include this consideration. *Id.* at 7. However, NEPA requires consideration of these types of benefits, in addition to the consideration of mitigation and alternatives.

119.    The ROD provided new details on the Postal Service's contract with Oshkosh. The Postal Service responded that EPA failed to timely raise its concern that the Postal Service's issuance of the contract award with Oshkosh was improperly early in the NEPA process. *Id.* at 9. The Postal Service ignored in this response that several entities, including Sierra Club and the Center, had raised this issue in comments.

120.    The Postal Service stated in the ROD that information provided by Oshkosh formed the basis of its analysis regarding the total cost of ownership for EVs. *Id.* at 9–10. The Postal Service conceded it did *not* consider industry forecasts or expert reports. The Postal Service also attacked one expert report as "biased," without evidence to substantiate these claims. *Id.* at 7. The Postal Service failed to explain how the information provided by Oshkosh was unbiased.

121.    Instead of addressing environmental justice impacts, and despite the agency's claim that it would do so, the Postal Service concluded without any provided analysis or support that no "one community is disproportionately impacted by the Preferred Alternative." *Id.* at 11.

122.    The Postal Service asserted that the ROD had "been prepared in accordance with the requirements of" NEPA, CEQ's NEPA regulations, and the Postal Service's NEPA regulations. *Id.* at 1.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

123. The Postal Service also rejected EPA's request for a public hearing, asserting that EPA had not made a timely request because the public comment period had expired. *Id.* at 11. However, the Postal Service's regulations include no such time limitation and instead state a public hearing "must be held *whenever*" any one of the stated criteria for a hearing is met. 39 C.F.R. § 775.14 (emphasis added).

124. The ROD provides no reference to CEQ's letter on the Final EIS.

125. The ROD provides no reference to the letter from sixteen Senators and three Congressional representatives.

126. Mark A. Guilfoil, the Postal Service's Vice President for Supply Management, signed the ROD as the responsible official.

127. The Postal Service provided no comment period on the ROD.

**FIRST CLAIM FOR RELIEF**
**(NEPA Violation:**
**Irreversible Commitment of Resources)**

128. Plaintiffs reallege and incorporate Paragraphs 1 through 127.

129. CEQ requires agencies to begin the NEPA process "at the earliest reasonable time." 40 C.F.R. § 1501.2(a). These regulations require that an EIS "will not be used to rationalize or justify decisions already made." *Id.* § 1502.5.

130. The Postal Service's regulations similarly require that the EIS "must . . . [s]erve to assess the environmental impact of proposed actions, rather than to justify decisions already made." 39 C.F.R. § 775.11(b)(2)(vi).

131. NEPA's requirement that agencies prepare an EIS is intended to require forward-looking analysis that shapes the decisions they make. Decisions taken and resources committed in advance of an EIS frustrate that purpose. *See Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000) (stating that agencies are required to prepare NEPA documents "before any irreversible and irretrievable commitment of resources" (citations omitted)); *Ctr. for Env't. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1006 (9th Cir. 2011) ("To avoid *post hoc* agency

rationalizations, '[p]roper timing is one of NEPA's central themes.'" (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 718 (9th Cir. 1988)).

132.    The Postal Service awarded the delivery vehicle contract to Oshkosh Defense and issued an initial order in February 2021, prior to beginning the NEPA process. The Postal Service issued its Draft EIS approximately 6 months later.

133.    The Postal Service's award of a contract, issuance of a task order, and reliance on the information from the contract in the EIS was arbitrary and capricious, did not demonstrate reasoned decision-making, exceeded the Postal Service's statutory authority, and was contrary to NEPA, 42 U.S.C. § 4332(2)(C); CEQ's NEPA regulations, 40 C.F.R. §§ 1501.2, 1502.5; and the Postal Service's NEPA regulations, 39 C.F.R. § 775.11.

## SECOND CLAIM FOR RELIEF
### (NEPA Violation:
### Unreasonable Range of Alternatives Analyzed)

134.    Plaintiffs reallege and incorporate Paragraphs 1 through 127.

135.    Each EIS must include "a detailed statement" on "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

136.    "The analysis of alternatives to the proposed action is the heart of the environmental impact statement." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (quotation marks omitted); *see also California ex rel. Lockyer v. U.S. Dept. of Agric.*, 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006). Critically, "[t]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *NRDC*, 421 F.3d at 813 (citations omitted).

