ADRIANO L. MARTINEZ (State Bar No. 237152)
YASMINE L. AGELIDIS (State Bar No. 321967)
CANDICE L. YOUNGBLOOD (State Bar No. 328843)
amartinez@earthjustice.org
yagelidis@earthjustice.org
cyoungblood@earthjustice.org
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
T: (415) 217-2000 / F: (415) 217-2040

*Attorneys for Plaintiffs CleanAirNow and Sierra Club*

MAYA D. GOLDEN-KRASNER (State Bar No. 217557)
SCOTT B. HOCHBERG (State Bar No. 305567)
mgoldenkrasner@biologicaldiversity.org
shochberg@biologicaldiversity.org
Climate Law Institute
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
T: (510) 844-7119 / F: (510) 844-7150

*Attorneys for Plaintiff Center for Biological Diversity*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CLEANAIRNOW; CENTER FOR BIOLOGICAL DIVERSITY; and SIERRA CLUB,<br><br>Plaintiffs,<br><br>v.<br><br>LOUIS DEJOY, in his official capacity as U.S. Postmaster General; and U.S. POSTAL SERVICE,<br><br>Defendants. | Case No. 3:22-cv-02576-RFL<br><br><br>**FIRST SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

- 1 -

**INTRODUCTION**

1.      Plaintiffs CleanAirNow, Center for Biological Diversity, and Sierra Club ("Plaintiffs") challenge the United States Postal Service's decision to purchase and deploy 106,480 postal delivery vehicles—more than half of the agency's active vehicle fleet—without first performing a lawful environmental review as required under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.* Plaintiffs file this First Supplemental Complaint pursuant to Federal Rule of Civil Procedure 15(d) to raise allegations based on events that have occurred since Plaintiffs filed their original Complaint on April 28, 2022, ECF No. 1 in Case No. 3:22-cv-02576-RFL. In particular, the Postal Service has undertaken further environmental review of its vehicle acquisition decision and issued a Final Supplemental Environmental Impact Statement ("Final SEIS") and revised Record of Decision ("revised ROD") under NEPA. That further environmental review remains deficient, and many of Plaintiffs' objections remain. Plaintiffs hereby challenge the Postal Service's deficient Final SEIS and revised ROD, and also incorporate by reference the factual and legal allegations in the original Complaint.

2.      The United States Postal Service has one of the largest civilian vehicle fleets in the world. Its vehicles are on the road six days a week in every community in the United States, including communities that are already overburdened by air pollution, experiencing severe weather due to climate change, and those already in nonattainment with the national ambient air quality standards set by the United States Environmental Protection Agency ("EPA"). While the Postal Service plays a critical role in delivering the nation's mail, its vehicles also pollute the air in the communities where they operate and emit significant amounts of greenhouse gases. As its current vehicle fleet nears the end of its useful life, the Postal Service has been presented with a tremendous opportunity to convert its fleet to zero-emission, electric vehicles—a change that would alleviate air pollution, particularly in overburdened communities, and help tackle the climate crisis.

3.      Given the significant environmental and public health implications of this decision, the Postal Service was obligated under NEPA to take a "hard look" at the impacts of its "Next Generation Delivery Vehicle Acquisitions" program in order to look before it leaps. The

Postal Service failed to do so here. Instead, the Postal Service first chose a manufacturer with minimal experience in producing electric vehicles, signed a contract, and made a substantial down payment for new vehicles. Only then did the Postal Service publish a cursory environmental review setting forth its proposed alternatives and environmental impacts analysis for the project. In doing so, the Postal Service failed to comply with even the most basic requirements of NEPA.

4.      In particular, the Postal Service violated well-established legal precedent prohibiting "an irreversible and irretrievable commitment of resources" before completing the NEPA process by signing contracts with a defense company (Oshkosh Defense, LLC or "Oshkosh") to procure vehicles six months before even releasing its initial draft environmental review, and a year prior to issuing the Final Environmental Impact Statement ("Final EIS") and original Record of Decision ("original ROD").

5.      The Postal Service also failed to consider and evaluate reasonable alternatives to its action. During its initial environmental review, the Postal Service put forward a proposed action that would largely continue the status quo by replacing up to 90 percent of its fleet with fossil-fuel-powered, internal combustion engine vehicles ("original Preferred Alternative"). The Postal Service then evaluated only 10 percent electric and 100 percent electric vehicle options, while arbitrarily rejecting any consideration of fleets with a mix of electric vehicles between these two extremes.

6.      The Postal Service further failed to take the required "hard look" at these alternatives. Specifically, the Postal Service did not properly evaluate several environmental impacts of its action, including air quality, climate harms, and impacts on environmental justice communities, such as health risks and cumulative impacts, by simply assuming that any upgrade to its vehicle fleet would have positive impacts on the environment.

7.      After issuing its Final EIS and original ROD, but prior to completing its supplemental environmental review of the project, the Postal Service made a further irreversible and irretrievable commitment of resources in violation of NEPA by awarding new contracts for the purchase of 18,500 vehicles, half of which would be internal combustion engine vehicles that can stay on the road for decades and prevent the Postal Service from re-evaluating the fleet

makeup in the near future. The Postal Service signed these contracts at least four months prior to releasing a Draft Supplemental Environmental Impact Statement ("Draft SEIS"), seven months before issuing a Final SEIS, and nine months before issuing a revised ROD.

8. The Final SEIS and revised ROD failed to address many of the inadequacies in the Final EIS and original ROD, and failed to comply with NEPA. Strikingly, the Postal Service again refused to consider a reasonable range of alternatives. Instead, the Postal Service considered only one more vehicle mix—consisting of 62 percent electric and 38 percent internal combustion engine vehicles to be delivered over a period of either six or eight years—despite numerous comments, including from EPA as well as Plaintiffs, urging the Postal Service to consider a higher percentage of electric vehicles or hybrid vehicles. Whether the delivery period will be six or eight years makes only a slight difference to the environmental impact of the program. Here again, the Postal Service considered only the outcome that it intended to reach, without consideration of alternatives that would provide a meaningful contrast. The Postal Service also failed to disclose to the public the underlying information and data explaining why the Postal Service limited its consideration of additional alternatives to an allocation consisting of 62 percent battery electric vehicles.

9. The Postal Service failed to take the required "hard look" at the alternatives set forth in the SEIS. Specifically, the Postal Service did not adequately consider the air quality, climate change, or perpetuation of environmental justice impacts of its program, including cumulative air quality and health effects on environmental justice communities.

