ROB BONTA
Attorney General of California
ABIGAIL BLODGETT
Supervising Deputy Attorney General
STACY J. LAU (SBN 254507)
Deputy Attorney General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-1973
  Fax:  (510) 622-2270
  E-mail:  Stacy.Lau@doj.ca.gov

*Attorneys for Plaintiff State of California*

*[Additional counsel listed on signature page]*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF NEW YORK, COMMONWEALTH OF PENNSYLVANIA, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, PEOPLE OF THE STATE OF MICHIGAN, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, DISTRICT OF COLUMBIA, CITY OF NEW YORK, AND THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT,** | Case No.:  3:22-cv-02583-RFL<br><br>Case No.:  3:22-cv-02576-RFL<br><br>**PLAINTIFFS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT**<br><br>Date:         November 19, 2024<br>Time:        10:00 a.m.<br>Location:   Courtroom 15, 18th Floor<br>Judge:       The Honorable Rita F. Lin<br><br>Actions Filed: April 28, 2022 |
| Plaintiffs, | |
| v. | |
| **UNITED STATES POSTAL SERVICE, and LOUIS DEJOY, in his official capacity as United States Postmaster General,** | |
| Defendants. | |

1

2    **CLEANAIRNOW; CENTER FOR**
     **BIOLOGICAL DIVERSITY; and SIERRA**
3    **CLUB,**

4                                      Plaintiffs,

5            **v.**

6    **LOUIS DEJOY, in his official capacity as**
     **U.S. Postmaster General; and U.S. POSTAL**
7    **SERVICE,**

8                                      Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ................................. 1

STATEMENT OF THE ISSUES ................................................................................ 1

LEGAL BACKGROUND ...................................................................................... 3

    I.     The National Environmental Policy Act ........................................ 3

    II.    USPS's Status and Coverage by NEPA ........................................ 4

FACTUAL BACKGROUND .................................................................................. 5

    I.     The Environmental and Climate Impacts of Transportation Pollution .................. 5

    II.    State and Local Governments' Responses to Climate Change .............................. 6

    III.   Postal Delivery Trucks in the United States ................................... 8

    IV.   The Next Generation Delivery Vehicle Acquisition Program .............................. 8

    V.    The Environmental Impact Statement and Record of Decision ............................ 9

    VI.   Developments in the Program After the Original Record of Decision ................. 11

    VII.  The Supplemental Environmental Impact Statement and Revised Record of Decision ................................................................................ 11

    VIII. Procedural History of this Litigation ............................................ 15

STANDARD OF REVIEW .................................................................................. 16

ARGUMENT .................................................................................................. 17

    I.     Plaintiffs Have Standing to Challenge the EIS and Record of Decision ............. 17

          A.    Plaintiffs Have Been Injured By USPS's NEPA Violations ..................... 18

              1.    NEPA procedures are designed to protect Plaintiffs' concrete interests. ................................................................. 18

              2.    USPS's NEPA violations threaten Plaintiffs' concrete interests ................................................................... 19

          B.    Plaintiffs Meet the Causation Element of Standing. ........................... 20

          C.    Plaintiffs Meet the Redressability Element of Standing. ...................... 21

    II.    There is No Genuine Dispute That USPS Violated NEPA by Awarding the Next Generation Delivery Vehicle Acquisition Contract Prior to Environmental Review ................................................................... 21

          A.    USPS Contracted Away Its Ability to Consider Reasonable Alternatives ............................................................................ 22

          B.    USPS's Significant Steps in Furtherance of Its Project Prior to Finalizing the ROD Predetermined the Results of Its Environmental Review ........................................................................... 23

    III.   USPS Failed to Analyze Reasonable and Feasible Alternatives ........................ 26

          A.    USPS's Failure to Consider Reasonable Alternatives Consisting of More Than 62% Electric Vehicles Was Arbitrary and Capricious. .......... 26

i

**TABLE OF CONTENTS**
(continued)

Page

B.   USPS's Stated Reasons for Failing to Consider Additional Alternatives Are Arbitrary and Capricious. ............................................... 31

IV.   USPS Failed to Take a Hard Look at the Impacts of the Project ........................ 33

A.   The SEIS's Analysis Lacked the Necessary Rigor That NEPA Requires.............................................................................................. 33

B.   The SEIS Underestimates Emissions ...................................................... 35

C.   The SEIS Contains an Inadequate Environmental Justice Analysis ......... 36

V.   USPS Failed to Consider the Inconsistencies of Its Preferred Alternative with State and Local Laws and Plans.................................................................... 37

VI.   This Court Should Vacate USPS's Decision and Grant Injunctive Relief .......... 39

CONCLUSION ............................................................................................................. 40

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*Akiak Native Cmty. v. U.S. Postal Serv.*
213 F.3d 1140 (9th Cir. 2000) ...................................................................*passim*

5

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ....................................................................................... 16

6

7

*Bark v. U.S. Forest Serv.*
958 F.3d 865 (9th Cir. 2020) ........................................................................... 3

8

9

*Blue Mountains Biodiversity Project v. Blackwood*
161 F.3d 1208 (9th Cir. 1998) ........................................................................ 17

10

*Blue Mountains Biodiversity Project v. Jeffries*
72 F.4th 991 (9th Cir. 2023) ........................................................................... 25

11

12

*California ex rel. Lockyer v. U.S. Dep't of Agric.*
459 F. Supp. 2d 874 (N.D. Cal. 2006) ............................................................. 4

13

*California ex rel. Lockyer v. U.S. Dep't of Agric.*
575 F.3d 999 (9th Cir. 2009) ..................................................................... 39, 40

14

15

*California v. Bernhardt*
472 F. Supp. 3d 573 (N.D. Cal. 2020) ........................................................... 37

16

*Chelsea Neighborhood Ass'ns v. U.S. Postal Serv.*
516 F.2d 378 (2d Cir. 1975) ............................................................................ 4

17

18

*Citizens for Better Forestry v. U.S. Dep't of Agric.*
341 F.3d 961 (9th Cir. 2003) ..................................................................... 18, 21

19

20

*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*
123 F.3d 1142 (9th Cir. 1997) ........................................................................ 27

21

*City of Sausalito v. O'Neill*
386 F.3d 1186 (9th Cir. 2004) .................................................................... 20, 33

22

23

*Coliseum Square Ass'n, Inc. v. Jackson*
465 F.3d 215 (5th Cir. 2006) .......................................................................... 36

24

25

*Communities Against Runway Expansion, Inc. v. FAA*
355 F.3d 678 (D.C. Cir. 2004) ........................................................................ 36

26

*Conner v. Burford*
848 F.2d 1441 (9th Cir. 1988) .................................................................... 22, 23

27

28

1

<u>**TABLE OF AUTHORITIES**</u>
(continued)

2
<u>Page</u>

3
*Conservation Cong. v. U.S. Forest Serv.*
    No. CIV. S-13-0832 ............................................................................... 38

4

*Conservation Council for Haw. v. Nat'l Marine Fisheries Serv.*
5
    97 F.Supp.3d 1210 (D. Hawai'i 2015)................................................... 28

6
*Ctr. for Bio. Diversity v. U.S. Forest Serv.*
7
    349 F.3d 1157 (9th Cir. 2003)................................................................. 3

8
*Ctr. for Biological Diversity v. Brennan*
    571 F. Supp. 2d 1105 (N.D. Cal. 2007) ............................................... 16
9

10
*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*
    538 F.3d 1172 (9th Cir. 2008)......................................................... 32, 33

11
*Douglas County v. Babbitt*
12
    48 F.3d 1495 (9th Cir. 1995).......................................................... 18, 19

13
*Earth Island Inst. v. U.S. Forest Serv.*
    351 F.3d 1291 (9th Cir. 2003)......................................................... 33, 34
14

15
*el Bienestar de la Comunidad Costera v. FERC*
    6 F.4th 1321 (D.C. Cir. 2021) ............................................................... 36

16
*Friends of the Earth v. U.S. Navy*
17
    841 F.2d 927 (9th Cir. 1988)................................................................. 18

18
*Friends of Southeast's Future v. Morrison*
    153 F.3d 1059 (9th Cir. 1998)............................................................... 27
19

20
*Hausrath v. U.S. Dep't of the Air Force*
    491 F. Supp. 3d 770 (D. Idaho 2020)................................................... 37

21
*Idaho Conservation League v. Mumma*
22
    956 F.2d 1508 (9th Cir. 1992)......................................................... 17, 18

23
*Idaho Sporting Cong. v. Rittenhouse*
    305 F.3d 957 (9th Cir. 2002)................................................................... 3
24

25
*Institute for Fisheries Resources v. Burwell*
    2017 WL 89003 (N.D. Cal. Jan. 10, 2017) .......................................... 31

26
*Klamath Siskiyou Wildlands Ctr. v. Boody*
27
    468 F.3d 549 (9th Cir. 2006)................................................................. 40

28

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Lands Council v. McNair*
    537 F.3d 981 (9th Cir. 2008)............................................................... 17

4

5

*Lathan v. Volpe*
    455 F.2d 1111 (9th Cir. 1971)............................................................. 24

6

*Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*
    756 F.3d 447 (6th Cir. 2014)............................................................... 36

7

8

*Lujan v. Defs. of Wildlife*
    504 U.S. 555 (1992)........................................................... 18, 20, 21

9

10

*Marsh v. Or. Nat. Res. Council*
    490 U.S. 360 (1989)............................................................................ 34

11

*Massachusetts v. E.P.A.*
    549 U.S. 497 (2007)...................................................................... 19, 20

12

13

*Metcalf v. Daley*
    214 F.3d 1135 (9th Cir. 2000)............................................... 4, 22, 23

14

*Mid States Coal. for Progress v. Surface Transp. Bd.*
    345 F.3d 520 (8th Cir. 2003)............................................................... 36

15

16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
    463 U.S. 29 (1983).................................................................... 17, 39

17

18

*N. Alaska Env't Ctr. v. Hodel*
    803 F.2d 466 (9th Cir. 1986)............................................................... 40

19

*Nat. Res. Def. Council, Inc. v. Evans*
    168 F. Supp. 2d 1149 (N.D. Cal. 2001) ............................................. 28

20

21

*Nat'l Audubon Soc'y v. Dep't of the Navy*
    422 F.3d 174 (4th Cir. 2005)............................................................... 25

22

23

*Occidental Eng'g Co. v. I.N.S.*
    753 F.2d 766 (9th Cir. 1985)............................................................... 17

24

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*
    625 F.3d 1092 (9th Cir. 2010)............................................................. 30

25

26

*Or. Nat. Res. Council v. Marsh*
    52 F.3d 1485 (9th Cir. 1995)................................................................. 3

27

28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Pub. Citizen v. Dep't of Transp.*
  316 F.3d 1002 (9th Cir. 2003).................................................................. 19, 20, 21

4

*Robertson v. Methow Valley Citizens Council*
  490 U.S. 332 (1989)............................................................................................ 3, 33

5

6

*Rumsfeld v. Forum for Acad. and Institutional Rights, Inc.*
  547 U.S. 47 (2006) .................................................................................................. 18

7

*Save the Yaak Comm v. Block*
  840 F.2d (9th Cir. 1988)..................................................................... 21, 22, 23, 25

8

9

*Se. Alaska Conserv. Council v. U.S. Army Corps. of Eng'rs*
  486 F.3d 638 (9th Cir. 2007)................................................................................ 39

10

*Sierra Club v. FERC*
  867 F.3d 1357 (D.C. Cir. 2017) ........................................................................... 36

11

12

*Sierra Club v. U.S. Forest Serv.*
  843 F.2d 1190 (9th Cir. 1988)............................................................................. 38

13

14

*Sierra Forest Legacy v. Sherman*
  646 F.3d 1161 (9th Cir. 2011).............................................................................. 19

15

16

*Small v. Avanti Health Sys., LLC*
  661 F.3d 1180 (9th Cir. 2011).............................................................................. 40

17

*State of Cal. v. Block*
  690 F.2d 753 (9th Cir. 1982)................................................................. 17, 30, 32

18

19

*Thomas v. Peterson*
  753 F.2d 754 (9th Cir. 1985)................................................................................ 26

20

21

*Union Neighbors United, Inc. v. Jewell*
  831 F.3d 564 (D.C. Cir. 2016) ...................................................................... 29, 31

22

23

*WildEarth Guardians v. U.S. Dep't of Agric.*
  795 F.3d 1148 (9th Cir. 2015).............................................................................. 20

24

*WildWest Inst. v. Bull*
  547 F.3d 1162 (9th Cir. 2008)............................................................................. 22

25

26

**STATUTES**

27

5 United States Code
  § 706(2)(A) ................................................................................................................ 17

28

1

2

### TABLE OF AUTHORITIES
### (continued)

**Page**

3

4

38 Maine Revised Statutes
   § 576-A ................................................................................................. 6

5

6

39 United States Code
   § 201 ..................................................................................................... 4
   § 410(a) ................................................................................................ 4

7

8

9

42 United States Code
   § 4321 ..................................................................................................... 1
   § 4332 ..................................................................................................... 4
   § 4332(2)(C) ................................................................................... 3, 19, 33
   § 4332(2)(C)(iii) ................................................................................. 4, 26

10

11

2022 Maryland Law
   ch. 38 § 3 .............................................................................................. 7
   ch. 38 § 4 .............................................................................................. 7

12

13

Annotated Statues of New Mexico
   §§ 62-18-1. ............................................................................................ 7

14

15

California Health & Safety Code
   § 38501 ................................................................................................ 38
   § 38562.2 ............................................................................................... 6

16

17

Colorado Revised Statutes
   § 25-7-102(2)(g) ................................................................................... 6

18

19

Delaware Code Title 7
   § 10003 ................................................................................................. 6

20

General Statutes of Connecticut
   § 22a-200a(a) ....................................................................................... 6

21

22

New Jersey Statutes Annotated
   26:2C-39 ............................................................................................... 7
   26:2C-40 ............................................................................................... 7

23

24

New Mexico Administrative Code
   §§ 20.2.1.1 - 20.2.101.115 .................................................................. 19

25

26

New York City Administrative Code
   § 24-803 ............................................................................................... 7

27

New York Environmental Law
   § 75-0107(1) .......................................................................................... 7

28

# TABLE OF AUTHORITIES
**(continued)**

**Page**

Revised Code of Washington
  § 70A.45.020(1)(a)(ii) ................................................................................ 7