137.    CEQ regulations require an EIS to "[e]valuate reasonable alternatives to the proposed action," including a discussion of the environmental consequences of each alternative and the reasons for elimination of alternatives not considered. 40 C.F.R. § 1502.14. The EIS's consideration of environmental consequences then "forms the scientific and analytic basis for the comparisons" for the alternatives analysis. *Id.* § 1502.16(a).

138.    The Postal Service is bound by its own NEPA regulations to "[s]tudy, develop, describe, and evaluate . . . reasonable alternatives to recommended actions which may have a significant effect on the environment." 39 C.F.R. § 775.8(a)(4). Under Postal Service regulations, the EIS "must" "[e]xplore and evaluate all reasonable alternatives." *Id.* § 775.11(c)(5). This alternatives analysis is "vitally important" and must be "presented in comparative form, thus sharply defining the issues and providing a clear basis for choosing alternatives." *Id.*

139.    The EIS included only four alternatives for the new fleet: (1) purpose-built vehicles consisting of at least 10% EV and up to 90% combustion engines; (2) purpose-built vehicles consisting of 100% EVs; (3) 100% commercially available right-hand-drive combustion engine vehicles; and (4) 100% commercially available left-hand-drive EVs. Final EIS at 3-4 to 3-7.

140.    The Postal Service quickly rejected the commercially available options because they do not comport with the agency's need to have a right-hand steering wheel. *See id.* at 4-42. And it rejected the 100% purpose-built EVs alternative due to supposed operational constraints on approximately 5% of routes. The Postal Service unreasonably assumed that its EVs could only travel 70 miles on a single charge. *See id.* at 3-2.

141.    The Postal Service did not explain why it chose to evaluate only a mix of 10% EVs and 90% combustion vehicles and not any other combination, despite EPA, Plaintiffs, and others' requests during the public comment period that the Postal Service include other reasonable alternatives.

142.    EPA, Plaintiffs, and others provided examples of other reasonable alternatives that were not considered. For instance, even including the unjustified and unreasonable assumptions regarding battery technology and range the Postal Service assumed would prevent electrification of roughly 5% of routes, the EIS should have included an alternative for 95% EVs. EPA recommended the Postal Service evaluate a "mid-range alternative," such as acquiring 25% EVs and "as high a percentage of [EV delivery vehicles] as is economically feasible."

143.    The Postal Service did not include any of these reasonable alternatives in the Final EIS, nor did it explain why it rejected them.

144.     The Postal Service's failure to include and analyze reasonable alternatives was arbitrary and capricious, did not demonstrate reasoned decision-making, exceeded the Postal Service's statutory authority, and was contrary to NEPA, 42 U.S.C. § 4332(2)(C); CEQ's NEPA regulations, 40 C.F.R. §§ 1502.14, 1502.16; and the Postal Service's NEPA regulations, 39 C.F.R. §§ 775.8, 775.11, 775.12.

**THIRD CLAIM FOR RELIEF**
**(NEPA Violation:**
**Failure to Take a "Hard Look" at Environmental Impacts)**

145.     Plaintiffs reallege and incorporate Paragraphs 1 through 127.

146.     NEPA requires agencies to take a "hard look" at environmental consequences before taking an action. *See* 42 U.S.C. § 4332; *Robertson*, 490 U.S. at 350 (noting that the "sweeping policy goals" of NEPA are "realized through a set of action-forcing procedures that require that agencies take a hard look at environmental consequences" (quotations marks omitted)). Agencies must provide the data on which they base their environmental analysis. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083 (9th Cir. 2011). Agencies do not satisfy the "hard look" standard if they rely on "stale data." *Id.* at 1086–87.

147.     CEQ's NEPA regulations require a hard-look analysis through a variety of specific requirements, including: informed decision-making, 40 C.F.R. § 1502.1; alternatives analysis, *id.* § 1502.14; evaluation of environmental consequences, *id.* § 1502.16; requirements for methodology and scientific accuracy, *id.* § 1502.23; if applicable, cost-benefit analysis, *id.* § 1502.22; response to comments, *id.* § 1503.4; and record of decision, *id.* § 1505.2.