10. The Postal Service also failed to ensure the scientific integrity of the analysis in the SEIS. Despite relying on a total cost of ownership model in the Final EIS to evaluate alternatives, the Postal Service set aside best practices in the SEIS by evaluating alternatives based on upfront acquisition costs instead.[1] Moreover, even though the SEIS was finalized more than 18 months after the Final EIS, the SEIS did not consider updated information on the mileage range offered by current battery technology, the costs of charging infrastructure, and the ratio and

---

[1] Revised ROD, App'x D [EPA NGDV Final SEIS Comment Letter, Oct. 30, 2023, at p. 1].

1  number of chargers necessary to support a fleet at higher percentages of electrification. Nor did

2  the Postal Service consider regional variations when calculating emissions, as the Postal Service's

3  Office of Inspector General recommended, but instead used emissions inputs from a single

4  county, Westchester County, New York. The Postal Service also underestimated emissions from

5  the purpose-built delivery vehicles to be manufactured by Oshkosh by classifying them as "light

6  commercial trucks" rather than giving them the more accurate "light-heavy duty" vehicle

7  classification, as defined by EPA, when conducting its analysis. Both Plaintiffs and EPA had

8  alerted the Postal Service of these flaws in its analysis through their comments on the Final EIS

9  and SEIS.

10         11.     The deficiencies in the Postal Service's environmental analysis and the resulting

11  failure to entertain viable options for electrifying the national mail delivery fleet have grave

12  consequences. In addition to reducing climate change impacts, electrifying the entire Postal

13  Service fleet would ensure that virtually every neighborhood in America has a reduction in smog

14  and particulate matter pollution. Postal delivery routes are stop-and-go by nature, which means

15  that gas-powered delivery vehicles may idle just outside homes for lengthy periods of the day.

16  This daily pollution impacts nearly every resident in the country, but the harmful effects are felt

17  most significantly by environmental justice communities, which are often forced to breathe

18  polluted air from multiple and compounding sources. Indeed, highways, ports, railyards,

19  warehouses, oil refineries, and other industrial facilities are often located in or near low-income

20  communities of color, exacerbating the daily, negative health impacts these communities

21  experience. Transitioning to a zero-emission postal fleet would remove many otherwise polluting

22  vehicles from this harmful equation.

23         12.     Accordingly, Plaintiffs seek a declaration that the Postal Service's Final EIS,

24  original ROD, Final SEIS, and revised ROD for its Next Generation Delivery Vehicle

25  Acquisitions program violated NEPA, request that the Court vacate and set aside the Final EIS,

26  Final SEIS, and both the original and revised ROD, and enjoin actions by the Postal Service

27  under its Next Generation Delivery Vehicle Acquisitions program until it has complied with

28  NEPA.

1

**JURISDICTION AND VENUE**

2    13.    This case arises under the National Environmental Policy Act, 42 U.S.C. §§ 4321

3    *et seq.*; the Council on Environmental Quality's NEPA regulations, 40 C.F.R. pts. 1500–1508;

4    and the Postal Service's NEPA regulations, 39 C.F.R. pt. 775.

5    14.    As a federal agency, the Postal Service is subject to the requirements of NEPA. 42

6    U.S.C. § 4332; 40 C.F.R. § 1500.3(a); *see also Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d

7    1140 (9th Cir. 2000); *Chelsea Neighborhood Ass'ns v. U.S. Postal Serv.*, 516 F.2d 378 (2d Cir.

8    1975).

9    15.    Plaintiffs have a cause of action to enforce the Postal Service's violations of

10   NEPA, the CEQ's NEPA regulations, and the Postal Service's NEPA regulations as arbitrary and

11   capricious, a violation of the requirement for reasoned decisionmaking, and in exceedance of the

12   Postal Service's statutory authority.

13   16.    The challenged agency action is final.

14   17.    The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (actions arising under the

15   laws of the United States) and 39 U.S.C. §§ 401(1), 409 (suits against the Postal Service). This

16   Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§

17   2201–2202 and its equitable powers.

18   18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because this

19   complaint seeks relief against an agency of the United States, and defendant Louis DeJoy is an

20   officer or employee of the United States acting in his official capacity; plaintiff Sierra Club is

21   headquartered in this District; plaintiff Center for Biological Diversity is incorporated and has an

22   office in this District; and no real property is involved in the action.

23   **PARTIES**

24   19.    Plaintiff CleanAirNow is a leading nonprofit environmental justice organization in

25   the Midwest that is dedicated to improving air quality and addressing environmental injustice in

26   the counties that compose the Kansas City metro area, with a particular focus on overburdened

27   communities impacted by environmental health hazards associated with cumulative pollution

28   exposure. CleanAirNow is especially committed to preventing and mitigating disease caused by

air pollution and climate change in the communities that are forced to suffer the greatest health burdens from these injustices. Specifically, CleanAirNow works extensively on cleaning up transportation pollution, including pollution from medium- and heavy-duty trucks. CleanAirNow also works to clean up industrial sources of pollution and is very concerned about the impacts of oil and gas transport and dispensing in the region where it works. CleanAirNow is a member of the Moving Forward Network, which is a nationwide coalition of grassroots organizations committed to addressing the pollution burdens from the freight and logistics industry.

20.     CleanAirNow is a membership organization that holds regular meetings to strategize how best to address air pollution and environmental injustice in the Kansas City metro area. CleanAirNow's members are impacted by transportation pollution every day. CleanAirNow's members have an interest in reducing the air quality and noise pollution in and around their homes, neighborhoods, places of work, schools, and parks. CleanAirNow's members are also interested in minimizing and eliminating additional harms to their members' health from the Postal Service's decision to procure such a high percentage of ICE vehicles.

21.     Among CleanAirNow's impacted members is Atenas Mena, who lives in Kansas City, Missouri. Ms. Mena grew up in an area greatly impacted by industrial pollution, and she remains concerned about industrial and transportation pollution impacts on her health. She must remain constantly vigilant about the cumulative impacts of pollution from postal delivery vehicles that drive through her neighborhood every day to deliver mail. Her nursing background has guided her work in the community to identify preventive care measures such as zero emissions infrastructure versus reactive care response.

22.     Plaintiff Center for Biological Diversity is a national nonprofit membership organization incorporated and with a major office in the Northern District of California, and with its headquarters in Tucson, Arizona. The Center has over 89,000 members and more than 1.7 million supporters throughout the United States dedicated to the protection of endangered species and the environment. Combining conservation biology with litigation, policy advocacy, creative communications, and strategic vision, the Center is working to protect the lands, water, air, and climate that all living species need to survive.