Rhode Island General Law
  § 42-6.2-9 ................................................................................................ 7

Vermont Statutes Annotated Title 10
  § 578 ........................................................................................................ 7

**COURT RULES**

Federal Rules of Civil Procedure
  56(a) ....................................................................................................... 16

**FEDERAL REGULATIONS**

39 Code of Fedeal Regulations.
  § 775 ........................................................................................................ 4
  § 775.2(a) ................................................................................................. 4
  § 775.11(b)(6) .......................................................................................... 33
  § 775.11(b)(8) .......................................................................................... 33
  § 775.11(b)(10) ........................................................................................ 38
  § 775.11(c)(5) ..................................................................................... 27, 28

40 Code of Federal Regulations.
  § 1500.1(a) ................................................................................................ 3
  § 1500.3(a) ................................................................................................ 4
  § 1501.2(a) .............................................................................................. 22
  § 1502.2(f) .......................................................................................... 4, 25
  § 1502.5 .................................................................................................... 4
  § 1502.9(d)(1) ......................................................................................... 11
  § 1502.14(a) ....................................................................................... 27, 28
  § 1502.14(b) ................................................................................ 26, 28, 33
  § 1502.14(c) ............................................................................................ 27
  § 1502.24 ................................................................................................ 33
  § 1506.1(a)(2) ......................................................................................... 25
  § 1506.2(d) ........................................................................................ 37, 39

**OTHER AUTHORITIES**

59 Fed. Reg. 7629 (Feb. 11, 1994) ........................................................... 36

86 Fed. Reg.
  12,715 (Mar. 4, 2021) ............................................................................... 9
  70,935 (Dec. 8, 2021) ............................................................................... 7
  47662 (Aug. 26, 2021) .............................................................................. 9

Plaintiffs' Consolidated Motion for Summary Judgment (3:22-cv-02576-RFL; 3:22-cv-02583-RFL)

1
2

### TABLE OF AUTHORITIES
(continued)

**Page**

3

87 Fed. Reg.
14,589 (Mar. 15, 2022) .......................................................................................... 10

4

5,581 (June 10, 2022)....................................................................................... 11, 12

5

994 (Jan. 7, 2022) ................................................................................................. 10

6

88 Fed. Reg.

7

67,277 (Sept. 29, 2023).......................................................................................... 14
85,936 (Dec. 11, 2023)...................................................................................... 15, 16

8

Exec. Order No. 2019-01 .......................................................................................... 7

9

10

Office of Inspector General, Electric Delivery Vehicles and the Postal Service,
Report No. RISC-WP-22-003 (Mar. 17, 2022) ....................................... 11

11

12

Pub. L. No. 91-375, 84 Stat. 719 (1970) ................................................................... 4

13

Pub. L. No. 117-169, § 70002, 136 Stat. 1818, 2086-87 (2022)............................. 11

14

USPS, Press Release, "USPS Intends To Deploy Over 66,000 Electric Vehicles by
2028, Making One of the Largest Electric Vehicle Fleets in the Nation" (Dec.

15

20, 2022) ........................................................................................................... 12

16

USPS, Press Release, "USPS Moves Forward with Awards to Modernize and
Electrify the Nation's Largest Federal Fleet" (Feb. 28. 2023)................................. 13

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that on November 19, 2024 at 10:00 a.m., or as soon thereafter as the matter may be heard, Plaintiffs California, New York, Pennsylvania, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, People of the State of Michigan, New Jersey, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, District of Columbia, the City of New York, and the Bay Area Air Quality Management District ("Government Plaintiffs"), and CleanAirNow, Center for Biological Diversity, and Sierra Club ("NGO Plaintiffs"), jointly move this Court for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Plaintiffs seek a court order: (1) granting summary judgment against defendants United States Postal Service and Louis DeJoy, in his official capacity as United States Postmaster General (collectively, "USPS" or "Defendants"); (2) declaring USPS's Final Environmental Impact Statement, Supplemental Environmental Impact Statement, Record of Decision, and Revised Record of Decision unlawful, arbitrary, capricious, and an abuse of discretion under the National Environmental Policy Act; (3) vacating the Record of Decision and revised Record of Decision; (4) remanding the Environmental Impact Statement and Supplemental Environmental Impact Statement to USPS; and (5) enjoining the Next Generation Delivery Vehicles Acquisition Program until Defendants fully comply with the National Environmental Policy Act by preparing a new and legally compliant Environmental Impact Statement.

**STATEMENT OF THE ISSUES**

This case is about USPS's violations of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), by repeatedly committing to a predetermined course of action, contracting away billions of dollars of taxpayer money, and only reviewing the environmental consequences after the fact. Plaintiffs brought this case after USPS announced a contract to replace a portion of its aging mail delivery vehicle fleet with up to 165,000 vehicles, with as many as 90% internal combustion engine ("gas-powered") trucks. Although USPS later announced—after Congress appropriated $3 billion for USPS to purchase electric vehicles and associated infrastructure—that it planned to replace up to 106,480 postal delivery vehicles, 62%

1

of which would be electric vehicles and 38% gas-powered, it again made this decision *before* completing the required NEPA review. When it finally conducted NEPA review, USPS failed to consider reasonable alternatives and adequately evaluate environmental impacts. Throughout this flawed process, USPS committed several NEPA violations, each of which warrant injunctive relief.

*First*, USPS awarded the Next Generation Delivery Vehicle Acquisition contract to Oshkosh Defense, LLC ("Oshkosh")—and committed substantial public resources—before even starting the required environmental review. USPS continued to violate NEPA by awarding contracts before publishing its draft supplemental environmental review. These premature commitments resulted in an environmental review that skewed USPS's analysis towards its predetermined decision and precluded the full and fair analysis of feasible alternatives required under NEPA.

*Second*, USPS failed to adequately consider and analyze a reasonable range of alternatives. Initially, the Final Environmental Impact Statement ("EIS") failed to consider any percentage of electric vehicles between a 10% minimum and 100% maximum. The Supplemental EIS ("SEIS") merely added two nearly identical alternatives, to procure 62% electric and 38% gas-powered vehicles, and ignored public comments calling for USPS to consider higher percentages of electric or other zero-emission vehicles.

*Third*, USPS failed to take the required "hard look" at the Next Generation Delivery Vehicle Acquisition Program's ("Program") direct, indirect, and cumulative impacts, and failed to ensure the scientific integrity of its analysis. Throughout the EIS and SEIS, USPS failed to support numerous conclusions, resulting in technical analyses that lacked the rigor required by NEPA. This included abandoning a total cost of ownership model in favor of focusing on upfront acquisition costs without a reasoned explanation, relying on an overly generalized classification for its trucks that resulted in underestimated emissions from gas-powered alternatives, and performing a cursory analysis of environmental justice impacts that was insufficient under NEPA.

*Fourth*, USPS violated NEPA's requirement to consider its decision's consistency with laws and policies enacted by Government Plaintiffs to reduce greenhouse gas ("GHG") emissions

and promote development of zero-emission vehicles.

Gas-powered postal delivery trucks that are sold over the next ten years could be on the road for twenty or more years, meaning that the consequences of this decision will be felt decades into the future. A timely and proper environmental review is essential for a government purchase of this magnitude. NEPA requires—and indeed its very purpose is—informed consideration of environmental impacts and alternatives, *before* settling on a course of action.

## LEGAL BACKGROUND

### I.    The National Environmental Policy Act

NEPA is "the basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). At its core, the statute is guided by the principle that "by focusing the agency's attention on the environmental consequences of a proposed project . . . important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA requires a "hard look" at the consequences of a proposed action to ensure that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" from the action. *Id.*; *see also Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). If the agency has not taken a "hard look," then a court may set aside the agency's action. *Or. Nat. Res. Council v. Marsh*, 52 F.3d 1485, 1488 (9th Cir. 1995).

NEPA also "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349. Its "disclosure requirement[s] obligate[] the agency to make available to the public high-quality information, including accurate scientific analysis, expert agency comments and public scrutiny, before decisions are made and actions are taken." *Ctr. for Bio. Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003).

To meet the "hard look" and disclosure requirements, agencies must prepare an EIS for federal actions that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 868 (9th Cir. 2020). The EIS must

3

examine the "alternatives to the proposed agency action." 42 U.S.C. § 4332(2)(C)(iii). This requirement "lies at the heart of any NEPA analysis." *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006).

"Agencies shall not commit resources prejudicing selection of alternatives before making a final decision." 40 C.F.R. § 1502.2(f); *see also id*. § 1506.1 (headed "Limitations on actions during NEPA process"). An EIS "shall be prepared early enough so that it can serve as an important practical contribution to the decision-making process and will not be used to rationalize or justify decisions already made." *Id*. § 1502.5. Thus, agencies must "prepare NEPA documents . . . before any irreversible and irretrievable commitment of resources." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000).

## II.    USPS's Status and Coverage by NEPA

USPS is an "independent establishment of the executive branch of the Government of the United States," 39 U.S.C. § 201, and, as an agency of the federal government, is subject to NEPA requirements.[1] 42 U.S.C. § 4332; 40 C.F.R. § 1500.3(a); *see also Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1144 (9th Cir. 2000); *Chelsea Neighborhood Ass'ns*, 516 F.2d at 386.[2]

USPS has recognized its NEPA obligations by, among other things, promulgating agency-specific NEPA procedures in 39 C.F.R. Part 775, in which USPS recognizes its responsibilities to "[i]nterpret and administer applicable policies, regulations, and public laws of the United States in accordance with the policies set forth in [NEPA] and the NEPA Regulations." 39 C.F.R. § 775.2(a). These regulations stress that USPS's policy is to "[e]mphasize environmental issues and alternatives in the consideration of proposed actions," to "identify and assess reasonable alternatives to proposed actions in order to avoid or minimize adverse impacts on the

---

[1] The Postal Reorganization Act ("PRA"), *see* Pub. L. No. 91-375, 84 Stat. 719 (1970), exempts USPS from some federal laws, unless "such laws remain in force as rules or regulations of [USPS]." 39 U.S.C. § 410(a). The PRA does not exempt USPS from NEPA. *Chelsea Neighborhood Ass'ns v. U.S. Postal Serv.*, 516 F.2d 378, 386 (2d Cir. 1975).

[2] Postmasters General are appointed by the USPS Board of Governors ("Board"), whose members are nominated by the President and confirmed by the Senate. The position does not have a fixed term length and a Postmaster General may serve until removed by the Board. The current Postmaster General, Louis DeJoy, was appointed in 2020.

1   environment," and to "[u]se all practicable means to protect, restore, and enhance the quality of

2   the human environment." *Id*. § 775.2(c), (e), (f). Courts review USPS's compliance with NEPA

3   under an arbitrary and capricious standard of review. *See Akiak*, 213 F.3d at 1144.

4   **FACTUAL BACKGROUND**

5   **I.     The Environmental and Climate Impacts of Transportation Pollution**

6           Fossil-fuel burning vehicles are a significant source of conventional pollutants such as

7   volatile organic compounds, nitrogen oxides, carbon monoxide, and particulate matter as well as

8   climate warming GHGs. Administrative Record ("AR") 7627. The conventional pollutants

9   emitted from these vehicles negatively impact public health, particularly in areas already

10  overburdened by pollution. AR 361. USPS itself identified the meaningful reductions in these

11  pollutants which would come from replacing its current outdated and highly polluting fleet of

12  delivery trucks. AR 9024-25. For example, USPS's own analysis of the SEIS's preferred

13  alternative (62% electric and 38% gas-powered) projected that it would reduce direct GHG

14  emissions by 798,181 metric tons of carbon dioxide equivalents annually. AR 9749. Similarly,

15  USPS found that the preferred alternative would reduce direct emissions of conventional

16  pollutants, including volatile organic compounds by 5,858 tons per year and carbon monoxide by

17  75,201 tons per year. *Id.* However, higher percentages of electric vehicles—had they been

18  considered—could more significantly reduce direct emissions of these pollutants: with 38% gas-

19  powered trucks, the fleet is still expected to directly emit over 121 tons per year of volatile

20  organic compounds and 1,358 tons per year of carbon monoxide into neighborhoods across the

21  country, and 261,131 metric tons of carbon dioxide equivalents. *Id.* Electric vehicles would have

22  no such direct emissions. AR 9024.

23          Air pollution, including particulate matter and smog, causes or exacerbates health harms,

24  including shortness of breath, asthma attacks, reduced lung function, lung cancer, increased infant

25  mortality, increased hospital admissions for cardiovascular disease, and premature death. AR

26  9295-96, 9598. Government Plaintiffs face significant economic losses with each additional ton

27  of carbon pollution, as heat waves, droughts, wildfires, extreme rainfall, and floods plague the

28  nation. AR 9350, 9585, 9591. Furthermore, the Intergovernmental Panel on Climate Change has

5

1   determined that there is a narrow and rapidly closing window in which to limit global warming to

2   1.5 degrees Celsius, the international goal set to avoid the worst catastrophic damages to the

3   United States and the rest of the world. AR 10815.

4        The health harms from transportation pollution fall disproportionately on low-income

5   communities and communities of color. AR 9598, 9628, 9296. For example, many highways,

6   busy roads, and depots, including USPS depots, are located in low-income communities and

7   communities of color. Low-income communities and communities of color breathe some of the

8   worst air in the country. AR 9312-13.

9        Transitioning to zero-emission vehicles, which do not require gasoline and emit no

10  tailpipe pollution, will ameliorate these climate and health impacts. Electric vehicle availability,

11  reliability, and affordability have increased dramatically in recent years. AR 9863-73.

12  **II.    State and Local Governments' Responses to Climate Change**

13       Government Plaintiffs have long been leaders in adopting laws and plans to reduce GHG

14  emissions and slow the pace of climate change, AR 9330-31, 9591-93, including policies to

15  promote the development and adoption of zero-emission technologies in the transportation sector:

16  •   California's laws and plans include: (1) a policy to achieve 85% below 1990 GHG emissions
        levels by 2045, carbon neutral (net zero) GHG by 2045, and to achieve and maintain net
17      negative GHG emissions thereafter, AB 1279, Cal. Health & Safety Code § 38562.2; and (2) a
        policy to achieve carbon neutrality by 2045, Exec. Order No. B-55-18. The Bay Area Air
18      Quality Management District ("BAAQMD") has set a target that 90% of vehicles in the Bay
        Area should be zero emission by 2050, with an interim target of 1.5 million such vehicles by
19      2030.