148.     The Postal Service's NEPA regulations similarly require a hard look to "[i]dentify environmental effects and values in detail, and appraise them in conjunction with economic and technical analyses." 39 C.F.R. § 775.8. The Postal Service must do so in an "analytic" EIS that serves "to assess the environmental impact of proposed actions, rather than to justify decisions already made." *Id.* § 775.11(b)(2).

149.     Following the Final EIS, EPA sent a detailed letter to the Postal Service about the numerous technical flaws in the "seriously deficient" EIS. The Postal Service refused to fix any of the errors EPA had identified.

150.     The Postal Service failed to take a hard look at air pollutant emissions, including for nitrogen oxides, volatile organic compounds, and particulate matter. Although internal combustion engines emit significant amounts of these pollutants, the Postal Service failed to analyze, monetize, or contextualize the reductions of these pollutants for EV alternatives. *See, e.g.*, Final EIS at 4-22, tbl. 4-6.1 (quantifying pollutants as "not applicable").

151.     In some cases, the emissions reductions benefits of going fully electric are as much as 10 times those of the proposed action. *Compare id.* at 4-25, tbl. 4-6.5 (534 tons per year reduction in sulfur dioxide for fully electric), *with id.* at 4-23, tbl. 4-6.2 (55 tons per year reduction in sulfur dioxide for proposed action). But the Postal Service did not compare alternatives of air pollution reduction because of its failure to calculate emissions for some air pollutants. The Postal Service also did not contextualize the benefits or impacts of all air pollutants.

152.     The EIS therefore "falls below NEPA's standards because it fails to provide policymakers and the public with sufficient information to make an informed comparison of the alternatives." *Se. Alaska Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1058 (9th Cir. 2011) (quotation marks omitted).

153.     On greenhouse gas emissions, EPA explained that annual carbon dioxide equivalent emissions from combustion engines were 2.5 times greater than what the Postal Service had calculated. For annual emissions from new vehicles with 100% combustion engines, EPA calculated 821,807 metric tons, but the Postal Service only calculated 311,739 metric tons. Final EIS at B-166.

154.     This error had a large impact on the conclusions the Postal Service made. It allowed the Postal Service to claim that even replacing the existing fleet with 100% combustion engines would have a *beneficial* impact on the environment compared to continuing to repair and use the existing fleet. *See id.* at F-9 (showing negative emissions for each alternative); 4-43 (labeling each alternative "beneficial" for greenhouse gas emissions).

155.     Because of these and other errors, the Postal Service failed to rely on scientifically

sound calculations for greenhouse gas emissions, in violation of NEPA regulations. *See* 40 C.F.R.

§ 1502.23.

156.     The Postal Service also failed to take a hard look at costs. While the purpose of a

NEPA analysis is to identify environmental consequences of an action, presenting inaccurate

economic information in an EIS prevents the decisionmaker from making a "well-informed and

reasoned decision," and is therefore reviewable as a violation of the statute. *NRDC v. U.S. Forest

Serv.*, 421 F.3d 797, 812 (9th Cir. 2005).

157.     The Postal Service's economic analysis comprised numerous flaws. It failed to

consider trends in EV battery technology, which led it to overestimate the costs of EVs. It estimated

that the cost of gasoline would be $2.14 per gallon in 2022, when much of the nation already

experiences gas prices double that. *See* Final EIS at B-160. It projects that gasoline will only rise to

$2.55 by 2040. *Id.* And it failed to compare its cost assumptions to currently available cost data for

Class 2b-3 vehicles, which is the class of commercial delivery vehicles used by the Postal Service as

well as private delivery companies like Amazon and UPS.

158.     The Postal Service also refused to disclose the assumptions used in its total cost of

ownership analysis. *See id.* at B-161 to B-163, B-165. But NEPA requires an agency to "disclose its

methodologies and scientific sources." *Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025,

1038 (9th Cir. 2012). The "withholding of information violated NEPA, which requires upfront

disclosures of relevant shortcomings in the data." *Lands Council v. Powell*, 395 F.3d 1019, 1032 (9th

Cir. 2005).