23.     The Center's Climate Law Institute, in particular, works to curb greenhouse gas and other air pollution, in order to limit the damaging effects of climate change and air pollution on endangered species, their habitats, and human health. For instance, the Center was a Plaintiff in *Massachusetts v. EPA*, which resulted in the landmark Supreme Court decision finding that greenhouse gases are pollutants under the Clean Air Act. *Massachusetts v. EPA*, 549 U.S. 497 (2007). The Center has submitted comments on and litigated many successive vehicle rules under the Energy Policy Conservation Act, the Clean Air Act, and NEPA. For example, when the National Highway Traffic Safety Administration issued a rule preempting state greenhouse gas emissions standards and zero-emission mandates and EPA withdrew California's Clean Air Act waiver allowing it to set those standards (84 Fed. Reg. 51,310 (Sept. 27, 2019)), the Center challenged the preemption rule and waiver withdrawal. *Union of Concerned Scientists v. Nat'l Highway Traffic Safety Admin.*, No. 19-1230 (D.C. Cir. filed Nov. 25, 2019).

24.     Air pollution and greenhouse gas emissions from Postal Service vehicles harm the health, welfare, economic, recreational, and aesthetic interests of the Center's members. Climate change is already driving many animals and plants to extinction; increasing temperatures, causing droughts, flooding, and sea level rise; and affecting the livelihoods and property of Center members. Center members are increasingly less able to, and sometimes altogether prevented from, viewing, photographing, and enjoying wildlife threatened by climate change and from recreating in wilderness areas undergoing rapid climate change. They are deprived of the aesthetic and recreational enjoyment that stems from such activities, and experience worry, upset, and other significant emotional injury because of it. Some of the Center's members suffer from pulmonary diseases such as asthma from the smog-forming co-pollutants emitted by vehicles and from refineries used to process fuels. Those co-pollutants include volatile organic compounds, sulfur dioxide, nitrogen oxides, and fine particulate matter.

25.     Among the Center's affected members is Jennifer Molidor in Cloverdale, California. Ms. Molidor spends a part of almost every day gardening outside with her son and taking long walks along the Russian River near her house. Postal trucks drive by her home and through her neighborhood several times a day, and she lives near a busy intersection that draws

pollution from other postal trucks completing their routes. Ms. Molidor has asthma, which is exacerbated when the air quality is worse. Another Center member, Mary K. Reinhart, lives in Scottsdale, Arizona. She goes running in her neighborhood six days a week, and sometimes she is caught behind a gas-burning postal truck as it completes its route. She also hikes and walks her dog in local parks. Ms. Reinhart lives near a busy six-lane roadway, which adds constant noise and vehicle exhaust to her community. Gas-burning postal trucks exacerbate this pollution and endanger her ability to exercise outside and enjoy her neighborhood.

26.     Plaintiff Sierra Club is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. The Sierra Club has over one million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out those objectives. The Sierra Club has chapters and members in every state.

27.     The Sierra Club actively works toward the widespread shift to electric vehicles as a way to reduce emissions. This work includes advocacy for policies at all levels of government to make EVs more affordable; pushing for investments in EVs from the utility sector; outreach on the benefits of EVs; and campaigning for public transportation and school adoption of electric buses. In 2016, the Sierra Club published Rev Up Electric Vehicles, the first multi-state study of the EV shopping experience. The Sierra Club is a co-presenter of the annual National Drive Electric Week and a member of the EV Charging Initiative.

28.     Among Sierra Club's members impacted is Hadrien Dykiel. Mr. Dykiel lives in Evergreen, Colorado, which is located in an area that is in nonattainment of the Clean Air Act's National Ambient Air Quality Standards for ozone. Mr. Dykiel has an infant son who is particularly susceptible to the impacts of air pollution. The Dykiel family enjoys outdoor activities, including walking and running, but they alter their activities based on air pollution levels. Mr. Dykiel sees several postal vehicles travel in his neighborhood daily. He is very concerned that continued reliance on gas postal vehicles will impact air quality in his

- 9 -

neighborhood. He is also concerned about the large number of postal vehicles in the Denver region contributing to poor air quality where he lives and works. Another Sierra Club member, Alexa Cameron, lives in Denver, Colorado, close to a large USPS distribution facility and in a nonattainment area for ozone. Ms. Cameron can clearly see the USPS facility and postal delivery vehicles when she is driving to and from her home. Ms. Cameron is an avid runner who used to run semi-competitively; she currently trains 3 to 4 days per week on a trail that she believes is impacted by postal vehicle pollution from a large USPS distribution facility. Ms. Cameron monitors the daily air quality and alters her training schedule on days with poor air quality. Ms. Cameron is highly concerned that the continued use of gas vehicles at the USPS facility near her home will worsen the local air quality and continue to impact her ability to recreate outdoors.

29. Defendant Postal Service is "an independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 201. The Postal Service may be sued in its official name. *Id.* § 401.

30. Defendant Louis DeJoy is sued in his official capacity as Postmaster General. The Postmaster General is the chief executive officer of the Postal Service. *Id.* § 203.

31. Defendant-Intervenor Oshkosh Defense, LLC, is a private defense contractor that was awarded a contract to manufacture vehicles for the Postal Service pursuant to the Postal Service's Next Generation Delivery Vehicle Acquisitions program.

## STATUTORY BACKGROUND

### I. NATIONAL ENVIRONMENTAL POLICY ACT.

32. NEPA "is our basic national charter for protection of the environment." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020). NEPA has two fundamental purposes: (1) to guarantee that an agency takes a "hard look" at the consequences of its actions before the action occurs by ensuring that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989).

33.     To achieve these purposes, NEPA requires the preparation of a detailed EIS for any "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In preparing the EIS, NEPA requires federal agencies to take a "hard look," which involves considering the direct, indirect, and cumulative impacts of their proposed actions. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). When a proposed action has a potential adverse impact on minority or low-income populations, agencies should include an environmental justice analysis as part of this "hard look" under NEPA. *See* Exec. Order No. 12898, § 1-101, 59 Fed. Reg. 7,629 (Feb. 16, 1994); *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021) (reviewing challenge to agency's environmental justice analysis under NEPA). Moreover, an agency must provide to the public "the underlying environmental data" from which the agency develops its opinions and arrives at its decisions. *WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015. "[A]n agency may not rely on incorrect assumptions or data." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005). Fundamentally, these "disclosure requirement[s] obligate the agency to make available to the public high-quality information, including accurate scientific analysis, expert agency comments and public scrutiny, before decisions are made and actions are taken." *Ctr. for Bio. Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003).

34.     NEPA further requires that federal agencies provide a "detailed statement" regarding the "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). This requirement "lies at the heart of any NEPA analysis." *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006). Agencies must explore and evaluate all reasonable alternatives that relate to the purposes of the project and must briefly discuss the reasons for eliminating any alternatives from detailed study. *See* 40 C.F.R. § 1502.14. The existence of "a viable but unexamined alternative renders [an] environmental impact statement inadequate." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999).

35.     A fundamental requirement of NEPA is that an agency must not commit resources to a particular course of action prior to completing its environmental review. *See* 40 C.F.R.

§ 1502.2(f) ("Agencies shall not commit resources prejudicing selection of alternatives before making a final decision"), *see also id*. § 1506.1 (headed "Limitations on actions during NEPA process"). The Ninth Circuit has construed this requirement "as requiring agencies to prepare NEPA documents . . . before any irreversible and irretrievable commitment of resources." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000). "The point of commitment" constituting an irreversible and irretrievable commitment of resources can occur when an agency "sign[s] the contract" with a project proponent "and then work[s] to effectuate the Agreement." *Id*.

36. The Postal Service is an "independent establishment of the executive branch of the Government of the United States," 39 U.S.C. § 201, and, as an agency of the federal government, the Postal Service is subject to the requirements of NEPA. 42 U.S.C. § 4332; 40 C.F.R. § 1500.3(a); *see Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140 (9th Cir. 2000); *Chelsea Neighborhood Ass'ns v. U.S. Postal Serv.*, 516 F.2d 378 (2d Cir. 1975).

37. The Postal Service has recognized its NEPA obligations by, among other things, promulgating agency-specific NEPA procedures in 39 C.F.R. Part 775, in which the Postal Service recognizes its responsibilities to "[i]nterpret and administer applicable policies, regulations, and public laws of the United States in accordance with the policies set forth in [NEPA] and the NEPA Regulations . . . ." 39 C.F.R. §§ 775.2(a). These regulations stress that the Postal Service's policy is to "[e]mphasize environmental issues and alternatives in the consideration of proposed actions," to "identify and assess reasonable alternatives to proposed actions in order to avoid or minimize adverse impacts on the environment," and to "[u]se all practicable means to protect, restore, and enhance the quality of the human environment." *Id*. § 775.2(c), (e), (f). In addition, the regulations state that the consideration of alternatives in an EIS "is vitally important." *Id*. § 775.11(c)(5).

38. Courts review the Postal Service's compliance with NEPA under an arbitrary and capricious standard of review. *See Akiak*, 213 F.3d at 1144.

## II. POSTAL SERVICE HISTORY, OPERATIONS, AND GOVERNING LAWS.

39. The United States Constitution empowers Congress to "establish Post Offices and post Roads." U.S. Const., art. I, § 8, cl. 7. In 1789, Congress established the first Post Office

under the Constitution and made the Postmaster General subject to the President's direction. U.S. Postal Serv., The United States Postal Service: An American History 1, 4 (2020), https://about.usps.com/publications/pub100.pdf.

40.     The Postal Service has played "a vital yet largely unappreciated role in the development of" the United States. *U.S. Postal Serv. v. Council of Greenburgh Civic Assocs.*, 453 U.S. 114, 121 (1981). During the early years of this country's development, "the Post Office was to many citizens situated across the country the most visible symbol of national unity." *Id.* at 122. Since its beginnings in the pre-Revolutionary period, the Postal Service "has become the nation's oldest and largest public business." *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 739 (2004) (citations and quotations omitted).

41.     Since its founding, "the Postal Service's efforts to deliver mail quickly and reliably have been a force for innovation in the American transportation sector." USPS Office of Inspect. Gen., *Electric Delivery Vehicles and the Postal Service*, at 3 (Mar. 17, 2022). The Postal Service has spurred nationwide adoption of the stagecoach, nationwide expansion of railroads, nationwide use of air transportation, and the development of electric vehicles. *Id.*

42.     In 1970, Congress passed the Postal Reorganization Act ("PRA"), *see* Pub. L. No. 91-375, 84 Stat. 719, in large part to "convert the Post Office Department into an independent establishment in the Executive Branch of the Government freed from direct political pressures." H.R. Rep. No. 91-1104, at 1 (1970) (Conf. Rep.), *as reprinted in* 1970 U.S.C.C.A.N. 3649, 3650.

43.     The PRA renamed the agency the U.S. Postal Service, restructured its operations, removed it from the Cabinet to ensure its political independence, provided that the Postmaster General would be appointed by a newly-established Board of Governors rather than the President, and stated it had the power "to sue and be sued in its official name." 39 U.S.C. § 401(a). The PRA provides that "[t]he United States Postal Service shall be operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." *Id.* § 101(a). The PRA further affirms that the Postal Service's "basic function" is "to bind the Nation together through the personal, educational, literary, and business correspondence of the people." *Id.* To do so, the

1    Postal Service "shall render postal services to all communities." *Id.*

2        44.    The PRA provides that it "shall be the responsibility of the Postal Service to

3    maintain an efficient system of collection, sorting, and delivery of the mail nationwide." 39

4    U.S.C. § 403(b)(1). The PRA further requires that "[i]n selecting modes of transportation, the

5    Postal Service shall give highest consideration to the prompt and economical delivery of all mail.

6    Modern methods of transporting mail by containerization and programs designed to achieve

7    overnight transportation to the destination of important letter mail to all parts of the Nation shall

8    be a primary goal of postal operations." 39 U.S.C. § 101(f).

9        45.    The Postal Service has adopted new transportation technologies when necessary to

10   carry out its mission—from boats, to airplanes, to motorized delivery vehicles. U.S. Postal Serv.,

11   The United States Postal Service: An American History, at 12-24, 40, 57, 80-81, 110-118.

12       46.    In 2022, the Postal Service had 216,456 delivery and collection vehicles in its

13   inventory. U.S. Postal Serv., FY 2022 Annual Report to Congress, at 29.

14                    **FACTUAL AND PROCEDURAL BACKGROUND**

15   **I.    THE POSTAL SERVICE'S NEXT GENERATION DELIVERY VEHICLE ACQUISITIONS**

16   **PROGRAM.**

17       47.    The Postal Service has one of the largest civilian vehicle fleets in the world,

18   consisting of approximately 216,000 vehicles that are on the road delivering mail at least six days

19   per week to nearly 165 million delivery points in every community in the United States. Most of

20   these vehicles, known as Long Life Vehicles, were manufactured between 1986 and 1994 and are

21   now beyond their intended service life and becoming increasingly expensive and dangerous to

22   operate and maintain.

23       48.    To address this problem, the Postal Service launched its Next Generation Delivery

24   Vehicle Acquisitions program. The initial goal of this program was to evaluate, test, and

25   eventually purchase up to 165,000 new purpose-built vehicles over the next ten years.

26       49.    On February 23, 2021, the Postal Service announced a contract award to a defense

27   contractor, Oshkosh, for the future production of these vehicles. The contract covers non-

28   recurring engineering and tooling costs and allows the Postal Service to order between 50,000 and

- 14 -

165,000 Next Generation Delivery Vehicles over a ten-year period. The Postal Service has claimed that the contract requires the company to be able to support two powertrain alternatives: (1) a modern and efficient internal combustion engine, and (2) a battery electric vehicle powertrain. At the time the contract was awarded, though, Oshkosh did not manufacture any electric vehicles. The contract was allegedly "contingent on the satisfactory completion of the NEPA process." However, the Postal Service provided as much as $482 million to Oshkosh under the contract prior to initiating the NEPA process.

**II.     NEPA EIS AND RECORD OF DECISION FOR THE PROGRAM.**

50.     On August 26, 2021, the Postal Service announced the availability of a draft EIS for its Proposed Action—namely, to "purchase and deploy[] up to 165,000 Next Generation Delivery Vehicles ("NGDVs") over a ten-year period." *See* 86 Fed. Reg. 47,662 (Aug. 26, 2021). The stated purpose and need of the Proposed Action in the draft EIS were "to replace the end-of-life and high-maintenance long life vehicles ("LLVs") and flexible fuel vehicles ("FFVs") with vehicles with more energy-efficient powertrains, updated technology, reduced emissions, increased cargo capacity and improved loading characteristics, improved ergonomics and carrier safety, and reduced maintenance costs," and "to enable the Postal Service to meet its Congressional mandate to maintain efficient nationwide delivery of the mail and to provide prompt, reliable, and efficient services to patrons."

51.     In evaluating the Proposed Action and alternatives, the draft EIS considered (1) the purchase and deployment of custom-made vehicles with 90 percent gas-powered, internal-combustion engines and 10 percent electric vehicles (Alternative 1, or the "original Preferred Alternative"); (2) the purchase and deployment of 100 percent custom-made electric vehicles (a different "scenario" under Alternative 1); (3) an alternative of purchasing 100 percent commercial off-the-shelf gas-powered vehicles with right-hand drive (Alternative 1.1); (4) an alternative of purchasing 100 percent commercial off-the-shelf electric vehicles with left-hand drive (Alternative 1.2); and (5) the required "No Action Alternative" of attempting to maintain the Postal Service's existing fleet.

52.     The Postal Service accepted comments on the draft EIS until October 18, 2021.

Plaintiffs, as well as EPA, submitted comments on the draft EIS.

53.     For example, EPA explained that while the Postal Service identified a clear need to update its vehicle fleet, the draft EIS lacked adequate data and presented biased cost and emissions estimates, thereby precluding "meaningful consideration of the proposed action and alternatives."

54.     On January 7, 2022, the Postal Service released the Final EIS with minimal changes from the draft EIS. 87 Fed. Reg. 994 (Jan. 7, 2022).

55.     In the Final EIS, the Postal Service decided to move forward with its original Preferred Alternative of procuring custom-made, right-hand-drive delivery vehicles with 90 percent internal combustion engines and 10 percent battery electric vehicles. The Final EIS noted that the actual delivery vehicle types purchased would be contingent, in part, "upon the supplier's production and delivery capabilities."

56.     The Final EIS stated that the original Preferred Alternative was chosen because battery electric vehicles involved a higher total cost of ownership and would have limited range, rendering their use infeasible on longer rural routes, despite comments and evidence submitted to the agency contradicting these conclusions. In fact, the Final EIS assumes fuel costs for gas-powered vehicles of $2.19 per gallon, grossly underestimating even current gasoline prices, let alone future ones. The Final EIS rejected an alternative of 100 percent battery electric vehicles as infeasible, and evaluated no other percentage of electric powertrains between the 10 percent it selected and the 100 percent it rejected.

57.     The Final EIS relied on acquisition and maintenance cost data at least in part based on the contract awarded to Oshkosh, which was not provided to the public, despite requests for the Postal Service to make this information public as required by NEPA.

58.     The Final EIS failed to fully evaluate environmental justice impacts from the program.

59.     On February 2, 2022, EPA Associate Administrator Vicky Arroyo wrote to the Postal Service to express the agency's disapproval of the Final EIS. In particular, EPA wrote that its "concerns with the draft EIS were not adequately addressed and the final EIS remains

seriously deficient," and "preparation of a supplemental EIS is particularly important to maintain the integrity of the NEPA process." For example, using well-established metrics for estimating greenhouse gas emissions, EPA calculated that carbon dioxide emissions from the use of gas-powered vehicles would be 2.5 times greater than what the Postal Service had estimated.

60.     On the same day, the White House Council on Environmental Quality ("CEQ"), the federal agency responsible for implementing NEPA, wrote to the Postal Service to express similar concerns. In a letter addressed to Defendant DeJoy, CEQ Chair Brenda Mallory reiterated EPA's "grave concerns" with the adequacy of the Final EIS, criticized the Postal Service's decision to contract with Oshkosh prior to completing the NEPA review, and urged the Postal Service to redo its analysis.

61.     On February 4, 2022, these concerns were echoed in a letter to the Postal Service signed by several members of Congress, who wrote to express "strong opposition to the failure of the United States Postal Service (USPS) to plan to electrify its fleet of mail delivery vehicles and contribute to the fight against climate change." The letter continued: "After an unjustifiable, truncated, and deficient process, it is unacceptable that the USPS intends to cling to an overwhelmingly fossil fuel-powered fleet whose emissions are endangering our planet."

62.     On February 23, 2022, the Postal Service signed the original ROD, which incorporated the findings and analysis of the Final EIS, and announced the agency's determination that it would implement the original Preferred Alternative. *See* 87 Fed. Reg. 14,588 (Mar. 15, 2022).

63.     On March 17, 2022, the United States Postal Service Office of Inspector General released a report titled "Electric Delivery Vehicles and the Postal Service," which found that "electric vehicle technology is generally capable of meeting the Postal Service's needs" and is generally more cost-effective than using gas-powered vehicles. Contrary to the findings in the Final EIS and original ROD, the Inspector General found that the average 24-mile postal route was well within the ability of current electric vehicle technology, and even the 2 percent of routes that are 70 miles or longer could be more suited to electric vehicles because the Postal Service saves money on each mile driven compared to gas-powered vehicles.

64.     On April 28, 2022, Plaintiffs filed a complaint challenging the Postal Service's Final EIS and original ROD for its Next Generation Delivery Vehicle Acquisitions Program under NEPA.

**III.     SEIS AND REVISED RECORD OF DECISION FOR THE PROGRAM.**

65.     In June 2022, the Postal Service announced that it would prepare an SEIS in light of substantial changes to its delivery network. On June 10, 2022, it published a draft scope identifying several issues requiring supplementation, including "network refinements and route optimization efforts" that could increase the minimum number of electric vehicles acquired under the program. 87 Fed. Reg. 35,581 (June 10, 2022). The notice also identified the need to accelerate replacement of the fleet with a combination of Next Generation Delivery Vehicles and commercially available vehicles. *Id*.

66.     On July 21, 2022, the Postal Service published a revised draft notice regarding the SEIS scope, which stated that the Postal Service's preferred alternative would include: (1) the purchase and deployment of 50,000 Next Generation Delivery Vehicles; and (2) acquisition of up to 20,000 left-hand-drive commercial vehicles and 14,500 right-hand-drive gas-powered vehicles within the next two years. 87 Fed. Reg. 43,561 (July 21, 2022). The Postal Service accepted public comments on the scope of the SEIS until August 15, 2022. *Id*.

67.     Plaintiffs submitted comments, and encouraged the Postal Service to consider alternatives in the SEIS that would include mostly electric vehicles.

68.     In August 2022, Congress passed the Inflation Reduction Act, which provides $3 billion to the Postal Service, including $1.29 billion in subsidies for the purchase of zero-emission vehicles and $1.71 billion for the purchase, design, and installation of infrastructure to support them. Pub. L. No. 117-169, § 70002, 136 Stat. 1818, 2086-87 (2022).

69.     This $3 billion in funding for zero-emission vehicles was intended to close the purported gap in funding identified in the Final EIS and original ROD between the cost of gas-powered replacement vehicles and an electric vehicle fleet. However, in December 2022, before releasing its Draft SEIS, the Postal Service announced that it expected to acquire at least 66,000 electric vehicles as part of a 106,000-vehicle acquisition plan between 2022 and 2028. Under this

plan, the proportion of electric vehicles would amount to 62 percent of the acquisition. Up to 38 percent of the Postal Service's acquisition would remain gas-powered internal combustion engine vehicles. The new electric vehicle acquisitions would total only 31.4 percent of the Postal Service's entire delivery fleet.

70.     In February 2023, again before completing even its Draft SEIS, the Postal Service awarded new contracts to purchase 9,250 commercial gas-powered vehicles, 9,250 commercial electric vehicles, and 14,000 electric vehicle charging stations. At the same time, the Postal Service announced that after 2026 all NGDV vehicle acquisitions would be "100 percent electric." USPS, *USPS Moves Forward with Awards to Modernize and Electrify the Nation's Largest Federal Fleet* (Feb. 28, 2023), https://about.usps.com/newsroom/local-releases/ny/2023/0228-usps-moves-forward-with-awards-to-modernize.htm.

71.     In April 2023, the United States Government Accountability Office ("GAO") issued a report entitled, "Action Needed to Improve Credibility of Cost Assumptions for Next Generation Delivery Vehicles." The GAO found that assumptions about two cost factors—the price of gas and the cost of installing electric charging infrastructure—had the potential to considerably affect the recommendation of the number of electric and gas vehicles to purchase. For example, increasing the gas price by $1.00 within a selected range of gas prices resulted in a recommendation that almost 90 percent of the delivery vehicles be electric.

72.     On June 30, 2023, the Postal Service made the Draft SEIS available for public review and comment. Despite scoping comments urging the Postal Service to consider alternatives including higher percentages of electric vehicles, the Draft SEIS evaluated only one new alternative consistent with its previously announced allocation of electric and gas vehicles, which consisted of 62 percent electric vehicles and 38 percent gas-powered vehicles. The vehicles would be acquired and deployed over a period of either six or eight years.

73.     Specifically, the Draft EIS considered: (1) the acquisition of 106,480 vehicles, consisting of 62 percent electric vehicles and 38 percent gas-powered vehicles, and including 60,000 purpose-built vehicles, 14,500 right hand drive off-the-shelf gas-powered vehicles, and 31,980 off-the-shelf or purpose-built vehicles, to be deployed over a period of six years (the

"SEIS Preferred Alternative"); (2) the acquisition of 106,480 vehicles, consisting of 62 percent electric vehicles and 38 percent gas-powered vehicles, all of which would be purpose-built vehicles, to be deployed over a period of eight years; and (3) the required No-Action Alternative, consisting of up to 165,000 purpose-built vehicles with a minimum of 10 percent electric vehicles.

74.     The Postal Service ignored Plaintiffs' comments, urging it to consider alternatives with a greater percentage of electric vehicles, such as 80 to 95 percent electric vehicles. The Postal Service also did not consider other potential alternatives that would include cargo bikes, small battery electric vehicles, or low-speed options. Instead, the Postal Service limited its consideration of alternatives to the proportion of electric and gas-powered vehicles that it had announced it would proceed with in December 2022, six months before releasing its Draft SEIS for public comment.

75.     In comments on the Draft SEIS, Plaintiffs and others expressed continued concern with the Postal Service's limited range of alternatives. As Plaintiffs commented, "[t]he alternatives in the Draft SEIS do not provide a meaningful contrast to each other," and that "[t]he evaluation of only two nearly identical alternatives can render a NEPA analysis inadequate." In fact, "[t]he alternatives are so similar that USPS combined its analysis of their environmental impacts in nearly every major category."

76.     EPA identified "additional shortcomings" in the Postal Service's analysis, such as the Postal Service's use of upfront costs rather than the total cost of ownership to select and compare alternatives. EPA further commented that the Postal Service's methodology to determine the alternatives was unclear, and that "the optimal, cost-effective strategy would be to purchase a much higher percentage of [electric vehicles] than the approximately 60 percent proposed by the Postal Service." EPA also pointed out that the GAO analysis suggested that the Postal Service should purchase 90 percent electric vehicles.

77.     On September 29, 2023, the Postal Service published its Final SEIS. 88 Fed. Reg. 67277 (Sept. 29, 2023).

78.     The Final SEIS did not evaluate any alternatives besides those included in the

Draft SEIS. Rather, the Postal Service selected its SEIS Preferred Alternative of procuring a combination of off-the-shelf and custom vehicles, with a mix of 62 percent battery electric vehicles and 38 percent internal combustion engine vehicles – the exact same allocation of vehicles that the Postal Service had announced it would acquire nine months earlier.

79.     The Final SEIS ignored viable alternatives that would allocate a greater percentage of the acquisition to electric vehicles.

80.     The Final SEIS failed to present complete information to the public regarding the Postal Service's selection of alternative vehicle allocations. While the Postal Service provided generalized statements about the urgent need to replace its outdated vehicles with "some" internal combustion engine vehicles, route suitability, and financial considerations, the Postal Service did not explain why it considered only an allocation of 62 percent battery electric vehicles and 38 percent gas-powered vehicles. Notably, the Postal Service acknowledged that electric vehicles are suitable for more than 90 percent of its routes. And the Postal Service did not disclose adequate information on how the $3 billion provided under the Inflation Reduction Act would be spent, or the cost assumptions that would purportedly preclude the purchase of a greater percentage of zero-emission vehicles.

81.     The Final SEIS failed to fully evaluate environmental justice impacts from the program, including air quality impacts, health risks, and cumulative impacts that environmental justice communities will face.

82.     The Final SEIS also improperly relied on an upfront acquisition cost analysis, rather than using the best practice of a total cost of ownership analysis.

83.     In an October 30, 2023 comment on the Final SEIS, EPA remained critical of the Postal Service's analysis. EPA recommended that the Postal Service provide greater disclosure in its revised ROD, consider alternatives that would exceed the minimum battery electric vehicle commitment of 62 percent, and strengthen its environmental justice commitments. EPA also disagreed with the Postal Service's abandonment of the best practice of using a total cost of ownership analysis. Notably, EPA stated that "the Final SEIS does not clearly articulate what is motivating the Postal Service's vehicle acquisition strategy." EPA also stated, "the Final SEIS

does not provide sufficient information for the public to understand whether the Postal Service is selecting the most cost-effective mix of vehicles," and route optimization efforts do not explain "why the Postal Service is proposing to purchase 40,250 [internal combustion engine] vehicles," resulting in a total of 140,250 gas-powered vehicles in the Postal Service's fleet.

84.    On December 5, 2023, the Postal Service signed and certified the revised ROD, selecting the SEIS Preferred Alternative, and finalizing the NEPA process for its vehicle acquisition program. The Postal Service published its revised ROD in the Federal Register on December 11, 2023.

**FIRST CAUSE OF ACTION**

**(VIOLATION OF NEPA:**

**IRREVERSIBLE COMMITMENT OF RESOURCES**

**42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.2(F); 39 C.F.R. § 775.11(B)(2)(VI))**

85.    Paragraphs 1 through 84 are realleged and incorporated herein by reference.

86.    Plaintiffs have a right of action to seek that the court declare unlawful and set aside agency action that is arbitrary and capricious, exceeds the agency's statutory authority, and violates NEPA.

87.    A fundamental requirement of NEPA is that agencies must not commit resources to a particular course of action prior to completing their environmental review. *See* 40 C.F.R. § 1502.2(f) ("Agencies shall not commit resources prejudicing selection of alternatives before making a final decision"), *see also id*. § 1506.1 (Limitations on actions during NEPA process); 39 C.F.R. § 775.11(b)(2)(vi) (EIS must "[s]erve to assess the environmental impact of proposed actions, rather than to justify decisions already made"). As the Ninth Circuit has found, agencies are required to prepare NEPA documents "*before* any irreversible and irretrievable commitment of resources." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000) (emphasis added). "The point of commitment" constituting an irreversible and irretrievable commitment of resources can occur when an agency "sign[s] the contract" with a project proponent "and then work[s] to effectuate the Agreement." *Id*.

88.    Here, the Postal Service awarded a contract for the manufacture of Next

- 22 -

1   Generation Delivery Vehicles to Oshkosh in February 2021, roughly six months before the

2   agency even issued its Draft EIS, and a year before it finalized the EIS and issued the original

3   ROD. The Final EIS states that "[a]t the time of awarding the contract, the Postal Service placed

4   an order that funds the production design, assembly tooling, and factory start-up costs to support

5   the production of both vehicle types in parallel"—even though Oshkosh had only minimal

6   experience producing electric vehicles. As EPA noted, the contract with Oshkosh was "not the

7   most competitive" for battery electric vehicles, and three other contract bids had higher rated

8   battery electric vehicles. The Final EIS notes that the type of vehicles ultimately purchased will,

9   in part, "be contingent upon the supplier's production and delivery capabilities." According to

10  CEQ, the Postal Service committed more than $480 million to begin engineering and factory

11  construction for its procurement decision before completing this NEPA process.

12      89.     In the original ROD, the Postal Service incorporated the Final EIS's findings and

13  analysis and determined that it would implement the original Preferred Alternative.

14      90.     After announcing substantial changes would be made to its vehicle acquisition

15  program, and that it would perform supplemental environmental review, the Postal Service

16  refused to withdraw or suspend its original ROD while its supplemental environmental review

17  process was pending. Instead, the Postal Service allowed work under its contract with Oshkosh to

18  advance without completing NEPA review.

19      91.     Indeed, during its supplemental environmental review of the vehicle acquisition

20  program, the Postal Service made a further irreversible and irretrievable commitment of resources

21  by awarding a contract for the acquisition of 9,250 gas-powered vehicles and 9,250 battery

22  electric vehicles at least four months before issuing its Draft SEIS.

23      92.     Accordingly, the Postal Service's issuance of the Final EIS and original ROD, and

24  Final SEIS and revised ROD, was arbitrary and capricious, did not demonstrate reasoned

25  decision-making, exceeded the Postal Service's statutory authority, and was contrary to the

26  requirements of NEPA, 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1502.2(f), and 39 C.F.R. §

27  775.11(b)(2)(vi). The Final EIS, original ROD, Final SEIS, and revised ROD should be held

28  unlawful and set aside, and the Postal Service should be enjoined from taking action under its

Next Generation Delivery Vehicle Acquisitions program until it has complied with NEPA.

## SECOND CAUSE OF ACTION

## (VIOLATION OF NEPA:

## FAILURE TO CONSIDER REASONABLE ALTERNATIVES

## 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14; 39 C.F.R. § 775.11(C)(5))

93.     Paragraphs 1 through 92 are realleged and incorporated herein by reference.

94.     Plaintiffs have a right of action to declare unlawful and set aside agency action that is arbitrary and capricious, exceeds the agency's statutory authority, and violates NEPA.

95.     NEPA requires that Defendants provide a "detailed statement" regarding the "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14(a); 39 C.F.R. § 775.11(c)(5); *see also* 30 C.F.R. §§ 775.8(a)(4), 775.11(b)(2)(iv)-(v). The requirement to consider reasonable alternatives "lies at the heart of any NEPA analysis." *California ex rel. Lockyer v. U.S. Dept. of Agric.*, 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006). "The existence of a viable but unexamined alternative renders" an EIS inadequate. *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (internal quotations and citations omitted).

96.     Here, the Postal Service failed to consider reasonable alternatives to its SEIS Preferred Alternative of procuring 38 percent gas-powered vehicles and 62 percent electric vehicles.

97.     While the Postal Service put forward 100 percent electric vehicle alternatives for both custom-made and commercial off-the-shelf vehicles, it summarily rejected these alternatives as impractical and infeasible without any legitimate justification for doing so. The Postal Service claims to have identified at least 12,500 delivery routes where length, environmental conditions, or facility constraints do not allow for electric vehicles. However, these routes account for only 5 percent of the agency's total delivery routes, and the Postal Service's assumptions regarding the infeasibility of using electric vehicles for the vast majority of its routes have no factual basis. The Postal Service unreasonably failed to consider alternatives that would have involved a greater mix of electric vehicles between 62 percent and 100 percent that could still meet its delivery needs.

98.     Nor does the Postal Service's reliance on alleged cost constraints provide a

1  legitimate basis for its failure to consider reasonable alternatives under NEPA. The Postal Service

2  failed to disclose adequate information in its analysis about how it allocated the $3 billion in

3  subsidies from the Inflation Reduction Act and neglected to explain why alternatives consisting of

4  more than 62 percent electric vehicles would be precluded by cost, route suitability, or timing.

5      99.    In the revised ROD, the Postal Service incorporated the Final EIS's findings and

6  analysis, as well as the Final SEIS's findings and analysis, and determined that it would

7  implement the SEIS Preferred Alternative.

8      100.   Accordingly, the Postal Service's issuance of the Final EIS, original ROD, Final

9  SEIS, and revised ROD was arbitrary and capricious, did not demonstrate reasoned decision-

10  making, exceeded the Postal Service's statutory authority, and was contrary to the requirements

11  of NEPA, 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1502.14, and 39 C.F.R. § 775.11(c)(5). The Final

12  EIS, original ROD, Final SEIS, and revised ROD should be held unlawful and set aside, and the

13  Postal Service should be enjoined from taking action under its Next Generation Delivery Vehicle

14  Acquisitions program until it has complied with NEPA.

15                          **THIRD CAUSE OF ACTION**

16                          **(VIOLATION OF NEPA:**

17                  **FAILURE TO TAKE A "HARD LOOK"**

18      **42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.16(A)(1); 39 C.F.R. § 775.11(C)(6))**

19      101.   Paragraphs 1 through 100 are realleged and incorporated herein by reference.

20      102.   Plaintiffs have a right of action to declare unlawful and set aside agency action that

21  is arbitrary and capricious, exceeds the agency's statutory authority, and violates NEPA.

22      103.   As discussed above, a fundamental requirement of NEPA is that federal agencies

23  take a "hard look" at the environmental consequences of a proposed activity before acting. *See* 42

24  U.S.C. § 4332; *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989) ("The

25  sweeping policy goals" of NEPA are "realized through a set of action-forcing procedures that

26  require that agencies take a hard look at environmental consequences, and that provide for broad

27  dissemination of relevant environmental information") (citations and internal quotes omitted).

28  When preparing an EIS, an agency must disclose and consider any "environmental impacts of the

proposed action and reasonable alternatives to the proposed action and the significance of those impacts." 40 C.F.R. § 1502.16(a)(1); 42 U.S.C. § 4332(2)(C); 39 C.F.R. § 775.11(c)(6); *see also* 40 C.F.R. § 1508.1(g).

104.    Here, the Final EIS and Final SEIS fail to take the required "hard look" at numerous environmental impacts from the Proposed Action and alternatives, including impacts related to air quality, health, climate, cumulative impacts, and environmental justice.

105.    The Final EIS and Final SEIS fail to properly consider the specific impacts of continued fossil fuel use on environmental justice communities located near postal facilities and already suffering from significantly degraded air quality. *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330-31 (D.C. Cir. 2021). The Final SEIS also improperly relied solely on an upfront acquisition cost analysis, instead of using the best a total cost of ownership analysis.

106.    The Final EIS and Final SEIS also significantly underestimate the climate impacts of maintaining a large fleet of gas-powered vehicles for potentially the next several decades, rather than electrifying more of its fleet in the near term. Moreover, the conclusion that "[n]o effects of climate change are expected" is inconsistent with even the estimates in the Final EIS and is contrary to Ninth Circuit precedent. *See Center for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1224 (9th Cir. 2008) (finding that "simply because the Final Rule may be an improvement over the [prior] standard does not necessarily mean that it will not have a 'significant effect' on the environment").

107.    In the revised ROD, the Postal Service incorporated the Final EIS's and Final SEIS's findings and analysis and determined that it would implement the SEIS Preferred Alternative.

108.    Accordingly, the Postal Service's issuance of the Final EIS and original ROD, and Final SEIS and revised ROD, was arbitrary and capricious, did not demonstrate reasoned decision-making, exceeded the Postal Service's statutory authority, and was contrary to the requirements of NEPA, 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1502.16(a)(1), and 39 C.F.R. § 775.11(c)(6). The Final EIS and original ROD, and Final SEIS and revised ROD, should be held

1    unlawful and set aside, and the Postal Service should be enjoined from taking action under its

2    Next Generation Delivery Vehicle Acquisitions program until it has complied with NEPA.

3                                    **PRAYER FOR RELIEF**

4        WHEREFORE, Plaintiffs respectfully request that this Court:

5        1.      Issue a declaratory judgment that the Postal Service violated NEPA in issuing the

6    Final EIS, Final SEIS, and Records of Decision;

7        2.      Issue an order vacating and setting aside the Final EIS, Final SEIS, and Records of

8    Decision unless and until the Postal Service complies with applicable law;

9        3.      Issue an order enjoining action by the Postal Service under its Next Generation

10   Vehicle Acquisition Program until it has complied with NEPA;

11       4.      Award Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

12       5.      Award such other relief as the Court deems just and proper.

13

14

15   Dated: February 2, 2024                    Respectfully submitted,

16

17                                              /s/ Adriano L. Martinez
                                                ADRIANO L. MARTINEZ (SBN 237152)
18                                              YASMINE L. AGELIDIS (SBN 321967)
                                                CANDICE L. YOUNGBLOOD (SBN 328843)
19                                              amartinez@earthjustice.org
                                                yagelidis@earthjustice.org
20                                              cyoungblood@earthjustice.org
                                                Earthjustice
21                                              707 Wilshire Blvd., Suite 4300
                                                Los Angeles, CA 90017
22                                              T: (415) 217-2000 / F: (415) 217-2040

23
                                                *Attorneys for Plaintiffs CleanAirNow and Sierra*
24                                              *Club*

25                                              /s/ Scott B. Hochberg
26                                              SCOTT B. HOCHBERG (SBN 305567)
                                                MAYA D. GOLDEN-KRASNER (SBN 217557)
27                                              shochberg@biologicaldiversity.org
                                                mgoldenkrasner@biologicaldiversity.org
28

                                       - 27 -

Climate Law Institute
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
T: (510) 844-7119 / F: (510) 844-7150


*Attorneys for Plaintiff Center for Biological Diversity*

1

## **ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1**

2

I hereby certify that the above counsel in Case Nos. 3:22-cv-02583 and 3:22-cv-02576

3

have concurred in the filing of this document.

4

/s/Adriano L. Martinez

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:22-cv-02576-RFL

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that, on February 2, 2024, I electronically filed the foregoing document

3

with the Clerk of the Court using the ECF System, which will send notification of such filing to

4

all counsel of record by operation of the Court's ECF System.

5

6

/s/ Adriano L. Martinez

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:22-cv-02576-RFL