20  •   Colorado laws require net-zero statewide GHG pollution by the middle of the twenty-first
        century and establish interim targets to reduce GHG emissions by a minimum of 26% by
21      2025, 50% by 2030, 65% by 2035, 75% by 2040, 90% by 2045, and 100% by 2050,
        compared to 2005 levels. Colo. Rev. Stat. § 25-7-102(2)(g).
22

23  •   Connecticut must reduce the level of GHG emissions in the state by at least 45% below the
        2001 level by 2030 and by at least 80% below the 2001 level by 2050. Conn. Gen. Stat. § 22a-
24      200a(a).

25  •   Delaware established a Climate Action Plan aiming to reduce statewide GHG emissions by
        50% below 2005 levels by 2030, and to achieve net-zero emissions by 2050. Del. Code tit. 7,
26      §10003.

27  •   Maine must reduce its gross annual greenhouse gas emissions to at least 45% below 1990
        levels by 2030, and to at least 80% below 1990 levels by 2050.  38 M.R.S. § 576-A.  Maine
28      also must achieve net carbon neutrality by 2045.  *Id*.  A focus of Maine's plan to reduce

6

emissions is decarbonization of the transportation sector.  *See* Me. Exec. Order No. 36 FY 20/21 (Mar. 30, 2021).

- Maryland law requires the state to reduce GHG emissions 60% below 2006 levels by 2031, and to achieve net-zero GHG emissions by 2045. Climate Solutions Now Act of 2022, 2022 Md. Laws, ch. 38, §§ 3-4.

- The Global Warming Response Act commits New Jersey to reducing GHG emissions to 80% below their 2006 levels by 2050. N.J. Stat. Ann., 26:2C-39, 26:2C-40.

- New Mexico has enacted an Energy Transition Act, which sets standards for electric utilities of 50% renewable energy by 2030, 80% by 2040, and 100% by 2050. N.M. Stat. Ann. §§ 62-18-1, *et seq.*

- New York must reduce economy-wide GHG emissions 40% below 1990 levels by 2030 and at least 85% below 1990 levels by 2050. *See* N.Y. Envtl. Conserv. L. § 75-0107(1).

- The City of New York has committed to reducing GHG emissions 80% below 2005 levels by 2050, *see* NYC Admin. Code § 24-803, and has issued numerous plans describing its path to achieving this goal, all of which call for increased electrification of the transportation sector. AR 9930.

- Pennsylvania has adopted a Climate Action Plan to comply with the governor's commitment to reach a 26% reduction in GHG by 2025 and an 80% reduction by 2050. Exec. Order No. 2019-01; AR 9931.

- Rhode Island's climate laws and plans include: Rhode Island's 2021 Act on Climate which, *inter alia*, mandates GHG emission reductions to 45% below 1990 levels by 2030; 80% below 1990 levels by 2040, and to net-zero emissions by 2050. *See* R.I. Gen Laws § 42-6.2-9. As of 2026, there will be a statutory right to bring actions, including actions against the State and its agencies, for failure to comply with the 2021 Act on Climate. *See* R.I. Gen Laws § 42-6.2-9.

- The Vermont Global Warming Solutions Act requires Vermont to reduce GHG emissions to 26% below 2005 levels by 2025, 40% below 1990 levels by 2030, and 80% below 1990 levels by 2050. Vt. Stat. Ann. tit. 10, § 578.

- Washington State must reduce overall GHG emissions in the state by 45% below 1990 levels by 2030. Wash. Rev. Code § 70A.45.020(1)(a)(ii). Washington has also set a target of 100% electric passenger and light-duty vehicle sales starting in model year 2030. *Id.* § 43.392.020(1).

Recognizing that zero-emission vehicles are crucial to addressing the climate crisis and reducing air pollution across the nation, President Biden issued an executive order in 2021 that committed to transition the federal vehicle fleet to zero-emission vehicles. This executive order specifically directed government agencies to acquire only zero-emission light-duty vehicles after 2027. Exec. Order No. 14057: *Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability*, 86 Fed. Reg. 70,935 (Dec. 8, 2021).

7

### III.   Postal Delivery Trucks in the United States

USPS operates 212,000 delivery vehicles, representing over 30% of the overall federal fleet. AR 28. This constitutes not only the largest government fleet in the country, but one of the largest civilian fleets in the world. AR at 34. More than 125,000 of USPS's 212,000 delivery vehicles are purpose-built, right-hand-drive light delivery vehicles labeled "Long-Life Vehicles," and another 21,000 are similar "Flexible Fuel Vehicles." *See* AR 353. Much of the current fleet has operated for decades—long past its intended lifespan. Current Long-Life Vehicles are costly and lack optimal safety features such as airbags and anti-lock brakes. AR 35. Long-Life Vehicles average over $4,500 in annual maintenance costs, and total annual maintenance costs exceeded $700 million for these vehicles in 2019. *See* AR 309, 9005.

Postal delivery trucks are highly suited for electrification. The vast majority of postal delivery routes are under 70 miles—well within a single battery charge—and USPS makes deliveries during predictable work hours, which provide opportunities for off-duty charging. AR 9810. An electrified USPS fleet would reduce tailpipe emissions of conventional pollutants and GHGs and dramatically reduce the significant operating and maintenance costs associated with a fleet of gas-powered vehicles.

### IV.   The Next Generation Delivery Vehicle Acquisition Program

On January 20, 2015, USPS initiated its Program by issuing a Request for Information from prospective suppliers, which included draft specifications and plans for the fleet replacement. AR 29. USPS then engaged in a lengthy process of reviewing submissions, considering prototype proposals, awarding contracts for 44 prototype vehicles, testing prototypes, and requesting further proposals, all before beginning NEPA review. AR 29-30. In July 2020, USPS began evaluating the proposals, which each included both gas-powered and electric vehicles. AR 30. However, the agency did not consider the proposals' environmental impacts under NEPA.

On February 23, 2021, again, before even *beginning* its NEPA review, USPS announced a contract award to Oshkosh for the future production of Next Generation Delivery Vehicles. AR 30, 8742. Oshkosh had stated only a year earlier in a securities filing that it lacked "the expertise

8

or resources" to produce electric vehicles on a "cost-effective basis or at all." Plaintiffs Request for Judicial Notice ("RJN") at Exh. A-27. The final contract allowed for up to 90% of purchased vehicles to be gasoline-fueled. AR 3. The contract also required a minimum order of 50,000 vehicles. AR 8743. After committing to a minimum order of 50,000 vehicles, USPS placed its initial task order with Oshkosh. AR 30. The order, which allocated a sum of $482 million, funded Oshkosh's production design, assembly tooling, and factory start-up costs. AR 30, 358. Importantly, USPS explicitly directed Oshkosh to "proceed diligently with the performance of the contract" while the NEPA review was being done. AR 8750. Accordingly, the supplier selected a new 900,000-square-foot production facility and began retrofitting it. Declaration of Thomas Quigley, sworn June 15, 2022, at ¶13, 3:22-cv-02576-JD ("Gov't Dkt.") 82-1.

## V.      The Environmental Impact Statement and Record of Decision

After entering into the Oshkosh contract, USPS began its belated environmental review on March 4, 2021, when it published a Notice of Intent to prepare an EIS for the Program. 86 Fed. Reg. 12,715 (Mar. 4, 2021). USPS received 1,753 timely letters from interested parties, including federal agencies and a number of the Plaintiffs. AR 32. On August 26, 2021, USPS published a Notice of Availability of Draft Environmental Impact Statement for Purchase of Next Generation Delivery Vehicles. 86 Fed. Reg. 47662 (Aug. 26, 2021). The Draft EIS analyzed four options: (1) a Proposed Action, which is a purchase and deployment of Next Generation Delivery Vehicles under two hypothetical maximum scenarios (up to 90% gas-powered vehicles and a 10% to 100% electric vehicles alternative); (2) an alternative entailing a purchase and deployment of 100% right-hand-drive commercially available off-the-shelf gas-powered vehicles; (3) an alternative entailing a purchase and deployment of 100% left-hand drive commercially available electric vehicles; and (4) a No Action alternative. AR 40-43.

The public submitted over 37,511 comments, many of them critical of the Draft EIS. AR 33. In its comments, the United States Environmental Protection Agency ("EPA") explained that the Draft EIS lacked adequate data and presented biased cost and emissions estimates, thereby precluding "meaningful consideration of the proposed action and alternatives." AR 118. Other federal agencies and the public strongly criticized the Draft EIS for violating NEPA by, *inter alia*,

9

1   failing to include reasonable alternatives in its analysis, using incorrect cost information, failing

2   to take a hard look at air quality and socioeconomic impacts, lacking a proper analysis of

3   cumulative effects, and failing to consider environmental justice. AR 156-204. Despite this

4   criticism, on January 7, 2022, USPS published an EIS that was nearly identical to the Draft EIS

5   and reiterated the agency's intention to purchase up to 90% gas-powered vehicles. *See* Notice of

6   Availability of Final Environmental Impact Statement for Purchase of Next Generation Delivery

7   Vehicles, 87 Fed. Reg. 994 (Jan. 7, 2022). The EIS rejected an alternative of 100% battery

8   electric vehicles and evaluated no other percentage of electric or other zero-emission vehicles.

9        In addition to failing to consider a reasonable range of alternatives, the EIS was flawed in

10   several other ways. It relied on acquisition and maintenance cost data based, at least in part, on

11   the undisclosed contract awarded to Oshkosh, despite requests for USPS to make that information

12   public as required by NEPA. AR 120-21,124-26, 358-60, 373-74. The EIS also failed to

13   adequately evaluate environmental justice impacts between alternatives and did not consider the

14   inconsistency of the selected alternative with state and local laws that require reductions in GHG

15   emissions and a transition to zero-emission vehicles.

16        Expert agencies renewed their earlier concerns. EPA reiterated that awarding a contract

17   for the delivery vehicles in advance of starting the environmental analysis violated NEPA, and it

18   noted "that EPA's concerns with the Draft EIS were not adequately addressed" and that "the EIS

19   remains seriously deficient." AR 358, 363-70.

20        Similarly, the Council on Environmental Quality ("CEQ")—the agency tasked with

21   administering NEPA—issued a letter on the EIS emphasizing that USPS "committed to walk

22   down a path before looking to see where that path was leading" by awarding a contract for the

23   delivery vehicles before beginning NEPA review—an "approach [that] conflicts with

24   longstanding NEPA practice and law." Plaintiffs RJN at Exh. B-1.

25        On February 23, 2022, USPS issued a Record of Decision ("ROD") that incorporated the

26   EIS by reference. Next Generation Delivery Vehicles Acquisitions, 87 Fed. Reg. at 14,589 (Mar.

27   15, 2022). The ROD indicated USPS would purchase up to 148,500 gas-powered vehicles over

28   the next 10 years. The ROD altered its description of alternatives by combining the 90% gas-

powered alternative and the 10% battery electric alternative into one alternative described as the "proposed action." The EIS analysis did not change as a result of this change in the ROD. USPS originally stated in the ROD that it would not issue a supplemental EIS under 40 C.F.R. section 1502.9(d)(1) to address EPA's concerns. AR 4-5. USPS provided no opportunity for public comment on the ROD. On March 24, 2022, USPS placed an order for 50,000 Next Generation Delivery Vehicles, of which only 10,019 are battery electric vehicles. Notice of Intent to Prepare a Supplement to the Next Generation Delivery Vehicles Acquisitions Final Environmental Impact Statement, 87 Fed. Reg. 35,581 (June 10, 2022).

## VI.   Developments in the Program After the Original Record of Decision

Following USPS's issuance of the ROD, several relevant developments occurred. On March 17, 2022, USPS's Office of Inspector General issued a report finding that electric vehicles are generally capable of meeting USPS's needs, particularly on longer routes.[3] The Inspector General projected that electric vehicles are likely to be more affordable to own than gas-powered vehicles in certain cases, even in the absence of any financial incentives. *Id.*

In August 2022, Congress passed the Inflation Reduction Act, which provides $3 billion to USPS, including $1.29 billion in subsidies for the purchase of zero-emission vehicles and $1.71 billion for the purchase, design, and installation of infrastructure to support them. Pub. L. No. 117-169, § 70002, 136 Stat. 1818, 2086-87 (2022).

## VII.  The Supplemental Environmental Impact Statement and Revised Record of Decision

Plaintiffs filed this litigation challenging the initial ROD on April 28, 2022. See *infra* Section VIII. Shortly thereafter, on June 10, 2022, USPS published a notice of intent to prepare a supplemental EIS. 87 Fed. Reg. 35,581. In that same notice, the agency stated that on March 24, 2022, it had already placed an order for 50,000 Next Generation Delivery Vehicles, of which 10,019 are battery electric vehicles. *Id.* USPS stated that its SEIS would address, among other things, "network refinements and route optimization efforts" that could increase the minimum

---

[3] *See* USPS, Office of Inspector General, Electric Delivery Vehicles and the Postal Service, Report No. RISC-WP-22-003 (Mar. 17, 2022), Plaintiffs RJN at Exh. C.

11

1  number of electric vehicles acquired under the program and the need to accelerate replacement of

2  the fleet with a combination of Next Generation Delivery Vehicles and commercially available

3  vehicles. *Id.* On July 21, 2022, USPS published a revised draft notice stating that the agency's

4  preferred alternative would include: (1) the purchase and deployment of 50,000 Next Generation

5  Delivery Vehicles; and (2) acquisition of up to 20,000 left-hand-drive commercial vehicles and

6  14,500 right-hand-drive gas-powered vehicles within the next two years. AR 10798-99. The

7  preferred alternative tracks USPS's order four months prior for 50,000 Next Generation Delivery

8  Vehicles. 87 Fed. Reg. 35,581.

9      Government Plaintiffs filed scoping comments on August 15, 2022, AR 11615, stating,

10  *inter alia*, that USPS should pause its unlawful Oshkosh contract while its supplemental review is

11  completed, assess a reasonable range of alternatives, including 80% and 95% electric alternatives,

12  and account for inconsistencies with approved state and local laws, policies and plans.[4] The NGO

13  Plaintiffs similarly emphasized the need for USPS to pause the contract with Oshkosh and

14  examine a full set of alternatives, including 95% and 100% electric vehicles, in light of newly

15  appropriated funding. The NGO Plaintiffs' comments further stated that the SEIS would violate

16  NEPA if it failed to update data and assumptions used in the total cost of ownership analysis,

17  such as gas prices. NGO Plaintiffs also urged USPS to undertake a required environmental justice

18  analysis. Finally, the comments urged USPS management and staff to engage the public in this

19  decisionmaking process. AR 11591-600.

20      In December 2022, once again before releasing the required supplemental NEPA analysis,

21  USPS announced it expected to acquire 106,000 vehicles—at least 66,000 (or 62%) of which

22  would be electric—between 2022 and 2028. Plaintiffs RJN at Exh. D.[5] The announcement further

23  stated that acquisitions in 2026 and after were expected to be 100% electric. Two months later,

24  USPS prematurely and unlawfully awarded new separate contracts to purchase 9,250 commercial

---

[4] Government Plaintiffs filed a supplemental scoping comment letter on February 2, 2023, urging USPS to follow newly released guidance from CEQ on assessing GHG emissions and climate change impacts in NEPA reviews.

[5] USPS, Press Release, "USPS Intends To Deploy Over 66,000 Electric Vehicles by 2028, Making One of the Largest Electric Vehicle Fleets in the Nation" (Dec. 20, 2022).

gas-powered vehicles, 9,250 commercial electric vehicles, and 14,000 electric vehicle charging stations. Plaintiffs RJN at Exh. E.[6]

In April 2023, the USPS Office of Inspector General completed its report examining the Program's compliance with NEPA. The report recommended that the SEIS include an evaluation of more alternatives, update the total cost of ownership analysis, and update the assumptions underlying the environmental analysis to more fully reflect Next Generation Delivery Vehicle emissions. AR 11517-39.

In April 2023, the Government Accountability Office ("GAO") issued a report titled, "Action Needed to Improve Credibility of Cost Assumptions for Next Generation Delivery Vehicles." Plaintiffs RJN at Exh. F. The GAO found that assumptions about two cost factors—the price of gasoline and the cost of installing electric charging infrastructure—had the potential to considerably affect the calculation of how many electric and gas vehicles to purchase. For example, increasing the gasoline price by $1.00 within a selected range of prices resulted in a recommendation that almost 90% of the delivery vehicles be electric. *Id.* at p. F-2.

On June 30, 2023, USPS released the Draft SEIS for public comment. Specifically, the Draft EIS considered: (1) the acquisition of 106,480 vehicles, consisting of 62% electric vehicles and 38% gas-powered vehicles, and including 60,000 purpose-built vehicles, 14,500 right-hand-drive commercial gas-powered vehicles, and 31,980 commercial or purpose-built vehicles, to be deployed over a period of six years (the "SEIS Preferred Alternative"); (2) the acquisition of 106,480 vehicles, consisting of 62% electric vehicles and 38% gas-powered vehicles, all of which would be purpose-built vehicles, to be deployed over a period of eight years; and (3) a No-Action alternative, consisting of up to 165,000 purpose-built vehicles with a minimum of 10% electric vehicles. AR 12844.

USPS did not consider alternatives with a greater percentage of electric vehicles, such as 80% to 95%. USPS also did not consider other potential alternatives that would include hybrid vehicles, cargo bikes, small battery electric vehicles, or low-speed options. Instead, USPS limited

---

[6] Plaintiffs RJN at Exh. E. (USPS, Press Release, "USPS Moves Forward with Awards to Modernize and Electrify the Nation's Largest Federal Fleet" (Feb. 28. 2023)).

1   its consideration of alternatives to the proportion of electric and gas-powered vehicles that it had

2   already committed to in its December 2022 announcement, six months before releasing its Draft

3   SEIS for public comment.

4          Plaintiffs submitted comments criticizing the limited range of alternatives, USPS's failure

5   to take a "hard look" at various issues such as total cost of ownership, its failure to consider state

6   and local climate laws, plans and policies, and its failure to provide underlying data. AR 9890-

7   916, 10066-77.

8          On September 29, 2023, USPS published its SEIS. 88 Fed. Reg. 67,277 (Sept. 29, 2023).

9   The SEIS did not evaluate any alternatives besides those included in the Draft SEIS. Rather,

10   without adequate explanation, USPS simply selected its SEIS Preferred Alternative of procuring a

11   combination of commercial and custom vehicles, with a mix of 62% battery electric vehicles and

12   38% gas-powered vehicles—the exact same allocation of vehicles that USPS had announced it

13   would acquire nine months earlier. AR 8980. Under this allocation, USPS's fleet of more than

14   210,000 delivery vehicles would have a total of 68.6% gas-powered vehicles and only 31.4%

15   electric vehicles after the USPS acquisition is complete. AR 9840. USPS did not commit to

16   acquiring only zero-emission vehicles after 2026, as it had previously announced.

17          The SEIS failed to present the public with complete information regarding USPS's

18   consideration of alternative vehicle allocations. Notably, USPS failed to explain why it

19   considered only an allocation of 62% battery electric vehicles and 38% gas-powered vehicles. AR

20   8996-97. Instead, it relied upon generalized statements about the urgent need to replace its

21   outdated vehicles with "some" gas-powered vehicles, route suitability for electric vehicles, and

22   financial considerations as factors that limited the deployment of electric alternatives. But such

23   rationale was largely contradicted by other portions of the Draft SEIS where USPS acknowledged

24   that electric vehicles are suitable for more than 90% of its routes. AR 12845. Moreover, USPS did

25   not disclose adequate information on how the $3 billion provided under the Inflation Reduction

26   Act would be spent, or the cost assumptions that would purportedly preclude the purchase of a

27   greater percentage of zero-emission vehicles. The SEIS's financial analysis was further skewed

28

by an inexplicable shift from the total cost of ownership model used in earlier NEPA documents to an oversimplified analysis of acquisition costs.

Despite Plaintiffs' repeated calls to do so, the SEIS also failed to fully evaluate the Program's environmental justice impacts and its inconsistency with state and local laws and plans that require reductions in GHG emissions and a transition to zero-emission vehicles.

EPA commented on the SEIS on October 30, 2023, criticizing USPS's analysis and recommending that USPS provide greater disclosure in its revised ROD, consider alternatives that would exceed the minimum battery electric vehicle commitment of 62%, and strengthen its environmental justice commitments. AR 9824-31. EPA also disagreed with USPS's abandonment of the best practice of using a total cost of ownership analysis. AR 9826-28. Notably, EPA stated that "the Final SEIS does not clearly articulate what is motivating [USPS]'s vehicle acquisition strategy." AR 9826. EPA also stated, "the Final SEIS does not provide sufficient information for the public to understand whether [USPS] is selecting the most cost-effective mix of vehicles," *id.*, and route optimization efforts do not explain "why [USPS] is proposing to purchase 40,250 [internal combustion engine] vehicles," resulting in a total of 140,250 gas-powered vehicles in USPS's fleet, AR 9830.

On December 5, 2023, USPS signed and certified the revised ROD based on the analyses and findings from the EIS and SEIS, selecting the SEIS Preferred Alternative, and finalizing the NEPA process for its Program. AR 8967, 8969. USPS published its revised ROD in the Federal Register on December 11, 2023. 88 Fed. Reg. 85,936 (Dec. 11, 2023).

**VIII. Procedural History of this Litigation**

On April 28, 2022, the NGO Plaintiffs filed a Complaint challenging the ROD. 3:22-cv-02576-RFL ("CleanAirNow Dkt.") 1. Also, on April 28, 2022, Government Plaintiffs filed a Complaint challenging the ROD, and filed a First Amended Complaint on June 10, 2022. Gov't Dkt. 1, 79. The cases were related on May 10, 2022. CleanAirNow Dkt. 10; Gov't Dkt. 27. The Court granted Defendant Oshkosh's motion to intervene in February 2023. CleanAirNow Dkt. 64; Gov't Dkt. 122.

15

Meanwhile, on July 22, 2022, Defendants filed a motion before the Joint Panel on Multidistrict Litigation for consolidation and transfer of these matters, along with a similar case filed in the Southern District of New York, to the U.S. District Court of the District of Columbia. The Court *sua sponte* stayed the proceedings after Defendants moved to transfer to the multi-district panel. After briefing and oral argument, the panel denied Defendants' motion in October 2022. CleanAirNow Dkt. 50; Gov't Dkt. 105.

Following the panel's denial of transfer, on October 14, 2022, Defendants moved to continue the stay until USPS completed its supplemental environmental review. CleanAirNow Dkt. 51; Gov't Dkt. 106. After briefing and oral argument, the Court issued an order on February 2, 2023, extending the stay until completion of the revised ROD. USPS published its revised ROD in December 2023. AR 8967-75; *see also* 88 Fed. Reg. 85,936.

After the completion of the SEIS and revised ROD, on January 2, 2024, the parties filed a stipulation to lift the stay and modify the answer deadline. After a case management conference, the Court issued a scheduling order on January 24, 2024, and Plaintiffs filed supplemental complaints in their respective actions on January 31, 2024. CleanAirNow Dkt. 75; Gov't Dkt. 149. Oshkosh filed its answer on February 23, 2024. CleanAirNow Dkt. 78; Gov't Dkt. 152. USPS served the administrative record on April 9, 2024, and answered the supplemental complaints that same day. CleanAirNow Dkt. 81, 82; Gov't Dkt. 155, 156.

**STANDARD OF REVIEW**

Summary judgment must be granted if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). If a defendant cannot present specific and supported material facts of significant probative value to preclude summary judgment, then judgment should be entered in favor of plaintiffs. *Ctr. for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105, 1130-31 (N.D. Cal. 2007).

Challenges to final agency actions under NEPA are generally reviewed under the Administrative Procedure Act ("APA"). *Akiak*, 213 F.3d at 1144. Because the "[USPS] has adopted the relevant provisions of . . . NEPA," the APA's standard of review applies. *Id.* Thus,

16

1   the court "may set aside [USPS's] action only if it is 'arbitrary, capricious, an abuse of discretion,

2   or otherwise not in accordance with law.'" *Id.* (citing 5 U.S.C. § 706(2)(A)).

3        Under this standard, the court must determine whether the agency "examined the relevant

4   data and articulated a satisfactory explanation for its action including a rational connection

5   between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

6   *Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). An agency action is considered

7   arbitrary and capricious "only if the agency relied on factors Congress did not intend it to

8   consider, 'entirely failed to consider an important aspect of the problem,' or offered an

9   explanation 'that runs counter to the evidence before the agency or is so implausible that it could

10  not be ascribed to a difference in view or the product of agency expertise.'" *Lands Council v.*

11  *McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled in part on other grounds by Winter v. Nat.*

12  *Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

13       A reviewing court may find that the agency's decision was arbitrary and capricious if the

14  agency has not "taken a 'hard look' at the environmental consequences of its proposed action."

15  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (citation

16  omitted). The Ninth Circuit applies a rule of reason that asks whether an impact statement

17  "contains a 'reasonably thorough discussion of the significant aspects of the probable

18  environmental consequences,'" *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th

19  Cir. 1992), and whether the statement's "form, content and preparation foster both informed

20  decision-making and informed public participation," *State of Cal. v. Block*, 690 F.2d 753, 761

21  (9th Cir. 1982). Thus, in the APA context, "summary judgment is an appropriate mechanism for

22  deciding the legal question of whether the agency could reasonably have found the facts as it

23  did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985).

## ARGUMENT

### I.   Plaintiffs Have Standing to Challenge the EIS and Record of Decision

26       As an initial matter, Plaintiffs satisfy the constitutional standing requirements to bring this

27  action, which apply equally to both private and government plaintiffs: (1) they have suffered a

28  concrete and particularized "injury in fact"; (2) the injury is "fairly traceable" to the challenged

17

actions of the defendant; and (3) it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Additionally, where, as here, plaintiffs challenge compliance with a statutory provision under the APA, they must show that their injury "falls within the 'zone of interests' that the statute was designed to protect." *Douglas County v. Babbitt*, 48 F.3d 1495, 1499 (9th Cir. 1995). Under NEPA, this "zone of interests" encompasses the protection of the environment, which is threatened by USPS's unlawful revised ROD. *See id*. The presence of one party with standing is sufficient to satisfy Article III. *Rumsfeld v. Forum for Acad. and Institutional Rights, Inc.*, 547 U.S. 47, 52 n. 2 (2006).

**A.   Plaintiffs Have Been Injured By USPS's NEPA Violations**

First, Plaintiffs have suffered a concrete procedural injury arising from USPS's violations of NEPA. Plaintiffs asserting such an injury must show both that the procedures in question protect plaintiffs' concrete interests, and that it is reasonably probable that the challenged action will threaten these interests. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969-70 (9th Cir. 2003). Plaintiffs clearly meet these requirements.

1.   NEPA procedures are designed to protect Plaintiffs' concrete interests

Here, USPS violated NEPA by irreversibly committing resources before even beginning to review the environmental impacts of its action, by failing to adequately consider and analyze alternatives, by failing to take the required "hard look" at the environmental consequences of its action, and by failing to consider inconsistencies between its SEIS Preferred Alternative and Government Plaintiffs' laws and policies. Each of these procedural violations is sufficient to state an injury in fact to Plaintiffs. *See Mumma*, 956 F.2d at 1514 ("[T]he right to have agencies consider all reasonable alternatives before making a decision affecting the environment . . . is thus one that Congress—by virtue of imposing NEPA's procedural requirements—has acknowledged."); *Friends of the Earth v. U.S. Navy*, 841 F.2d 927, 931 (9th Cir. 1988) (explaining that "failure to follow procedures designed to ensure that the environmental consequences of a project are adequately evaluated" is an injury in fact).

Additionally, Government Plaintiffs have been "accorded a procedural right" under NEPA

18

because the statute provides that "'State, and local agencies, which are authorized to develop and enforce environmental standards,' may comment on the proposed federal action." *Douglas County v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir. 1995); 42 U.S.C. § 4332(2)(C). Each of the Government Plaintiffs is authorized to develop and enforce environmental standards, and have in fact developed stringent policies and laws to improve and protect the air quality of their respective jurisdictions, in accordance with state and local laws and the federal Clean Air Act. *See supra* at pp. 6-7; Decl. of Christopher M. LaLone ("LaLone Decl."), ¶¶ 5-8, 10, 19-29 (describing State of New York's Climate Law, emissions standards, regulations, and air quality attainment plans). Tailpipe emissions resulting from USPS's gas-powered vehicle acquisition threaten to cause the very harm addressed by Government Plaintiffs' plans and policies to limit such emissions. LaLone Decl. ¶¶3-4, 9-15, 20, 24-26, 29-55; *see, e.g.*, N.M. Admin. Code §§ 20.2.1.1 - 20.2.101.115.

### 2. USPS's NEPA violations threaten Plaintiffs' concrete interests

USPS's violations will result in air pollution and GHG emissions that will threaten Plaintiffs' economic, recreational, proprietary, aesthetic, and health interests. *See Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1016 (9th Cir. 2003) (noting that "credible threats" include factors such as "increased traffic, pollution, and noise" and "increased auto emissions"), *rev'd on other grounds*, 541 U.S. 752 (2004). As demonstrated by the declarations of Mary Reinhart, Jennifer Molidor, Rayan Makarem, Christopher LaLone, and Sarah Johnson, Plaintiffs' residents and members live, work, and recreate near major USPS depots that use the postal delivery vehicles that will be replaced by the Program. *See Public Citizen*, 316 F.3d at 1015 (noting the plaintiff organization's members live and work in areas that would be affected by increased truck traffic that would, in turn, cause them to be exposed to emissions that would affect their health).

Further, because Government Plaintiffs have "an interest independent of and behind the titles of [their] citizens, in all the earth and air within [their] domain," they are "entitled to special solicitude in [the] standing analysis." *Massachusetts v. E.P.A.*, 549 U.S. 497, 518-20 (2007) (quoting *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907)); *see also Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (a political body may sue to protect its

19

1   proprietary interests); *City of Sausalito v. O'Neill,* 386 F.3d 1186, 1198 (9th Cir. 2004) (including

2   among such interests the "ability to enforce land-use and health regulations" and "protecting its

3   natural resources from harm"). Plaintiffs' "well-founded desire to preserve [their] sovereign

4   territory" supports standing in cases implicating environmental harms such as air pollution and

5   climate change. *Massachusetts*, 549 U.S. at 519-20.

6       Here, USPS's decision to include a substantial number of gas-powered vehicles in its fleet

7   threatens Government Plaintiffs' proprietary interests by giving rise to unnecessary GHG and

8   criteria pollutant emissions, which will contribute to climate change and damage to Plaintiffs' air

9   quality, parks, public health, and other resources. For example, higher temperatures caused by

10  GHG will lead to a rise in sea levels along the California coast, increased wildfires and flooding,

11  and diminished fog, resulting in "significant adverse and costly impacts on the [California] State

12  Park System." Decl. of Jay Chamberlin ("Chamberlin Decl."), ¶¶7-15. Pollution from internal

13  combustion vehicles also poses significant risks to New York City residents, which leads to

14  increased hospitalization and emergency room costs for the city. Decl. of Sarah Johnson

15  ("Johnson Decl."), ¶¶8-11.

16      **B.    Plaintiffs Meet the Causation Element of Standing.**

17      Plaintiffs meet the causation requirement for standing, which is relaxed because Plaintiffs

18  have established a concrete injury under NEPA. *See WildEarth Guardians v. U.S. Dep't of Agric.*,

19  795 F.3d 1148, 1154 (9th Cir. 2015) (citing *W. Watersheds Project v. Kempthorne*, 632 F.3d 472,

20  485 (9th Cir. 2011)).

21      First, Plaintiffs' injury is "fairly traceable to the challenged activity of the defendant." *See*

22  *Lujan*, 504 U.S. at 560. There is a "reasonable probability" that as a result of its failure to comply

23  with the law and adequately consider the environmental impacts of its decision, USPS's Program

24  will result in increased pollution that will harm Government Plaintiff in their role as sovereigns,

25  landowners, regulators, and health care administrators, as well as "increased pollution and

26  adverse health effects to [NGO Plaintiffs] and [their] members." *Public Citizen*, 316 F.3d at 1017-

27  18 (finding causation satisfied because denying the petition would result in trucks immediately

28  beginning to operate in the United States, thereby "emitting pollutants that contaminate the air

20

1    Public Citizen's members breathe and that could potentially cause them myriad health effects.").

2    Here, unnecessary emissions of GHG and other air pollutants will directly cause harm to

3    Plaintiffs' interests. Chamberlin Decl. ¶¶7-15; Johnson Decl. ¶¶10-12, 13-14, 16-17; Decl. of

4    Jennifer Molidor ¶¶5-11, Decl. of Mary Reinhart ¶¶5-12; Decl. of Rayan Makarem ¶¶7-9; Decl.

5    of Hadrien Dykiel ¶¶5-7; Decl. of Jody Isenberg ¶¶8-11; Decl. of Huda Fashho ¶¶4.  *See Citizens*

6    *for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 972 (9th Cir. 2003) (explaining that

7    plaintiffs in a NEPA challenge "need only establish 'the reasonable probability of the challenged

8    action's threat to [their] concrete interest").

9        **C.    Plaintiffs Meet the Redressability Element of Standing.**

10       Finally, Plaintiffs satisfy the redressability element—that it is "'likely,' as opposed to

11   merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S.

12   at 561 (citations omitted). In procedural injury cases, it is unnecessary to "show that further

13   analysis by the government would result in a different conclusion;" plaintiffs need only show that

14   "the [agency's] decision *could be influenced* by the environmental considerations that [the

15   relevant statute] requires an agency to study." *See Public Citizen*, 316 F.3d at 1019. Should this

16   Court vacate the SEIS and revised ROD and require a proper NEPA review, that review could

17   influence USPS's decision to proceed with the Preferred Alternative. Accordingly, Plaintiffs have

18   standing to challenge USPS's action.

19   **II.    There is No Genuine Dispute That USPS Violated NEPA by Awarding the Next
             Generation Delivery Vehicle Acquisition Contract Prior to Environmental**
20   **        Review**

21       USPS violated NEPA by performing its environmental review six years after it began the

22   Program, signing a contract and committing almost half a billion dollars to it, and making

23   multiple delivery orders and commitments before completing NEPA review. "Proper timing is

24   one of NEPA's central themes." *Save the Yaak Comm v. Block*, 840 F.2d at 718 (9th Cir. 1988).

25   Agencies must "integrate the NEPA process with other planning and authorization processes at

26   the *earliest reasonable time* to ensure that agencies consider environmental impacts in their

27   planning and decisions, to avoid delays later in the process, and to head off potential conflicts."

28   40 C.F.R §1501.2(a) (emphasis added). An environmental assessment "must be 'prepared early

                                                        21

enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made.'" *Save the Yaak Comm.*, 840 F.2d at 718 (quoting 40 C.F.R. § 1502.5). Accordingly, an EIS should "be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary." *Metcalf*, 214 F.3d at 1142.

The Ninth Circuit has held that NEPA review is untimely where an agency has already made an "irreversible and irretrievable commitment of resources" to an option. *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988). Awarding a contract for a project and beginning performance of it before NEPA review weighs in favor of finding the review unlawful. *See Metcalf*, 214 F.3d at 1144. Additionally, where the agency's commitment of time and money is so significant that it limits its options and slants environmental review, the agency is considered to have irretrievably committed resources. *Id.*; *see also WildWest Inst. v. Bull*, 547 F.3d 1162, 1169 (9th Cir. 2008); *Save the Yaak Comm.*, 840 F.2d at 718 ("After major investment of both time and money, it is likely that more environmental harm will be tolerated."). Here, USPS's contract, and the significant steps USPS took in furtherance of the Program, sealed the fate of the environmental review that followed: they foreclosed certain alternatives from genuine consideration and irreversibly committed USPS to a course of action with financial and practical consequences.

### A.   USPS Contracted Away Its Ability to Consider Reasonable Alternatives

Before USPS even started its NEPA review, it had already signed a contract with Oshkosh and promised to purchase at least 50,000 vehicles. *Metcalf*, 214 F.3d at 1143 ("The 'point of commitment' in this case came when NOAA signed the contract . . . and then worked to effectuate the agreement. It was at this juncture that it made an 'irreversible and irretrievable commitment of resources.'"). Specifically, ███████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████, and in February 2021, *six months* before the Draft EIS was released, publicly announced the contract award to Oshkosh. Plaintiffs RJN at Exh. G; AR 32. USPS's commitment to such a large contractual obligation clearly indicates that its mind was made up long before it began

22

environmental review. *See Metcalf*, 214 F.3d at 1143 (agreement was strong evidence that agencies made the decision to support a proposal before finalizing the environmental assessment). NEPA, however, requires agencies to consider the environmental impacts of their actions before "the die [is] cast." *Id.* at 1144; *see also Conner*, 848 F.2d at 1446.

Even if USPS nominally conditioned its contract upon the completion of NEPA review, such a disclaimer was a mere formality for two reasons. First, the contract and large initial order obligated Oshkosh to begin substantial preparations for its completion, for which USPS would ultimately have to pay even if it later modified its order. For example,

And second, the existence of the contract and initial order influenced the results of the environmental review that followed, since the review would ultimately need to align with the contractual actions USPS had taken in the real world. USPS could and should have undertaken an environmental review before committing taxpayer resources to the project, and its failure to do so violates NEPA.

In addition to contractually binding itself, the large minimum order quantity demonstrates the strength of USPS's commitment to work with Oshkosh. In contracting and substantially committing to Oshkosh before assessing the environmental impacts of the decision, USPS violated NEPA. *See Save the Yaak Comm.*, 840 F.2d at 718-19.

**B.   USPS's Significant Steps in Furtherance of Its Project Prior to Finalizing the ROD Predetermined the Results of Its Environmental Review**

In addition to entering a contract with Oshkosh, USPS took significant steps in furtherance of the Proposed Action and "worked to effectuate the agreement" with Oshkosh before conducting NEPA review, which ultimately created a slanted environmental review. *Metcalf*, 214 F.3d at 1143. USPS issued an initial task order for up to $482 million for Oshkosh to begin preparations for production of the vehicles and made its first payment on the contract in February 2021. AR 358; CleanAirNow Dkt. 35-2, ¶76 ("Oshkosh admits that, in February 2021, the Postal Service made an initial task-order for engineering and factory preparation costs and

23

1    that this task-order was published before the publication of the draft EIS."). The contract directed

2    Oshkosh to move forward while the NEPA review was being conducted, so Oshkosh selected its

3    new 900,000-square-foot production facility and began to retrofit it by "building out its facility,

4    installing manufacturing equipment and tooling, and building test vehicles." CleanAirNow Dkt.

5    35-1, ¶ 13. ██████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ████████████████████████    In December 2022, USPS announced it expected to acquire at

8    least 66,000 electric vehicles as part of a 106,000-vehicle acquisition plan. Plaintiffs RJN at Exh.

9    D.

10    In February 2023, after USPS had announced it was completing a Supplemental EIS but

11    had not yet issued it, USPS again undermined its NEPA analysis by awarding two additional

12    contracts. ████████████████████████████████████████

13    ████████████████████████    Even to the extent USPS could alter or terminate all of

14    these contracts down the road due to its NEPA findings, it remains partially bound by them.

15    Regardless of the NEPA findings, ██████████████████████████████████

16    ████████████████████████    Moreover,    ████████████████████

17    ████████████████████████████████████████████████████████

18    ████████████████████████████████████████████████████████

19    ████████████████████████████████████████████████████████

20    ████████████████████████████████████████████████████████

21    ████████████████████████████████████████████

22    USPS's NEPA review was untimely at the point it had already paid for a specific location

23    for the contract's performance and lost flexibility to change or cancel its orders without incurring

24    substantial costs. *See Lathan v. Volpe*, 455 F.2d 1111, 1121 (9th Cir. 1971) (holding that the

25    agency made an irretrievable commitment of resources by approving the proposed location of an

26    interstate freeway and authorizing property acquisitions, even though the final approval of design

27    plans had not yet been given, because flexibility had been lost and more environmental harm

28    would be tolerated once the planning process reached the later stages). Because USPS had already

started accepting substantial performance under the contract, its environmental review was prejudiced toward tolerating more harm. *See Save the Yaak Comm.* 840 F.2d at 718 (NEPA review untimely where the construction of road had already begun by the time environmental assessment was done).

USPS conceded that its consideration of certain alternatives was compromised because of the commitments it had already made to Oshkosh and other vehicle manufacturers. █████████ ███████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████ For that reason, a 90% electric vehicle scenario was not presented as an alternative in the SEIS. USPS's prior contractual commitments prevented it from fully considering an environmentally preferred alternative, and as a result, that alternative was not part of the SEIS. USPS thus acted in a way that "[l]imit[ed] the choice of reasonable alternatives," in clear violation of NEPA. *See* 40 C.F.R. §§ 1502.2(f), 1506.1(a)(2).

Additionally, by the time the agency began considering environmental impacts, it had already spent six years reviewing prototypes and evaluating vendors, spending significant resources on a process that resulted in its contract with Oshkosh. As a result, the environmental review was little more than a "post hoc rationalization" for a decision that had already been made: Oshkosh—with its limited ability to produce electric vehicles—would build the Next Generation Delivery Vehicle fleet. *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 199 (4th Cir. 2005) (agency's post hoc rationalization was evidence of its failure to comprehensively investigate the environmental impact of its decisions).

This was not akin to the situation in *Blue Mountains Biodiversity Project v. Jeffries*, 72 F.4th 991, 998-99 (9th Cir. 2023), where the Ninth Circuit held that an agency did not make an irretrievable commitment of resources because the agency reserved the right to terminate a contract at its convenience, had not issued a notice to proceed, did not make any payments to the contractor, and did not engage in "post hoc rationalization." Here, USPS was required to make payments to Oshkosh even if it later altered its purchase plans, the contract parameters limited its analysis of a higher electric vehicle percentage, and USPS ultimately selected its alternatives to

25

1   conform with the contract it had already signed. *See Thomas v. Peterson*, 753 F.2d 754, 757-60

2   (9th Cir. 1985) (holding the EIS would be untimely where the Forest Service wanted to build a

3   road that would facilitate timber sales and then prepare an EA/EIS to analyze the environmental

4   impact of the timber sales because "building the road swings the balance decidedly in favor of

5   timber sales"). Throughout the vehicle acquisition process, USPS assumed that its NEPA review

6   would ratify the decisions it had already made and contracts it had signed. That is irreconcilable

7   with NEPA's intent that environmental study *precede and inform* the binding commitments an

8   agency makes.

9   **III.   USPS Failed to Analyze Reasonable and Feasible Alternatives**

10         **A.   USPS's Failure to Consider Reasonable Alternatives Consisting of More
              Than 62% Electric Vehicles Was Arbitrary and Capricious.**

11

12         USPS violated NEPA by failing to analyze reasonable and feasible alternatives to its SEIS

13   Preferred Alternative—including any alternative vehicle mix with more than 62% and less than

14   100% electric or other zero-emission vehicles. NEPA requires agencies to consider "a reasonable

15   range of alternatives to the proposed agency action . . . that are technically and economically

16   feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(2)(C)(iii); *see also id.*

17   at § 4332(2)(F) (agencies must "study, develop, and describe technical and economically feasible

18   alternatives"). An agency must discuss each of the alternatives that it considered in "detail . . . so

19   that reviewers may evaluate their comparative merits," 40 C.F.R. § 1502.14(b), and must "briefly

20   discuss the reasons" for the elimination of certain alternatives "from detailed study," *id.* at

21   § 1502.14(a).

22         Here, the purpose and need of the Program is to replace old delivery vehicles with

23   "vehicles with more energy-efficient powertrains, updated technology, reduced emissions,

24   increased cargo capacity and improved loading characteristics, improved ergonomics and carrier

25   safety, and reduced maintenance costs." AR 18, 8979. Acquisition of a greater percentage of

26   electric or other zero-emission vehicles would amply meet this purpose and need and result in

27   fewer environmental impacts than USPS's Preferred Alternative. AR 9024-30.

28         While an EIS is not required to "consider an infinite range of alternatives," it must

                                          26

1   consider "reasonable or feasible ones." *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123

2   F.3d 1142, 1155 (9th Cir. 1997); 40 C.F.R. § 1502.14(a)-(c). The "existence of reasonable but

3   unexamined alternatives renders an EIS inadequate." *Friends of Southeast's Future v. Morrison*,

4   153 F.3d 1059, 1065 (9th Cir. 1998). Indeed, USPS's own regulations recognize that the

5   alternatives analysis is "vitally important," and require those preparing an environmental impact

6   statement to "[e]xplore and evaluate *all* reasonable alternatives . . . and briefly discuss the

7   reasons for eliminating any alternatives." 39 C.F.R. § 775.11(c)(5) (emphasis added).

8        USPS's alternatives analysis failed to comply with NEPA because it did not include

9   reasonable and feasible alternatives. This failure has significant consequences for the

10   environment and public health: ignoring alternatives with a greater percentage of zero-emission

11   vehicles could result in excessive GHG emissions from tens of thousands of gas-powered vehicles

12   and significant amounts of otherwise avoidable criteria pollution in neighborhoods and

13   communities. AR 10066.

14        Here, many commenters proposed alternatives consisting of more than 62% electric

15   vehicles. Both Government Plaintiffs and NGO Plaintiffs, among others, emphasized that USPS

16   should consider 80% and 95% electric vehicle alternatives, and pointed out that approximately

17   95% of USPS routes can be completed on a single electric battery charge. AR 9890, 10066. EPA

18   also recommended as the preferred alternative "the greatest percentage of deployment of [electric

19   Next Generation Delivery Vehicles] as is economically feasible." AR 4908; *see also* AR 9918

20   (NGO comment urging USPS to reach the "fleet's maximum feasible electrification potential of

21   90 percent"), 11594 (Earthjustice comment urging USPS to consider an "alternative that features

22   the maximum number of BEVs compatible with current postal routes").

23        Expert commenters demonstrated that acquisition of greater numbers of electric vehicles

24   is feasible. The California Air Resources Board, for example, listed the many models of available

25   electric vehicles ordered by large companies such as Amazon (which purchased 100,000 zero-

26   emission delivery vans from Rivian), Royal Mail, UPS, and FedEx, and stated that USPS should

27   consider combinations of vehicles and charging strategies that would result in higher allocations

28   of electric vehicles, rather than committing to a single vehicle type or battery size. AR 11574-89;

27

1    *see also* AR 9844-45, 10082-83, 11609, 11688. A coalition of non-governmental organizations

2    submitted evidence that 4.3 million electric vehicles are expected to be produced by 2026, and

3    that the market for zero-emission vehicles—especially cargo vans and electric trucks—is

4    expanding rapidly. AR 9924-25; *see also* AR 11676, 10082-83.

5         USPS's failure to consider and discuss reasonable alternatives recommended by EPA,

6    State and local governments, and non-governmental organizations in the SEIS violated NEPA.

7    Courts have found an alternatives analysis inadequate when agencies failed to consider

8    reasonable alternatives proffered by commenters. *See Nat. Res. Def. Council, Inc. v. Evans*, 168

9    F. Supp. 2d 1149, 1160 (N.D. Cal. 2001) (agency did not explain failure to address commenters'

10   proposed alternatives or offer own appropriate alternatives), *order aff'd in part, vacated in part*,

11   316 F.3d 904 (9th Cir. 2003); *Conservation Council for Haw. v. Nat'l Marine Fisheries Serv.*, 97

12   F. Supp. 3d 1210, 1238 (D. Hawai'i 2015) ("general and cursory" rejection of commenters'

13   proposed alternatives violated NEPA). USPS did not consider any of the above reasonable

14   alternatives, either "in detail" or even "briefly" as required under NEPA. 40 C.F.R. § 1502.14(a),

15   (b); *see also* 39 C.F.R. § 775.11(c)(5).

16        Rather than evaluate reasonable alternatives, USPS improperly limited the alternatives to

17   those that it had already publicly announced and supported through pre-existing contractual

18   commitments. Specifically, across both the EIS and SEIS, USPS considered two No Action

19   alternatives and only two additional allocations of electric vehicles. The No Action alternatives

20   consist of: (1) the original EIS No Action alternative of acquiring no new delivery vehicles; and

21   (2) the SEIS No Action alternative of acquiring only 10% electric vehicles and 90% gas-powered

22   vehicles.[7] USPS considered only two alternative allocations of electric vehicles, despite public

23   comments urging USPS to consider more zero-emission alternatives: (1) the SEIS Preferred

24   Alternative, a vehicle mix of 62% electric and 38% gas-powered vehicles, to be deployed over a

25   period of either six or eight years, and (2) a 100% electric vehicle alternative, consisting of either

26   Next Generation Delivery Vehicles, or off-the-shelf left-hand-drive vehicles, which USPS

27   

28      [7] This alternative was presented as the preferred action alternative in the original EIS but considered as the No Action alternative in the SEIS.

28

1    rejected in the original EIS. AR 8994, 37-44. USPS also considered and rejected purchasing

2    100% gas-powered off-the-shelf vehicles. AR 17-18. USPS refused to consider reasonable

3    alternatives with more than 62% electric vehicles, which could result in further improved air

4    quality and reduced GHG emissions. Instead, it selected the SEIS Preferred Alternative, which

5    consists of the exact same vehicle allocation that USPS announced before even releasing its Draft

6    SEIS. AR 8996-9000.

7         The D.C. Circuit Court of Appeals addressed a similar case in *Union Neighbors United,*

8    *Inc. v. Jewell*, 831 F.3d 564 (D.C. Cir. 2016), concerning the U.S. Fish and Wildlife Service's

9    ("Service") EIS for a wind energy facility which had potential impacts on endangered bats. Of

10   seven potential alternatives, the Service considered four in depth: (1) the No Action alternative;

11   (2) an alternative with a designated "cut-in speed," restricting the speed at which turbines would

12   begin rotating to at least 5.0 meters per second ("m/s") during the bats' most active periods, and

13   taking 300 bats; (3) the "proposed action" with a designated "cut-in speed" of up to 6.0 m/s and

14   taking 26 bats; and (4) a maximally restricted alternative of shutting down all turbines at night

15   and taking no bats, but resulting in $216.5 million in lost revenues. *Id.* at 572-73. The Service

16   found the proposed action would not cause significant impacts and declined to consider plaintiff's

17   suggested cut-in speed of 6.5 m/s to further reduce bat mortality, arguing there were "infinite

18   combinations of cut-in speeds higher than the proposed action" and the existence of the

19   maximally restricted alternative made analysis of other variations unnecessary. *Id.* at 573. The

20   Court disagreed. It found that the Service "failed to consider a reasonable range of alternatives

21   because it did not consider any reasonable alternative that would be economically feasible while

22   taking fewer bats than [the proposed action]." *Id.* at 576. Similarly, here, the SEIS and revised

23   ROD violate NEPA because USPS ignored reasonable alternatives that would be economically

24   feasible, could result in fewer environmental impacts, and would better meet USPS's stated

25   purpose and need to acquire vehicles with more energy-efficient powertrains, reduced emissions,

26   and reduced maintenance costs.

27         Indeed, USPS's failure to consider the proposals set forth in public comments resulted, at

28   least in part, from USPS's improper pre-commitment of resources to its Preferred Alternative. As

29

1   stated above, █████████████████████████████████████████

2   ████████████████████████████████████████████████████████

3   ██████████████████████████████████ USPS thus illegally rejected consideration of

4   potential alternatives, "end[ing] its inquiry at the beginning," because it had already committed to

5   its Preferred Alternative before completing NEPA review. *Block*, 690 F.2d at 767 (citation

6   omitted).

7           Moreover, some of the alternatives that USPS considered in the EIS and SEIS represented

8   merely a "paper exercise" that does not comply with NEPA's mandate to consider reasonable

9   alternatives. *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1124 (9th Cir.

10  2010). Specifically, USPS viewed certain alternatives, including the 100% electric vehicle

11  alternative discussed in the original EIS and ROD, as merely "hypothetical." In response to

12  commenters who made this point, USPS claimed that the "hypothetical maximums" allowed it to

13  "understand the full potential environmental impacts at either end of the Proposed Action's range

14  of possible vehicle mixes," and on this basis, rejected commenters' requests to consider mid-

15  range vehicle mixes. AR 264 (declining to "expand the EIS by adding calculations for various

16  potential mixes within the set range").

17          USPS's statement underscores that it never truly considered a 100% electric vehicle

18  alternative, but instead used this "hypothetical" alternative as an excuse to omit consideration of

19  any alternative with a greater percentage of electric vehicles than the predetermined Preferred

20  Alternative. USPS's claims that electric vehicles cannot operate for 12,500 routes, and repeated

21  statements in the SEIS that it was "necessary to consider only Alternatives that include the

22  procurement of some [gas-powered] vehicles"—which do not take into account that tens of

23  thousands of gas-powered vehicles will remain in service—only highlight that USPS failed to

24  meaningfully consider a 100% electric vehicle alternative. AR 8995-96. USPS cannot be credited

25  for considering alternatives with more than 62% electric vehicles when the only such alternative

26  included in its EIS, the 100% electric vehicle alternative, was summarily rejected as infeasible.

27  *Cf. Union Neighbors United*, 831 F.3d at 576 (agency violated NEPA where the only alternative

28  to the preferred alternative which would take fewer endangered bats was found economically

1   infeasible). USPS's rejection of a "hypothetical" 100% electric vehicle alternative also does not

2   excuse its failure to consider reasonable alternatives with more than 62% zero-emission vehicles.

3

### B.   USPS's Stated Reasons for Failing to Consider Additional Alternatives Are
###      Arbitrary and Capricious.

4

5       USPS listed the following "consideration factors" as reasons for limiting its review of

6   alternatives: (1) an urgent need to replace its aging and increasingly unreliable vehicles in a cost-

7   and time-efficient manner; (2) route suitability; and (3) financial considerations, which require

8   USPS to consider only alternatives that include the procurement of some gas-powered vehicles.

9   AR 8994-96. But these vague and conclusory statements do not justify a failure to consider

10  alternatives with an electric vehicle mix above 62%.

11      First, even to the extent that USPS has demonstrated an urgent need to replace its existing

12  postal delivery vehicles, USPS has not explained how or why this urgent need limits the

13  percentage of electric vehicles to 62%. USPS gives only a vague explanation in the SEIS that

14  some gas-powered vehicles must be considered because of "the time needed to install necessary

15  infrastructure, the fact that over the near-term [commercial off-the-shelf] vehicles can be obtained

16  at a faster pace than the purpose-built [Next Generation Delivery Vehicles,] and that the

17  [commercial off-the-shelf electric vehicle] market is currently limited." AR 8994-95. The

18  administrative record lacks any support for these statements and provides no grounds for limiting

19  the share of electric vehicles to 62% on their basis.[8] Moreover, the record contains ample contrary

20  evidence regarding the availability of electric vehicles, including commercial off-the-shelf

21  models, that USPS did not address. *See supra* at pp. 27-28.

22      Second, with respect to route suitability, USPS conceded that more than 90% of its routes

23  could be served by an electric vehicle on a single charge. AR 8995. And in fact, the USPS

24  Inspector General found that only 1.5% of USPS routes are longer than 70 miles. AR 10070; *see*

25  *also* Plaintiffs RJN at Exh. C-8. Route suitability therefore is not a valid justification for refusing

26

---

27      [8] Administrative records typically include "internal comments, draft reports, inter- or
    intra-agency emails, revisions, memoranda, or meeting notes" which "inform an agency's final
    decision." *Institute for Fisheries Resources v. Burwell*, 2017 WL 89003 at *1 (N.D. Cal. Jan. 10,
28  2017). There are few such documents in USPS's record.

to consider alternatives with higher percentages of electric or other zero-emission vehicles. *See, e.g.*, AR 10081.

Third, the EIS and SEIS relied on costs as a reason to limit alternatives, but failed to show how USPS arrived at its conclusions. Instead, USPS's findings are "'vague and conclusory statements' unaccompanied by 'supporting data." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1224 (9th Cir. 2008). As EPA noted in its comments on the final SEIS, the "SEIS include[d] very limited information" about Inflation Reduction Act subsidies and "did not provide analytic support for the selection of 62 percent vs a higher percentage of [electric] vehicles;" moreover, USPS's "lack of detail [led] to seemingly contradictory statements" regarding vehicle costs. AR 9828. Even after being allocated $3 billion from the Inflation Reduction Act to fund the purchase of zero-emission vehicles and infrastructure (*i.e.*, charging stations), USPS vaguely stated that it would consider only alternatives that include some gas-powered vehicles because the "upfront acquisition cost differential between [electric and gas-powered] vehicles remains significant…" and that electric vehicles and infrastructure cost approximately 86% more than gas-powered vehicles. AR 8996. USPS, however, did not provide "supporting data" for deciding to acquire as much as 38% gas-powered vehicles in the revised ROD. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d at 1224.[9] USPS also failed to consider lower cost electric battery and charger options and opportunities for additional funding for zero-emission vehicles and infrastructure. AR 4978-79, 9932-36, 9849, 10064, 11607.

Finally, USPS claims that each of its alternatives comes with greater benefits than the current fleet. But that is insufficient to satisfy NEPA's requirement to consider a reasonable range of alternatives, and discuss "each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.14(b). Even to the extent the Preferred Alternative is an improvement over the outdated fleet, this does not absolve

---

[9] Indeed, the only discussion of costs ████████████████████████████████████████████████ This does not meet NEPA's mandate for agencies to foster "informed decision-making and informed public participation" in their environmental review. *Block*, 690 F.2d at 767.

32

USPS of NEPA's requirements. *Cf. Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d at 1178 (agency may not relinquish its obligation to consider significance of environmental impacts "simply because the [agency's] Final Rule may be an improvement" over the previous standard). The fact that any of USPS's alternatives will produce less emissions than the current fleet does not mean that the proffered range of alternatives is adequate.

In sum, the SEIS's alternatives analysis lacks support, is self-serving, was pre-determined, and eliminates alternatives without revealing its reasons for doing so. *See O'Neill*, 386 F.3d at 1207 ("[T]he EIS must briefly discuss the reasons for their having been eliminated."). Accordingly, the SEIS violates NEPA.

## IV.   USPS Failed to Take a Hard Look at the Impacts of the Project

In connection with a major action affecting the quality of the human environment such as this one, USPS was required to prepare a "detailed statement" that "take[s] a 'hard look' at environmental consequences. 42 U.S.C. § 4332(2)(C); *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003); *Robertson*, 490 U.S. at 350. When undertaking its analysis, the agency must also "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." 40 C.F.R. § 1502.24. At numerous points throughout the process, USPS violated NEPA by failing to take a hard look at the direct, indirect, and cumulative impacts of its decision.

### A.   The SEIS's Analysis Lacked the Necessary Rigor That NEPA Requires

The EIS and SEIS failed to support many of its conclusions with evidence and repeatedly relied on unrevealed methodologies. NEPA requires USPS to "identify any methodologies used" and "make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the [EIS]." 40 C.F.R. § 1502.24; 39 C.F.R. §§ 775.11(b)(6), 775.11(b)(8). "An agency is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints." *Earth Island Inst.*, 351 F.3d at 1301 (citing 40 C.F.R. § 1502.9(a)-(b)). While courts generally defer to an agency's analysis of scientific data due to the "high level of technical expertise" it requires, *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989), courts "must independently review the record in order to

33

1  satisfy themselves that the agency has made a reasoned decision based on its evaluation of the

2  evidence." *Earth Island Inst.*, 351 F.3d at 1301

3      Here, the SEIS took an incoherent and inconsistent approach to total cost of ownership,

4  falling short of the standard for reasoned decisionmaking. In the EIS, USPS relied on a total cost

5  of ownership[10] analysis to justify its decision. AR 308-11. While many commenters critiqued the

6  analysis in the EIS as failing to meet NEPA standards for technical rigor for a wide range of

7  reasons, no commenters argued that a total cost of ownership approach was improper. In the

8  SEIS, however, USPS completely abandoned the total cost of ownership approach and instead

9  focused solely on the upfront costs of vehicle acquisition, which does not account for the higher

10  long-term maintenance and operating costs of gas-powered vehicles. AR 8971-73. When

11  confronted with this unexplained reversal, USPS responded that it is required to follow several

12  authorities, including the federal laws and regulations overseeing USPS and the *USPS Supplying*

13  *Principles and Practices.* AR 8971-72. Yet none of the legal provisions USPS cited in the ROD

14  justifies relying solely on an upfront cost approach. In fact, USPS's *Supplying Principles and*

15  *Practices* document notes that total cost of ownership analysis "exposes the hidden costs easily

16  overlooked during budget planning or when making purchase decisions. As a result, it becomes

17  possible to yield higher savings by optimizing relevant cost elements." Plaintiffs RJN at Exh. H-

18  3. That document goes on to note that "[a] [total cost of ownership] analysis is especially helpful

19  for more complex purchases." *Id*.

20      While its policies do not "require a [total cost of ownership] for every purchase," (*id.*),

21  USPS did not contend that the Next Generation Delivery Vehicle acquisition falls outside of the

22  category of a "complex" decision. In fact, USPS described the complexity of this effort:

23      Electrifying a fleet the size and age of [USPS's], while maintaining high performance
        standards and managing a host of **complex**, interconnected changes as we implement key
24      tenets of our Delivering for America plan and modernize our network, will be an
        unprecedented, monumental effort across hundreds of facilities for multiple years,
25      particularly given the ongoing universal service mission of [USPS] to continue to deliver
        mail and packages to 165 million delivery addresses at least six, and in many instances
26

27      ⎯⎯⎯⎯⎯⎯⎯⎯
        [10] The USPS defines "Total Cost of Ownership" as "the total cost incurred over the useful
28  life of an item, encompassing development, purchase, use, maintenance, support, and disposal."
    Plaintiffs RJN at Exh. H-4.

34

seven, days per week.

AR 8973 (emphasis added). Given that the *USPS Supplying Principles and Practices* encourages a total cost of ownership analysis for "complex" decisions and the record demonstrates that this is a "complex" decision, USPS could not reasonably rely on that document to justify its use of an upfront cost approach. The agency thus failed "to 'articulate a rational connection between the facts found and the conclusions made.'" *Akiak*, 213 F.3d at 1146 (citation omitted).

### B. The SEIS Underestimates Emissions

USPS underestimated emissions from two categories of internal combustion vehicles by labeling them "light commercial trucks" rather than giving them the more accurate "light-heavy duty" vehicle classification, as defined by EPA, when conducting its analysis. Plaintiffs and EPA had alerted USPS of these flaws in its analysis through their comments on the EIS and SEIS. AR 321, 9261, 9597, 9646, 9737. This decision to undercount emissions is particularly important for an agency like USPS because "it own[s] 44.2% of all federal light trucks." AR 7558.

USPS classifies gas-powered Next Generation Delivery Vehicles and commercial off-the-shelf vehicles as the Motor Vehicle Emissions Simulator (MOVES)[11] source type, "light commercial truck." AR 9646. This source type includes trucks weighing less than 10,000 lbs. *Id.* However, source types can be further divided between regulatory classes based on gross vehicle weight rating. *Id.* Light commercial trucks less than 8,500 lbs. gross vehicle weight rating are considered light-duty in regulatory class 30, while those of 8,500-10,000 lbs. are considered light heavy-duty vehicles in regulatory class 41. Two categories of vehicles exceeded the 8,500 gross vehicle weight rating, the Next Generation Delivery Vehicles and left-hand-drive commercial off-the-shelf vehicles. Here, for these two categories of trucks, EPA used the class 30 classification, which understated impacts from the vehicles. By not designating a regulatory class, this SEIS analysis includes lower weight vehicles in the emissions modeling of gas-powered vehicles. Lighter vehicles have lower emission factors.

---

[11] MOVES is EPA's recommended "emission modeling system that estimates mobile source emissions for criteria pollutants and GHGs." AR 9020.

35

1     Because USPS should have classified these trucks as "light-heavy duty" which would

2  have more appropriately estimated emissions, the EIS is arbitrary and capricious.

3       **C.**    **The SEIS Contains an Inadequate Environmental Justice Analysis**

4     USPS's cursory analysis of the environmental justice impacts of the Program violates

5  NEPA. Multiple courts have held that an agency's discretionary environmental justice analysis in

6  an EIS is subject to arbitrary and capricious review. *See* Exec. Order No. 12898: *Federal Actions*

7  *to Address Environmental Justice in Minority Populations and Low-Income Populations*, 59 Fed.

8  Reg. 7629 (Feb. 11, 1994); *Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678,

9  680 (D.C. Cir. 2004) (reviewing environmental justice analysis under arbitrary and capricious

10  standard); *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017); *Latin Americans for Soc. &*

11  *Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 465 (6th Cir. 2014); *Coliseum*

12  *Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006); *Mid States Coal. for Progress v.*

13  *Surface Transp. Bd.*, 345 F.3d 520 (8th Cir. 2003). To determine whether an EIS's environmental

14  justice analysis is arbitrary and capricious, courts consider whether the analysis is "reasonable

15  and adequately explained," and whether the agency took a sufficiently "hard look" at those

16  impacts. *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330

17  (D.C. Cir. 2021). Relevant to that inquiry is whether the agency has articulated a reasonable

18  methodology for reaching its environmental justice conclusions. *See Communities Against*

19  *Runway Expansion*, 355 F.3d at 689 (finding the FAA's methodology reasonable and adequately

20  explained); *Latin Americans for Soc. & Econ. Dev.*, 756 F.3d at 476-77 (record shows that the

21  Federal Highway Administration scored alternatives on their community impact, and conducted a

22  study and community inventory report to understand and minimize impacts in a specific

23  community).

24     USPS's conclusion that the environmental justice impacts are negligible is based on a

25  cursory analysis that fails to satisfy the "hard look" standard. Plaintiffs and federal expert

26  agencies, including EPA, commented that the EIS oversimplifies its conclusion that nationwide

27  delivery would result in an equal impact on communities regardless of income and geography.

28  AR 9228, 9234-35, 9312-14. USPS did not address these comments and instead responded that

36

1   deployment of the new, cleaner vehicles will "benefit any locality" over the existing fleet. AR

2   288; *see also* AR 8970 (Preferred Alternative would "have a beneficial effect on the air quality of

3   the 84% of communities around likely major deployment sites that have Environmental Justice

4   concerns."). But an EIS must contain more than a bare-bones analysis of a project's nationwide

5   impacts. *California v. Bernhardt*, 472 F. Supp. 3d 573, 619-21 (N.D. Cal. 2020) (while NEPA

6   does not require agencies to include analyses "'for every particular area affected by the proposed

7   action,' especially for broad nationwide rules;" this does not enable agencies to "abdicat[e]" their

8   duty to analyze the heightened risks in certain communities, especially when "the potential for

9   alternative approaches exist."); *see also Hausrath v. U.S. Dep't of the Air Force*, 491 F. Supp. 3d

10  770, 795 (D. Idaho 2020) (Air Force's "reason[ing] that, since no one will be affected by noise

11  impacts, disadvantaged populations will not be affected" lacked support in the record).

12        USPS also failed to acknowledge any of the negative emissions impacts that the gas-

13  powered vehicle purchases will have on environmental justice communities. Instead, the SEIS

14  focuses solely on the beneficial effects of the Program. AR 8980, 9042-43, 9709-30. The SEIS

15  was required to include a rigorous analysis of the air quality impacts and health risks that

16  environmental justice communities will face, given that USPS's preferred alternative includes a

17  significant component of gas-powered vehicles that will likely operate in these communities for

18  decades to come. Moreover, the analysis fails to examine impacts from the continued operation of

19  vehicles that will not be replaced due to the narrowed number of vehicles covered under the

20  revised Program. The record shows that the EIS fails to "'articulate a rational connection between

21  the facts found and the conclusions made'" about negligible environmental justice impacts. *Akiak*,

22  213 F.3d at 1146 (citation omitted), and thus it is arbitrary and capricious.

23  **V.    USPS Failed to Consider the Inconsistencies of Its Preferred Alternative with**

24  **        State and Local Laws and Plans**

25        Under NEPA, federal agencies are required to "discuss any inconsistency of a proposed

26  action with any approved State, Tribal, or local plan or law (whether or not federally sanctioned).

27  Where an inconsistency exists, the statement should describe the extent to which the agency

28  would reconcile its proposed action with the plan or law." 40 C.F.R. § 1506.2(d). Moreover,

1   under USPS's own regulations, an "environmental impact statement must contain a discussion of

2   any inconsistency between the proposed action and any State or local law, ordinance, or approved

3   plan; and must contain a description of the manner and extent to which the proposed action will

4   be reconciled with the law, ordinance, or approved plan." 39 C.F.R. § 775.11(b)(10). Failure to

5   comply with these regulations is arbitrary, capricious, and not in accordance with the law. *See*

6   *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (agency failed to consider

7   impact of logging on California's water quality standards); *Conservation Cong. v. U.S. Forest*

8   *Serv.*, No. CIV. S-13-0832 LKK/DAD, 2013 WL 4829320, at *16 (E.D. Cal. Sept. 6, 2013) (EIS

9   required because Forest Service did not consider impacts of the project on federal law).

10          USPS entirely failed to meet this mandate. It did not address the Program's impacts on the

11   numerous Plaintiff state and local agency laws and policies to reduce GHG emissions, even

12   though Government Plaintiffs raised the need to consider these plans and policies in timely

13   comments on the Draft SEIS. AR 9903-05; *see also* AR 11607 (EPA advising USPS to "consider

14   the federal and state regulatory environment that its new vehicles will face"); AR 11613 (EPA

15   advising USPS to consider impacts of Program on state and local climate goals). For example,

16   recognizing the "serious threat" posed by GHG to "the economic well-being, public health,

17   natural resources, and the environment of California," California enacted various laws setting

18   mandatory GHG standards. *See* Cal. Health & Safety Code § 38501. These standards require the

19   California Air Resources Board to "ensure that statewide greenhouse gas emissions are reduced to

20   at least 40% below the statewide greenhouse gas emissions limit" by the end of 2030, among

21   other things. The States of Colorado, Connecticut, Delaware, Maryland, New Jersey, New York,

22   Pennsylvania, Rhode Island, Vermont, Washington, and the City of New York, have set similar

23   policies and plans, requiring double-digit decreases in GHG emissions at certain benchmarks

24   between the present and 2050. *See supra* at pp. 6-7. However, nowhere in the EIS or SEIS does

25   USPS consider its Program's impacts on the attainment of these state and local GHG targets. And

26   in fact, ███████████████████████████████████████████████████████

27   ████████████████████████████████████████████████

28          USPS also failed to consider how its vehicle acquisition policies would conflict with state

                                              38

and local policies and plans to promote the development of zero-emission vehicles. *See supra* at pp. 6-7. USPS has not provided any explanation why it failed to address these plans, and did not respond to Government Plaintiffs' comments urging USPS to consider conflicts with these plans as required under NEPA. AR 11626-28.

USPS's failure to evaluate the Program's conformity with state and local GHG and zero-emission vehicle standards violates its obligation under NEPA to describe inconsistencies of its project with state and local plans or laws. 40 C.F.R. § 1506.2(d). Omitting such an evaluation renders the revised ROD arbitrary and capricious, because USPS has "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfr. Ass'n*, 463 U.S. at 42.

## VI. This Court Should Vacate USPS's Decision and Grant Injunctive Relief

In addition to granting declaratory relief, this Court should vacate the ROD and revised ROD[12] and enjoin USPS's unlawful acquisition of gas-powered vehicles until USPS completes a valid NEPA review. Indeed, the default remedy for an unlawful agency action under both NEPA and the APA is to set aside, or vacate, the agency action. *Se. Alaska Conserv. Council v. U.S. Army Corps. of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007), *rev'd on other grounds*, *Coeur Alaska, Inc. v. Se. Alaska Conserv. Council*, 557 U.S. 261 (2009); *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1020 (9th Cir. 2009) (upholding vacatur on the basis of NEPA violation).

Likewise, the Court's authority to enforce NEPA extends to actions carried out on the basis of an unlawful NEPA review, like USPS's Program. To obtain permanent injunctive relief, a plaintiff must show that: (1) it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate; (3) a remedy in equity is warranted considering the balance of hardships between the plaintiff and defendant; and (4) the public interest would not be disserved by a permanent injunction. *California ex rel. Lockyer*, 575 F.3d at 1019 (citation omitted). The injury imposed by USPS's unlawful acquisition of gas-powered vehicles, which would result in excess GHG emissions and reduced air quality compared to zero-emission

---

[12] Although the revised ROD, and not the original ROD, represents USPS's final decision on the Program, the original ROD relies on the invalid EIS. Therefore, USPS also should be prohibited from proceeding with the project using the original ROD, which selected a 90% gas-powered and 10% electric vehicle alternative based on the invalid EIS.

39

1   alternatives, is irreparable and cannot be remedied by monetary damages. *See id.* ("Environmental

2   injury, by its nature, can seldom be adequately remedied by money damages and is

3   often . . . irreparable") (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987));

4   *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006) (enjoining a

5   completed and in-progress timber sale after concluding the sale did not satisfy NEPA); *N. Alaska*

6   *Env't Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986) (affirming decision to void mining

7   approvals and ordering shutdown of existing mining operations where National Park Service

8   failed to comply with NEPA).

9        The balance of hardships and public interest also favor an injunction. Plaintiffs are not

10   seeking the removal of vehicles that have already been delivered and/or deployed under the

11   Program.[13] Moreover, "the public interest favors applying federal law correctly." *Small v. Avanti*

12   *Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011). USPS's significant violations of NEPA—

13   by committing millions of dollars to contracts for gas-powered vehicles before completing NEPA

14   review, refusing to consider reasonable alternatives, failing to adequately consider environmental

15   impacts, and failing entirely to consider inconsistencies with state and local plans and policies—

16   warrant an injunction.

17                                    **CONCLUSION**

18        For the foregoing reasons, the Court should declare the Next Generation Delivery Vehicle

19   Acquisition Program, ROD, Revised ROD, EIS, and SEIS unlawful, arbitrary, capricious, an

20   abuse of discretion, and otherwise contrary to NEPA. The Court should vacate the ROD and

21   revised ROD, and enjoin the Program until USPS prepares a new and legally compliant EIS.

22

23

24

25

26

27        [13] Because of the lack of information regarding USPS's current vehicle replacement and
     deployment schedule, Plaintiffs request further briefing, supported by evidence from the parties,
28   regarding the appropriate remedy should the Court find Defendants did not comply with NEPA.

                                    40

1    Dated:  May 24, 2024                          Respectfully submitted,

2                                                  LETITIA JAMES

3    ROB BONTA
     Attorney General of California
     ABIGAIL BLODGETT
4    Supervising Deputy Attorney General           Attorney General of New York

5    /s/ *Stacy J. Lau*                            /s/ *Claiborne E. Walthall*
     STACY J. LAU                                  CLAIBORNE E. WALTHALL (*pro hac vice*)
6    Deputy Attorneys General                      Assistant Attorney General
     1515 Clay Street, 20th Floor                  New York State Office of the Attorney
7    P.O. Box 70550                                General
     Oakland, CA 94612-0550                        Environmental Protection Bureau
8    Telephone: (510) 879-1973                     State Capitol
     E-mail:  Stacy.Lau@doj.ca.gov                 Albany, NY 12224
9                                                  (518) 776-2380
                                                   claiborne.walthall@ag.ny.gov
10   *Attorneys for Plaintiff State of California*

11                                                 *Attorneys for Plaintiff State of New York*

12

13   FOR THE COMMONWEALTH OF                       WILLIAM TONG
     PENNSYLVANIA                                  Attorney General of Connecticut
14   MICHELLE A. HENRY
     Attorney General                              /s/ *Daniel Salton*
15                                                 DANIEL SALTON
16   /s/ *Ann R. Johnston*                         Assistant Attorney General
     ANN R. JOHNSTON                               Office of the Attorney General of
17   Assistant Chief Deputy Attorney General       Connecticut
     Civil Environmental Enforcement Unit          165 Capitol Avenue
18   Office of Attorney General                    Hartford, CT 06106
     Strawberry Square                             Telephone: (860) 808-5250
19   14th Floor                                    Email: Daniel.Salton@ct.gov
     Harrisburg, PA 17120
20   Email: ajohnston@attorneygeneral.gov          *Attorneys for Plaintiff State of Connecticut*
     717-497-3678
21

22   *Attorneys for Plaintiff*
     *Commonwealth of Pennsylvania*
23

24

25

26

27

28

Plaintiffs' Consolidated Motion for Summary Judgment (3:22-cv-02576-RFL; 3:22-cv-02583-RFL)

1
KATHLEEN JENNINGS
Attorney General of Delaware

2

3    /s/ Christian Douglas Wright
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation

4    VANESSA L. KASSAB (pro hac vice)

5    JAMESON A. L. TWEEDIE
RALPH K. DURSTEIN, III

6    Deputy Attorneys General
Delaware Department of Justice

7    820 N. French Street
Wilmington, DE 19801

8    (302) 683-8899

9
Attorneys for Plaintiff State of Delaware

10

11   KWAME RAOUL
Attorney General of Illinois

12

13   /s/ Jason E. James
JASON E. JAMES (pro hac vice)

14   Assistant Attorney General
MATTHEW J. DUNN

15   Chief, Environmental Enforcement/Asbestos
Litigation Division

16   Office of the Attorney General
201 West Pointe Drive, Suite 7

17   Belleville, IL 62226
Tel: (872) 276-3583

18   Email: Jason.james@ilag.gov

19   Attorneys for Plaintiff State of Illinois

20

21   MATTHEW J. PLATKIN
Acting Attorney General of New Jersey

22   /s/ Lisa Morelli
LISA MORELLI, State Bar No. 137092

23   Deputy Attorney General
Division of Law

24   25 Market Street
P.O. Box 093

25   Trenton, NJ 08625-093
Telephone: 609-376-2745

26   Email: lisa.morelli@law.njoag.gov

27

28   Attorneys for Plaintiff State of New Jersey

AARON M. FREY
Attorney General of Maine

/s/ Jillian R. O'Brien
JILLIAN R. O'BRIEN, State Bar No. 251311
JASON ANTON
PAUL SUITTER
Assistant Attorneys General
Six State House Station
Augusta, Maine 04333-0006
Telephone: (207) 626-8800
Fax: (207) 287-3145
Email: Jason.Anton@maine.gov
Email: Paul.Suitter@maine.gov
Email: Jill.Obrien@maine.gov

Attorneys for Plaintiff State of Maine

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Steven J. Goldstein
STEVEN J. GOLDSTEIN (pro hac vice)
Special Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Telephone: (410) 576-6414
Email: sgoldstein@oag.state.md.us

Attorneys for Plaintiff State of Maryland

RAÚL TORRES
Attorney General of New Mexico

/s/ William Grantham
WILLIAM GRANTHAM (pro hac vice)
Assistant Attorney General
201 Third St. NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 717-3520
E-Mail: wgrantham@nmag.gov

Attorneys for Plaintiff State of New Mexico

1   FOR THE STATE OF OREGON

2   ELLEN F. ROSENBLUM
    ATTORNEY GENERAL
3
    /s/ Paul Garrahan_____
4   PAUL GARRAHAN (*pro hac vice*)
5   Attorney-in-Charge
    STEVE NOVICK (*pro hac vice*)
6   Special Assistant Attorney General
    Natural Resources Section
7   Oregon Department of Justice
    1162 Court Street NE
8   Salem, Oregon 97301-4096
    (503) 947-4540
9   Paul.Garrahan@doj.oregon.gov
    Steve.Novick@doj.oregon.gov
10

11  *Attorneys for Plaintiff State of Oregon*

12

13  FOR THE PEOPLE OF THE
    STATE OF MICHIGAN
14
    /s/ Elizabeth Morrisseau_____
15  ELIZABETH MORRISSEAU (*pro hac vice*)
    Assistant Attorney General
16  Environment, Natural Resources,
    and Agriculture Division
17  Michigan Attorney General's Office
    6th Floor, G. Mennen Williams Building
18  525 West Ottawa Street
    PO Box 30755
19  Lansing, MI 48933
    Telephone: (517) 335-7664
20  Email: MorrisseauE@michigan.gov

21  *Attorneys for Plaintiff the People of the*
    *State of Michigan*
22

23

24

25

26

27

28

JOSHUA H. STEIN
Attorney General of North Carolina

/s/ Francisco Benzoni
ASHER SPILLER
Assistant Attorney General
FRANCISCO BENZONI
Special Deputy Attorney General
114. W. Edenton Street
Raleigh, NC 27063
Telephone: (919)716-7600
Email: fbenzoni@ncdoj.gov
aspiller@ncdoj.gov

*Attorneys for Plaintiff State of North*
*Carolina*

ROBERT W. FERGUSON
Attorney General of Washington

/s/ Megan Sallomi_____
MEGAN SALLOMI, State Bar. No. 300580
Assistant Attorney General
Environmental Protection Division
Washington State Attorney General's Office
800 5th Ave Suite 2000,
Seattle, WA 98104-3188
Telephone: (206) 389-2437
Email: Megan.Sallomi@atg.ca.gov

*Attorney for Plaintiff State of Washington*

PETER F. NERONHA
Attorney General of Rhode Island

/s/ Nicholas M. Vaz_____
NICHOLAS M. VAZ (*pro hac vice*)
Special Assistant Attorney General
Office of the Attorney General
Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
Telephone: (401) 274-4400 ext. 2297
nvaz@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

43

1

CHARITY R. CLARK
Attorney General of Vermont

2

3

/s/ Ryan Kane
RYAN KANE (pro hac vice)
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

4

5

6

7

8

Attorneys for Plaintiff State of Vermont

9

10

KARL A. RACINE
Attorney General for the District of Columbia

11

12

/s/ Adam Teitelbaum
ADAM TEITELBAUM, State Bar. No. 310565
Deputy Director
Office of the Attorney General
District of Columbia
400 6th St. NW
Washington, DC 20001
Telephone: 202-256-3713
Email: Adam.Teitelbaum@dc.gov

13

14

15

16

17

Attorneys for Plaintiff District of Columbia

18

19

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel
of the City of New York

20

21

22

/s/ Alice R. Baker
ALICE R. BAKER (pro hac vice)
Senior Counsel
New York City Law Department
100 Church Street
New York, NY 10007
Telephone: (212) 356-2314
E-mail: albaker@law.nyc.gov

23

24

25

26

Attorneys for Plaintiff City of New York

27

28

ALEXANDER G. CROCKETT
District Counsel

/s/ Marcia L. Raymond
MARCIA L. RAYMOND, State Bar No. 215655
Assistant Counsel
Bay Area Air Quality Management District
350 Beale Street, Suite 600
San Francisco, CA 94105
(415) 749-5158
mraymond@baaqmd.gov

Attorneys for Plaintiff
Bay Area Air Quality Management District


PHIL WEISER
Attorney General of Colorado

/s/ Shannon Stevenson
SHANNON STEVENSON
Solicitor General
Office of the Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508 6548
shannon.stevenson@coag.gov

Attorneys for Plaintiff State of Colorado


/s/ Adriano L. Martinez
ADRIANO L. MARTINEZ (SBN 237152)
YASMINE L. AGELIDIS (SBN 321967)
CANDICE  L.  YOUNGBLOOD  (SBN 328843)
amartinez@earthjustice.org
yagelidis@earthjustice.org
cyoungblood@earthjustice.org
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
T: (415) 217-2000 / F: (415) 217-2040

Attorneys for Plaintiffs CleanAirNow
and Sierra Club

44

1

2      _/s/ Scott B. Hochberg_____
       MAYA D. GOLDEN-KRASNER (SBN
3      217557)
       SCOTT B. HOCHBERG (SBN 305567)
4      mgoldenkrasner@biologicaldiversity.org
       shochberg@biologicaldiversity.org
5      Climate Law Institute
       Center for Biological Diversity
6      1212 Broadway, Suite 800
       Oakland, CA 94612
7      T: (510) 844-7119 / F: (510) 844-7150

8

9      *Attorneys for Plaintiff Center for*
       *Biological Diversity*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Consolidated Motion for Summary Judgment (3:22-cv-02576-RFL; 3:22-cv-02583-RFL)

1

2
## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1

3
I hereby certify that the above counsel in Case Nos. 3:22-cv-02583 and 3:22-cv-02576

4
have concurred in the filing of this document.

5

6
                                    */s/ Stacy J. Lau*
                                    Stacy J. Lau

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

761004667.1

1

2

<u>**CERTIFICATE OF SERVICE**</u>

3

         I hereby certify that, on May 24, 2024, I electronically filed the foregoing document with

4

the Clerk of the Court using the ECF System, which will send notification of such filing to all

5

counsel of record by operation of the Court's ECF System.

6

7

                                              */s/ Adriano L. Martinez*
                                              Adriano L. Martinez

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

761004667.1