159.     The Postal Service's erroneous cost data led it to conclude that "committing to

purchase more than 10 percent [EV delivery vehicles] . . . is not achievable, absent additional

funding." Final EIS at *iii*. The failure to consider reasonably foreseeable trends, and the reliance on

unsupported assumptions such as a static and outdated 70-mile battery range for EVs throughout the

10-year period of analysis, led the Postal Service to reject the potential for a higher mix of EVs.

160.     The Postal Service also failed to take a hard look at environmental justice impacts.

Although the Postal Service is an independent agency and thus is not bound by the Environmental

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Justice Order, it said that it would voluntarily consider environmental justice in the Draft EIS. *See* Draft EIS at 4-5. Because the Postal Service "exercised its discretion to include the environmental justice analysis in its NEPA evaluation, . . . that analysis therefore is properly subject to 'arbitrary and capricious' review under the APA." *Cmties. Against Runway Expansion, Inc.*, 355 F.3d at 688; *see also Vecinos para el Bienestar de la Comunidad Costera*, 6 F.4th at 1330.

161.    However, the Postal Service did not actually analyze environmental justice concerns. Despite the high likelihood that minority and low-income populations live in highly congested areas or areas near mail distribution facilities, the Postal Service did not examine the potential that combustion engines—and their attendant tailpipe pollution—would have disproportionate impacts on communities with environmental justice concerns. Nor did the Postal Service respond to comments raising these environmental justice concerns. *See* Final EIS at B-178 to B-179. Instead, the Postal Service concluded without discussion that its decision would not have significant environmental justice effects. *See* Final EIS at 4-41.

162.    The Postal Service's failure to take a hard look at greenhouse gas and air pollutant emissions, costs, or environmental justice considerations was arbitrary and capricious, did not demonstrate reasoned decision-making, exceeded the Postal Service's statutory authority, and was contrary to NEPA, 42 U.S.C. § 4332(2)(C); CEQ's NEPA regulations, 40 C.F.R. §§ 1502.1, 1502.14, 1502.16, 1502.22, 1502.23, 1503.4, 1505.2; and the Postal Service's NEPA regulations, 39 C.F.R. §§ 775.8, 775.11, 775.12.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a)    Declare the Postal Service violated NEPA and its implementing regulations in issuing its Final EIS and Record of Decision;

b)    Vacate the Postal Service's Final EIS and ROD until Defendants have demonstrated lawful compliance with NEPA and applicable regulations;

c)    Issue an order enjoining the Postal Service from any action under its Next Generation Vehicle Acquisition plan until Defendants have demonstrated lawful NEPA compliance;

d)    Award Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

1    e)    Provide for such other relief as the Court deems just and appropriate.

2

3    DATED: April 28, 2022                    Respectfully submitted,

4

5                                             /s/ Adriano L. Martinez
                                              ADRIANO L. MARTINEZ (SBN 237152)
6                                             YASMINE L. AGELIDIS (SBN 321967)
                                              CANDICE L. YOUNGBLOOD (SBN 328843)
7                                             amartinez@earthjustice.org
                                              yagelidis@earthjustice.org
8                                             cyoungblood@earthjustice.org
                                              Earthjustice
9                                             707 Wilshire Blvd., Suite 4300
                                              Los Angeles, CA 90017
10                                            T: (415) 217-2000 / F: (415) 217-2040

11
                                              *Attorneys for Plaintiffs CleanAirNow and Sierra Club*
12

13                                            /s/ Maya D. Golden-Krasner
                                              MAYA D. GOLDEN-KRASNER (SBN 217557)
14                                            SCOTT B. HOCHBERG (SBN 305567)
                                              mgoldenkrasner@biologicaldiversity.org
15                                            shochberg@biologicaldiversity.org
                                              Climate Law Institute
16                                            Center for Biological Diversity
                                              1212 Broadway, Suite 800
17                                            Oakland, CA 94612
                                              T: (510) 844-7119 / F: (510) 844-7150
18

19

20                                            *Attorneys for Plaintiff Center for Biological Diversity*

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF